IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.    20-mj-00033-STV

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SHAWN MICHAEL VENCEL

      Defendant.

---

## GOVERNMENT'S MOTION FOR ORDER OF DETENTION PURSUANT TO 18 U.S.C. §3142(f)

---

The defendant, Shawn Michael Vencel, is a serial criminal whose drug-fueled long crime spree inflicted serious harms to victims in multiple states despite multiple intervening arrests and the supervision of a state court.   For the reasons set forth below, he is both a danger to the community and a flight risk who should be detained pending trial in this matter pursuant to 18 U.S.C. § 3142(f).

1.     **Factual Background:   The Defendant's Frauds, Identity Thefts, Drug Distribution and Gun Possession Show his Facility with Means of Eluding Law Enforcement and his Danger to the Community**

The complaint charges an anecdotal execution of a fraud scheme that was itself one manifestation of a broader paroxysm of criminality that featured identity theft, controlled substance distribution, illegal possession of firearms and ammunition, and at least a dozen victims.   All of these crimes were committed while the defendant was under one form of supervision or another.   Many times, the defendant would be arrested by one jurisdiction,

1

released, and arrested for subsequent crimes in another jurisdiction as part of an iterative cycle of undeterred and unrepentant fraud.

### A.   The Government May Proceed by Proffer

The rules of evidence do not apply at a detention hearing and the Court has the discretion to proceed by way of proffer.    18 U.S.C. § 3142(f) (noting that proceedings may be by proffer); *See United States v. LaFontaine*, 210 F.3d 125, 130-131 (2d Cir. 2000) (PARENTHENTICAL); *United States v. Delker*, 757 F.2d 1390, 1395-96 (exploring legislative history of Bail Reform Act and concluding that district courts have discretion to conduct detention hearing by proffer); *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) ("We hold that the government as well as the defense may proceed by proffering evidence subject to the discretion of the judicial officer presiding at the detention hearing.").

The government proffers the relevant facts below, incorporating by reference the attached exhibits, the facts set forth in the affidavit supporting the complaint docketed at ECF No.1, and the facts set forth in the unrestricted portions of the search warrant affidavits docketed at 19-sw-6027 and 20-sw-252, which are respectively attached as exhibits 5 and 6.

### B.   The Defendant's Fraud Scheme

The complaint describes one execution of a much larger scheme in which the defendant used false and fraudulent pretenses, representations and promises to obtain, and attempt to obtain, trucks, boats, motorcycles, bank accounts, loans, drugs, guns, and other things of value. Between approximately November 2018 and December the defendant intended to gain approximately $746,907.45 from his many victims, ultimately acquiring approximately $431,792.81 in property and currency.

The defendant used email accounts to facilitate and organize his scheme, which involved victims in multiple states.   As part of the scheme he defrauded others through the careful manipulation of documents designed to advance the fraudulent pretense that he was someone (often someone with a completely different identity) deserving of credit.   The defendant obtained property by, among other means and methods, (1) creating false and fraudulent paystubs and other documents to misrepresent his income, (2) creating false and fraudulent identification documents with the personal identifying information ("PII") of others with good credit to either falsely assume those individuals' identities or to claim them as co-signers for loans, (3) creating false and fraudulent prescriptions for oxycodone that he could then distribute or otherwise barter.   The executions of this scheme are described in more detail in Exhibits 1 and 2 and summarized below along with other additional executions:

- The defendant obtained the PII of a doctor, identified in the affidavits and in this submission as Identity Theft Victim 1.   He then used a fake driver's license in Identity Theft Victim 1's name, but with his picture.   **Exhibit 7(c).**   Armed with this fake ID and Identity Theft Victim 1's information he then falsely posed as Identity Theft Victim to (1) open bank accounts in the name of Identity Theft Victim 1, which he then used to write bad checks (2) obtain a loan of approximately $25,000 in Identity Theft Victim's name, (3) finance a Ford F-150 truck worth approximately $70,908.60 from Victim Car Dealership 1 through a loan fraudulently obtained in the name of Identity Theft Victim 1, (4) obtain a boat worth approximately $8,200 from a victim in Florida, (5) attempted to obtain leases from at least three landlords by posing at Identity Theft Victim 1, (6) attempted to obtain firearms from others on the internet by posing as Identity Theft Victim 1, and (7) attempted to obtain a $104,000 student loan by listing Identity Theft Victim 1 as a cosigner.   As a result of these efforts, Identity Theft Victim 1's personal life was thrown into chaos.   Only through great personal effort that took him away from his patients was Identity Theft Victim 1 able to regain control of his identity and repair his credit.

- The defendant obtained the PII and a fake driver's license in the name of Identity Theft Victim 2. The driver's license was in the name of his Identity Theft Victim 2, but it had his grandmother's picture on it.   **Exhibit 9**.   He then used that fraudulent identity to (1) obtain the financing necessary to purchase a Ducati motorcycle worth approximately

$17,694 (2) finance a new GMC Sierra AT4 worth approximately $93,448.88, (3) attempt to obtain a $145,000 student loan.

- The defendant obtained the PII and a fake driver's license in the name of Identity Theft Victim 3.   The license had Identity Theft Victim 3's name, but the defendant's picture. **Exhibit 8(a)**.   Posing as Identity Theft Victim 2 he then (1) obtained credit cards, (2) obtained a Range Rover for approximately $40,619.50, and (3) attempted to obtain another range rover worth approximately $65,819.64.   Like Identity Theft Victim 1, Identity Theft Victim 3's personal credit was damaged.   He spent hundreds of hours dealing with problems associated with the identity theft.

- The defendant also used his real name, but fake documents, to obtain things of value. Among other things he (1) obtained a 2015 Cadillac Escalade worth approximately $38,805.06 using a fraudulent check as a down payment, (2) created fake checks worth approximately $49,039.96 and (3) obtained a second 2019 GMC Sierra worth approximately 77,989.89, financed using fraudulently inflated income figures and through the use of a fraudulent check drawn on a non-existent bank account.

- The defendant also used false and fraudulent pretenses to obtain prescription drugs from pharmacies, creating fake prescriptions with the forged signature of a doctor and then "paying" for at least one of those prescriptions with a fraudulent check for $999.99.

        C.      <u>The Defendant's Drug Use and Distribution</u>

Evidence also shows that while defendant was committing the fraud scheme he was also engaged in extensive efforts to obtain and distribute thousands of oxycodone pills.   A pharmacy alert from February 2017 identified the defendant as the former employee of a doctor who reported the theft of his prescription pad, which was then used to write prescriptions for approximately 2,000 oxycodone tablets of various strength.

As recounted in Exhibits 5 and 6, the defendant also obtained oxycodone tablets from two separate pharmacies in May and June 2019 by creating fake prescriptions endorsed with the forged signature of another doctor.

      D.      <u>The Defendant's Violation of the Prohibition on Possession of</u>
                 <u>Ammunition by a Felon</u>

The defendant was convicted of Felony Eluding in June 2018.   Despite his status as a felon, and while on supervised release for that offense, the defendant made substantial efforts to acquire firearms, sometimes while posing as Identity Theft Victim 1.   When the defendant was arrested by Broomfield Police in April 2019 while driving the Ford F-150 he fraudulently obtained, his truck was filled with hundreds of rounds of ammunition.

      **2.**      **Legal Standard — the Bail Reform Act**

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, authorizes the defendant's detention pending trial.   The law presumes that some categories of defendants — such as those charged with crimes involving guns, violence, and drugs — should be detained.   18 U.S.C. § 3142(f)(1). There is no such presumption for cases like this one, where the defendant is charged with mail fraud.   18 U.S.C. § 3142(f).   However, contrary to the representation made by defense counsel at the initial appearance on July 14, 2020, the criteria for detention are the same regardless of whether the defendant is covered by 3142(f)(1) or (f)(2).   Before those sub-sections of the statute, 3142(f) clearly states that the judge presiding over a detention hearing is required to determine whether there are no conditions or combinations of conditions that will reasonably (1) assure the appearance of the person *and* (2) the safety of any other person and the community. This conclusion is reinforced in § 3142(e), which repeats that the presiding judge should detain a person who poses either of those risks.   *See United States v. Reynolds*, 956 F.3d 192 (9th Cir. 1992) (holding that "danger may, at least in some circumstances, encompass pecuniary or economic harm"); *United States v. Madoff*, 586 F. Supp. 2d 240, 252-253 (S.D.N.Y. 2009) (extensively discussing the issue and concluding that § 3142 permits detention on basis that

prospect of further economic harm by defendant is a danger that can support pretrial detention).

A finding of risk of flight must be supported by a preponderance of the evidence and a finding of danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).

The Bail Reform directs that four factors be considered in the detention analysis: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including, among other things, the person's family ties, financial resources, length of residence in the community, and whether the defendant was under supervision when he committed the alleged offense; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

**3.     There is a Substantial Risk that the Defendant Will Flee**

For the reasons stated below, the first three factors to be considered by courts in ordering pretrial detention weigh heavily in favor of detention in this case.

A.     <u>This is a Serious Crime Committed Under Circumstances Showing that There are No Conditions Under Which the Defendant Can be Adequately Supervised</u>

If convicted, the defendant faces a maximum sentence of 20 years' imprisonment for the mail fraud scheme. The government estimates that if United States Sentencing Guidelines ("U.S.S.G.") offense level for the defendant is approximately 25.[1] Based on his prior convictions and sentences for improper animal care, trespassing, property damage, assault, child

---

1 The range is based on the following calculations under U.S.S.G. § 2B1.1 of the 2018 Guidelines: a base offense level of 7, plus an increase of 14 levels for intended losses of more than $550,000, an increase of 2 levels because the offense involved substantial financial hardship to one or more victims, an increase of two levels for the use of authentication feature

abuse and vehicular eluding, as well as his commission of this offense while under supervision, he is estimated to be in Criminal History Category IV.   This yields an advisory Guidelines Sentencing Range of 84-105 months.   Such a substantial sentence creates an extraordinary incentive to flee.

The circumstances surrounding this offense create an even greater incentive.   The defendant faces the prospect of serious additional charges, which would be unlikely to "group" under Chapter 3 of the Guidelines and would likely increase the sentencing range even further. Such charges include being a felon in possession of ammunition, a violation of 18 U.S.C. § 922(g), and possession with intent to distribute oxycodone, a violation of 21 U.S.C. § 841(a). In addition, the defendant's appropriation of multiple identities to further his fraud potentially subjects him to liability for aggravated identity theft in violation of 18 U.S.C. § 1028A, which requires a mandatory 24 month sentence *consecutive* to the sentence imposed for the fraud. While these crimes have not been charged at this early stage, the prospect of their filing simply increases the likelihood of flight.

B.   The Weight of the Evidence is Overwhelming, Further Increasing the Incentive to Flee

The charges set forth a pattern of behavior in which the defendant used his financial and technological savvy to almost literally conjure fraudulent money out of thin air.   The defendant's crimes left behind a substantial paper trail and required interaction with witnesses (from law enforcement and elsewhere) who are prepared to testify.   Because the defendant used email accounts to facilitate and track the success of his efforts to obtain money, drugs and guns, those accounts provide an almost day-by-day chronology of his criminal conduct.

*Evidence of Misrepresentations Related to Identity Theft Victim 1*.   The FBI has interviewed

Identity Theft Victim 1, who is prepared to testify that he never provided the defendant with authority to use his identity.   Identity Theft Victim 1 can provide credit reports chronicling each of the instances in which the defendant used his identity to obtain something of value.   As explained in the affidavit supporting the complaint, and in Exhibits 1 and 2, the additional evidence is overwhelming:

- Witnesses at Victim Car Dealership identified the defendant as the man posing as Identity Theft Victim 1.   Those witnesses corresponded with the defendant, who was using an email account identified with substantial portions of Identity Theft Victim 1's name ("Identity Theft Victim 1 Email Account").

- The defendant used the same Identity Theft Victim 1 Email Account to correspond with landlords from whom he sought to obtain leases.   **Exhibit 18 and 18(a)** (email to landlord with fraudulent lease application in name of Identity Theft Victim 1). Those landlords are available to testify about their interactions with the defendant, including interactions in which he posed as Identity Theft Victim 1 while using his girlfriend and child as props to bolster an image of trustworthiness.

- The Identity Theft Victim 1 Email Account used on paperwork to obtain the Ford F-150 that is the basis of the complaint was seized pursuant to a warrant.   Emails responsive to that warrant show the defendant corresponding with others as Identity Theft Victim 1 in an effort to obtain firearms, **Exhibits 10 and 11,** and to receive loans, **Exhibits 7 and 7(a) – (e)** (comprising email from Identity Theft Victim 1 account used to fraudulently obtain line of credit).   It also shows him emailing himself fake documents to bolster his fraud, such as W-2s and fraudulent pay stubs in the name of Identity Theft Victim 1.

- Another email account, this one in the name Shawn.Vencel@outlook.com contains numerous emails corresponding with the email account in the name of Identity Theft Victim 1.   Those emails contain various attachments related to the fraud, including fake financial documents designed to further his scheme to appropriate Identity Theft Victim 1's identity.   ***See, e.g.,* Exhibit 17 and 17(a)** (comprising email from outlook account to Identity Theft Victim 1 account with fake paystub).

- The defendant called a victim bank as part of his successful effort to obtain a $25,000 loan in the name of Identity Theft Victim 1.   The bank recorded telephone calls in which the defendant identified himself as Identity Theft Victim 1.   **Exhibits 1(a) and 1(b)**.   It also retained surveillance camera footage showing the defendant withdrawing the loan proceeds.   **Exhibit 16**.

8

- A search of the defendant's home uncovered devices used to manufacture fake identification materials.   **Exhibit 12**.

- The defendant created a fake Facebook account in the name of Identity Theft Victim 1 to add an additional venire of legitimacy to his fraud, posing as a doctor at a local Colorado hospital and associating his picture with Identity Theft Victim 1's identity. **Exhibit 13**.

*Evidence of Misrepresentations Related to Identity Theft Victims 2 and 3.*   As with Identity Theft Victim 1, Identity Theft Victims 2 and 3 have also been interviewed by the FBI. They are also prepared to testify that they did not authorize the defendant to use their identities and are similarly prepared to describe each of the instances in which the defendant misappropriated their identities to obtain items of value.   The defendant's email account contained samples of the fake driver's license he created in the name of Identity Theft Victim 3 with his picture, **Exhibits 8 and 8(a)**, and a fake driver's license for Identity Theft Victim 2 with a picture of his own grandmother, **Exhibit 9**.

*Evidence of Drug Use and Distribution.*   FBI Special Agent Justin Stern interviewed Drug Associates 1 and 2, whose identities are known to him.   Each of these witnesses is prepared to testify that the defendant distributed oxycodone and heroin to them on multiple occasions.   As set forth above, evidence also shows that the defendant wrote fake prescriptions for oxycodone using the forged signature of a doctor, who reported to pharmacies that the prescriptions were not valid.   The email account of shawn.vencel@outlook.com contains several of these prescriptions, **see, e.g., Exhibits 14 and 14(a)** (comprising email with fraudulent prescription) and **Exhibit 15, 15(a), 15(b)** (comprising email with an attached Microsoft word template for a fraudulent prescription in the defendant's name and a PDF with a fraudulent

9

prescription in the name of his elderly grandmother), as well as conversations with Drug Associate 1 he describes sharing drugs with him.   **Exhibit 16**.   As set forth in Exhibits 5 and 6, items that field-tested positive for controlled substances were found in the fraudulently obtained Ford F-150.   He also had items that field-tested positive for controlled substances in the car he drove to meet with a landlord, along with his girlfriend and minor daughter, while posing as Identity Theft Victim 1.

*Evidence of Unlawful Possession of Ammunition and Attempts to Obtain Firearms.*   As set forth, court records show that the defendant was convicted of felony eluding in 2018. Despite this conviction and his inability to thereafter lawfully possess firearms or ammunition, he showed up at Victim Car Dealership 1 with hundreds of rounds of ammunition in the Ford F-150 he was driving.   Emails from the Identity Theft Victim 1 Email Account show efforts by the defendant to obtain firearms from others using the assumed name of Identity Theft Victim 1. **Exhibits 10 and 11**.

*The Defendant's Statements.*   As set forth in Exhibits 5 and 6, the defendant has been interviewed by law enforcement.   In his first interview in May 2019, with an Arvada Police Detective, the defendant admitted to falsely using Identity Theft Victim 1's identity.   Despite the fact that he had already been arrested in April 2019 and charged with the theft of Identity Theft Victim 1's identity, he claimed he did know that Identity Theft Victim 1 was a real person. He claimed he bought the identity from someone he knew who assured him of this.

FBI Special Agent Justin Stern recorded his interview with the defendant on October 10, 2019.   It has been provided to the Court as **Exhibit 1.**   As set forth in Exhibits 5 and 6 the defendant now claimed in this interview that he bought the identity off of a "dark web" website

called "dream market." **Exhibit 1 at 15:30**   He admitted to using Identity Theft Victim 1's

identity to obtain things of value.   **Exhibit 1 at 18:32 – 21:43.**   During the interview he made

conflicting statements about his ownership of the ammunition found in the F-150.   **Exhibit 1 at**

**29:12**.   However he admitted at one point that he had ammunition for an AR-15 in a black bag,

**Exhibit 1 at 30:14 – 3-:22** and a black bag with AR-15 ammunition was recovered from the

Ford F-150 at the time of the defendant's April 2019 arrest.   Finally, the defendant admitted to

being addicted to opiates and told the agent that he had previously traded an assault rifle for

heroin. **Exhibit 1 at 37:30**.

C.   The Defendant's Character, Family Ties, Employment, Past Financial Conduct, History of Drug Abuse, Criminal History, and Long Record of Failures to Appear for Court Appearances All Weigh in Favor of Detention

The defendant claimed to have a business called Mile High Defenders, but evidence

shows that it generated almost no legitimate income while the defendant was committing his

crimes between 2018 and 2019.   The evidence shows, instead, that the defendant used his

considerable technological savvy and financial knowledge to generate fake checks and identity

documents allowing him to generate fraudulent income almost at will.   Although the

government is not aware of any current financial resources, this history shows that the defendant

would not have great difficulty generating the funds necessary for him to flee.

His character, history, and lack of current family ties in Colorado also support the

conclusion that he would flee.   For over a year the defendant appropriated the identities of other

people.   This conduct shows that he has no hesitation about using deceit to avoid detection or

accountability.

But the Court does not need to make inferences from the defendant's conduct in this case

11

because the defendant has stated his intent to flee.   During a call from a detention facility on

October 18, 2019 with an individual residing outside of Colorado who has not been identified,

the defendant said that he planned to drive outside of Colorado and then travel to Australia,

where he has lived in the past.   **Exhibit 4** (starting at approximately 2:13 the defendant

describes driving a motorcycle to California, leaving the motorcycle, and the taking a boat to

Australia).

     His interactions with law enforcement specifically confirm that this is not a bluff:   he

flees or seeks to avoid accountability when confronted by the police.   When he was arrested in

October 2019 in one of the GMC Sierras he obtained by fraud, which had the fraudulently

obtained Ducati in the back, he falsely assumed the identity of Drug Associate 2 and falsely

claimed that his "roommate," Identity Theft Victim 1 had purchased the truck.   **Exhibit 3**

(starting at approximately 2:12 to 2:31, again from 4:14 – 4:51, again from 9:33 to 10:46)

When he was arrested again in December 2019 he fled from Boulder County Sheriff's Deputies

on foot.

     While the defendant does have ties to Colorado, those ties are more attenuated than they

seem.   In the time since he was arrested, many of his closest family members have left the state.

Others reported to FBI that they are terrified of him.   In September 2019, when the defendant's

criminal problems were mounting, he texted a relative: "if you're trying to lure me there . . . I'll

get you."   The defendant's minor daughter, and the daughter's mother, live in Colorado. But the

defendant fraudulently used the mother's identity as a reference to obtain things of value during

the scheme and the Court should not allow him to reside with a victim.

     The defendant has no known current residence.   One of the defendant's prior residences

is a burnt out ruin.   The warrant executed at that address showed it to be littered with correspondence in the names of the defendant's victims, as well as drug paraphernalia and at least two firearms.   None of this suggests the stability or wherewithal necessary to assure his appearance in court.

Furthermore, the defendant's mental health is also a concern.   Family members noted that the defendant has advised that he will kill himself.   On December 3, 2019 the defendant texted a relative: "I think I'm just going to kill myself tonight.   I have nobody anymore and nowhere to go."   The text was accompanied by photographs of the defendant bleeding.   Upon being informed of the texts, the FBI attempted to contact the defendant with an FBI Negotiator, but was unsuccessful.

Finally, the defendant's history also suggests a risk of flight.   He has a conviction for felony eluding and at least 20 prior failures to appear for state court proceedings.   This is all substantial evidence that he is a flight risk.

D.  Whether the Defendant Was under Supervision at the Time of the Offense

The defendant's experience with state supervision shows that he cannot be adequately monitored.   He committed all of the criminal conduct described above while under supervision for the 2018 felony eluding charge.   A timeline of his various state arrests shows his inability to meet any conditions of a bond:

- The defendant was arrested at the dealership from which he fraudulently obtained the Ford F-150 in April 2019.

- After being released from custody pending trial for the charges related to the April 2019 arrest the defendant continued to use the identities of Identity Theft Victims 1-3.   In fact, his attempt to use Identity Theft Victim 1's identity to obtain leases resulted in yet another arrest on new charges in May 2019.

13

- Despite his arrests in two different jurisdictions in April and May 2019, the defendant was arrested in yet another jurisdiction in October 2019, this time while driving the $77,989.89 2019 GMC Sierra he obtained through fraud (not to be confused with the separate $93,448.88 GMC Sierra he also obtained through fraud).   The Ducati Motorcycle he obtained by using the identity of Identity Theft Victim 2 was in the back of the truck.   While being arrested, he pretended to be Drug Associate 2, gave false identifying information, and claimed the truck he was driving had been purchased by Identity Theft Victim 1. **Exhibit 3** (9:33 to 10:46)   Despite the two prior arrests, the defendant was released.

- Finally, despite *three* prior arrests for *three* subsequent crimes, all of which occurred while he was on supervision in *multiple* jurisdictions, the defendant was arrested again by the Boulder County Sheriff's Office in 2019.   This time he attempted to flee from his arrest on foot.

This history strongly supports the conclusion that the defendant is a flight risk and a danger to the community.   If released, there is a substantial likelihood that he uses his considerable skills and knowledge to steal yet another identity to obtain yet another vehicle or other property; that he can use to flee.   The evidence shows that the defendant is not a law-abiding character with any real ties to the community or place to reside.    He is, instead, a person with a dangerous drug addiction who lies, cheats and steals to assume the lives of other people, enrich himself and avoid any accountability.

     E.     <u>Summary of Defendant's Substantial Risk of Flight</u>

All of the factors the court must consider under § 3142 support detention in this case.

- The defendant has shown, time and time again, that all it takes for him to acquire resources and a new life is an internet connection, a printer and no compunctions about telling the truth.   If released, there is no doubt that he has the skills and savvy to evade authorities.

- The defendant has stated to others that he intends to flee.

- The defendant is facing a variety of criminal charges, each of which is extremely serious.   Just the charged fraud scheme subjects him to a recommended sentence

14

of over 7 years' imprisonment.   This creates enormous incentives to flee.

- The defendant has personal characteristics that increase his unpredictability and susceptibility to non-appearance, including an addiction to deadly drugs and a stated desire to harm himself.

- The defendant has a history of flight, including a conviction for felony eluding and numerous failures to appear.

### 4.    The Defendant is also a Danger to the Community

On numerous occasions in the past year the defendant was arrested for crimes, brought into courts of justice to answer for those crimes, and then released.   Each time he proceeded to find new victims and impose new harms.   For example, after his arrest in April 2019 he attempted to defraud several landlords and continued to open bank accounts.   After his arrest in July 2019 he continued to use false identities to obtain property.   Immediately before his arrest in October 2019, despite already being twice arrested for using Identity Theft Victim 1's identity, he used that identity *again* by falsely telling the police the fraudulently obtained truck he was driving was purchased by Identity Theft Victim 1.   **Exhibit 3** (9:33 to 10:46).   The harms imposed on these victims are long-lasting.   The evidence is clear and convincing that the defendant will not stop.   Releasing him will create more victims.

On top of this, the defendant's *other* crimes also imposed substantial harms.   In the midst of an opiate epidemic that kills 130 people every day, the defendant used his considerable skills to diver powerful opiate painkillers from legitimate channels of distribution.   *See* https://www.hhs.gov/opioids/about-the-epidemic/index.html.   Numerous arrests, including arrests in which he was charged with drug possession, did not deter him or cause him to seek help.   His addiction is powerful and his ability to obtain drugs is amply demonstrated by the

record.   Releasing him imposes a danger to himself and to the rest of the community.

The defendant's threat to a family member and his desire to obtain guns, despite his prohibited status, further buttress the conclusion that he is a danger.   As reflected in the probation report, the defendant has a prior conviction related to the manufacture of an explosive device.   A family member told the FBI that at the time of the Columbine High School shooting the defendant built a bomb out of an Excedrin bottle.   His extreme intelligence, vast knowledge of numerous criminal means and methods, and personal instabilities make him a danger to the community.   He should be detained.

### 5.    The Defendant's Purported Medical Condition Does not Undermine the Conclusion that He is a Flight Risk and a Danger

At the initial appearance the defendant argued that he has a diagnosis of keratoconus, an extremely rare degenerative eye disease.    There are several reasons to discount this argument as a reason for release.

*First*, the government has asked for, but has not been provided, documentation to support the diagnosis.    To the extent the diagnosis is based on subjective information relayed by the defendant it should be discounted.    Relatives told the FBI that the defendant — a gifted con man adept at emotional manipulation — convinced his own father that he had cancer so that the father would refinance his home to pay for treatment.    The defendant did not have cancer and admitted this in his interview, claiming it was a misdiagnosis.   **Exhibit 1 at 14:35**.   A search of this email account showed, however, that the defendant wrote fake prescriptions claiming a cancer diagnosis for another, **Exhibit 14(a)**, and claiming that he himself had cancer, **Exhibit 15(b)**. When he is in trouble or wants something, the evidence suggestions that his first instinct is to craft a false narrative to support his self interest.

16

*Second*, even if the defendant does have the disease it does not lower his flight risk.   At the initial appearance he argued that he has an incentive to stay because if he leaves he will go blind.   This argument has several problems.   Among them: (1) there is no indication as to how the defendant will pay for or receive treatment while released, (2) there is no indication of where he would live while seeking treatment, and (3) to the extent the disease progresses slowly over time, the defendant can use the time to escape, establish a new identity, and great treatment while he is free.

*Third*, the Court should not presume that the defendant will get inadequate care while he is in the custody.   That is, there is no conflict between making sure that the defendant is detained so that his appearance in these proceedings can be assured and so that the public is safe from further crimes *and* obtaining medical treatment.   Even if there is a slight tension, the solution to it is not to release the defendant so that he escapes. hurts himself, or hurts others. It is to resolve these proceedings one way or the other as quickly as possible.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:   s/ *Bryan David Fields*
      Bryan David Fields
      Assistant U.S. Attorney
      United States Attorney's Office
      1801 California St., Suite 1600
      Denver, CO 80202
      (303) 454-0100
      Fax: (303) 454-0409
      Bryan.Fields3@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

*s/ Bryan David Fields*
United States Attorney's Office