1

1           UNITED STATES DISTRICT COURT
                DISTRICT OF COLORADO
2

3   UNITED STATES OF AMERICA    .   Case No. 20-mj-00033-STV-1
                                .
4            Plaintiff,         .
                                .   Alfred A. Arraj Courthouse
5   vs.                         .   901 19th Street
                                .   Denver, CO  80294
6   SHAWN MICHAEL VENCEL,       .
                                .
7            Defendant.         .   July 17, 2020
    . . . . . . . . . . . . . . .   3:51 p.m.
8

9   **TRANSCRIPT OF PROCEEDINGS HELD VIA VIDEOCONFERENCE BEFORE THE
       HONORABLE NINA Y. WANG, UNITED STATES MAGISTRATE JUDGE**
10

11  APPEARANCES:
    For the Plaintiff:          U.S. Attorney's Office-Denver
12                              By:  Bryan Fields
                                1801 California Street
13                              Suite 1600
                                Denver, CO  80202
14                              (303) 454-0100

15  For the Defendant:          Office of the Federal Public
                                Defender-Denver
16                              By:  David Edward Johnson
                                633 Seventeenth Street
17                              Suite 1000
                                Denver, CO  80202
18                              (303) 294-7002

19  Court Recorder:             Clerk's Office
                                U.S. District Court
20                              901 19th Street
                                Denver, CO  80294
21

    Transcription Service:      AB Court Reporting & Video
22                              216 16th Street, Suite 600
                                Denver, CO  80202
23                              (303) 296-0017

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1                 (Time noted 3:51 p.m.)

2            THE COURT:  All right.  Good afternoon.  We're on

3 the record in 20-mj-33-STV, United States of America versus

4 Vencel.

5            Could I have appearances of counsel, please?

6            MR. FIELDS:  Good afternoon, Your Honor.  Bryan

7 Fields for the United States.

8            THE COURT:  Good afternoon, Mr. Fields.

9            MR. JOHNSON:  Good afternoon, Your Honor, David

10 Johnson on behalf of Mr. Vencel.  I am appearing from my

11 home.  Mr. Vencel appears to be present from jail.

12           THE COURT:  All right.  Good afternoon, Mr.

13 Johnson, and good afternoon, Mr. Vencel.

14           I believe we are here for a preliminary hearing

15 and a detention hearing in this matter.  It looks to me like

16 in the file I have a waiver of preliminary hearing.  Is that

17 correct?

18           MR. JOHNSON:  That is correct, Your Honor.

19           THE COURT:  Okay.

20           So, Mr. Vencel, can you hear me?

21           MR. VENCEL:  Yes, ma'am.

22           THE COURT:  The Court is conducting these

23 proceedings by video and teleconference pursuant to the CARES

24 Act and District Court General Orders 2020-10 and 2020-12

25 which order that certain pretrial criminal proceedings take

1    place using remote attendance and other social distancing

2    means to the full extent practicable.  This is based on the

3    Court's response to the spread of COVID-19 and its efforts to

4    assist in preserving public safety and health during the

5    national emergency.

6              Based on District Court General Order 2020-10, all

7    persons participating in and attending these proceedings

8    remotely, by video or teleconference, are prohibited under

9    the penalty of contempt from recording or broadcasting these

10   proceedings in any manner.

11             Mr. Vencel, like the other day, you will have an

12   opportunity to privately consult with your attorney at any

13   time necessary, but you need to let me know so I can make

14   technical arrangements.

15             In addition, these proceedings will proceed in the

16   same manner as they would if we were all in the same

17   courtroom but, instead, are being conducted by a

18   videoconference due to the concerns surrounding COVID-19.

19             Did you have an opportunity to consult with your

20   attorney about appearing by videoconference?

21             MR. VENCEL:  Yes, Ma'am, I sure did.

22             THE COURT:  And do I have your consent to proceed

23   in this manner today?

24             MR. VENCEL:  Yes, Ma'am.

25             THE COURT:  All right.

1        So as we've previously indicated, you have a right

2   to a preliminary hearing in which the government would have

3   to establish probable cause that you have committed -- that a

4   crime has been committed and that you have been -- you have

5   committed the crime for which you have been charged.  By

6   executing a waiver of preliminary hearing you are giving up

7   that right.  Do you understand that?

8        MR. VENCEL:  Yes, ma'am.

9        THE COURT:  And is it your intent to waive the

10  preliminary hearing in this case?

11       MR. VENCEL:  Yes, ma'am.

12       THE COURT:  All right.

13       Then let's proceed to detention, which I

14  understand is contested.  I have had an opportunity to look

15  at the submissions of each of the parties, as well as the

16  conventionally submitted material and the materials submitted

17  on behalf of Mr. Vencel.  So I will take some argument with

18  respect to the issue of detention.

19       I'll begin with Mr. Fields, given the fact that

20  the burden is on the government.

21       MR. FIELDS:  Thank you, Your Honor.

22       And because the burden is on the government, at

23  this time I would just ask for the Court to confirm on the

24  record that I may proceed by proffer rather than putting on

25  the agent who is (unintelligible) by if necessary.

1            THE COURT:  Well, as it's my understanding based

2   on the submission by the defendant, the defendant has no

3   objection to the government proceeding by proffer.  Is that

4   right, Mr. Johnson?

5            MR. JOHNSON:  That is correct, Your Honor.

6            THE COURT:  All right.

7            So, Mr. Fields, you will -- you are permitted to

8   proceed by proffer.

9            MR. FIELDS:  Thank you, Your Honor.

10           I'll first note some corrections to my filing.

11  The first correction is --

12           Is there an echo?  Does anyone else hear an echo?

13           THE COURT:  I hear an echo.  So who -- if anyone

14  is on the line who is not speaking, if you can mute, that

15  will help with the recording.  Okay?  Thank you.

16           MR. FIELDS:  Thank you, Your Honor.

17           So I first note a correction.  In the government's

18  filing on Page 9, Exhibit 12, the filing notes that that --

19  those items were seized from Mr. Vencel's house; they were

20  not.  Instead, they were found inside a 2019 GMC Sierra that

21  was obtained using the identity of identity theft victim

22  three and repossessed by the dealership.

23           Another correction I would note is, on Page 8,

24  there is a reference to and Exhibit 16 and it refers to that

25  exhibit as surveillance fills (phonetic).  Surveillance fills

1   were not filed and, instead, Exhibit 16, docketed at 1421, is

2   an email with drug associate one regarding drugs.  However, I

3   would note the defendant was caught on camera and there are

4   surveillance fills, though just not that exhibit.

5           Now I'll note, I want to go to the pretrial report

6   and note several things that are troubling.

7           Despite the defendant's arrest on numerous

8   occasions, despite the allegations of fraud, and despite his

9   claims now that he has been, you know, law-abiding, otherwise

10  the model prisoner, there are several misstatements that he

11  made to probation.

12          So, for example, he told probation that he has

13  cancer.  He told the agent, actually, that that was a

14  misdiagnosis.  And, in fact, in some of the exhibits that

15  were filed the Court will have noticed that the defendant in

16  the past had claimed to have cancer on fake prescriptions in

17  order to receive oxycodone.  I think that's a strong

18  indication that if released the defendant will continue to

19  have problems with the truth and may continue to use that

20  false cancer diagnosis to obtain oxycodone drugs.

21          It also goes to general misstatements about the

22  defendant's health condition and the current lack of parity

23  over the basis for statements about his health.

24          He also told probation that, in terms of his

25  education, that all he has is some coursework at Northeastern

1  Community College.  Well, that's different than what's

2  represented in the state filing, adopted at 16-1 Page 3,

3  where he told his state attorneys that he had a degree from

4  CU Boulder.

5        This is a defendant who lies about who he is, what

6  he's done depending on the circumstances to get advantage,

7  and his misstatements to pretrial right now I think are an

8  indication that this person cannot be adequately supervised.

9        Moving on now to address the issue raised in the

10  defense filing.

11        So the defense filing notes this diagnosis of

12  Keratoconus.  The government has requested, but has not

13  received, the documents underlying the Boulder County Jail's

14  referral for mental services.

15        At this time, while the Boulder County Jail, the

16  government does not deny that Boulder County Jail recommended

17  that he get that referral, we don't know what it was based

18  on.  And so given the defendant's misstatements about his

19  health conditions in the past, I think there are some real

20  concerns there and, at the very least, more time is needed by

21  federal authorities to look at his health condition and

22  objectively verify it.

23        The next thing I would say is that the defense

24  filing says that the defendant is not going to be able to get

25  treatment at Denver Health and it refers to the filing made

1  in state court.  The filing in state court said that the

2  defendant could not receive treatment at Denver Health

3  because he was outside the jurisdiction, not because he

4  couldn't receive health at all.

5          So there is no reason to believe, as we sit here

6  today, that the defendant will not be able to get treatment.

7          And the government would say that for all of the

8  reasons laid out in its proffer, this defendant is a flight

9  risk and he is a danger to the community, and the Court

10 should not presume that he will get constitutionally

11 inadequate care while he is in custody.  Remanding him to the

12 custody of the marshals would entitled to him to all the

13 services that he's entitled to and prevent him from being a

14 flight risk or a danger to the community.

15         If for some reason in the next couple of days the

16 marshals evaluate this and they are not able to get him care

17 for whatever reason, the Court has the discretion to reopen

18 these detention hearings, defense counsel can move, and we

19 can evaluate it at that time.

20         But the answer here, if the Court is inclined to

21 believe that he is a flight risk, but also that he has a

22 medical condition, isn't to release him.  It is, instead, to

23 detain him and see if the marshals can satisfy both

24 objectives; making sure that is not a danger to the community

25 or a flight risk, and that he gets healthcare.

1          Moving on to the government's proffer.  I'm just

2    going to summarize it here, the Court is aware of it.  But

3    the evidence is overwhelming.  It's well documented by

4    multiple sources.  This is a document intensive case.  The

5    defendant cheated multiple people, all of whom are prepared

6    to testify.  He's facing an extremely high guideline range,

7    and that guideline range is based only on the offense for

8    which he is currently charged.

9          As I note, he's facing the prospect of even more

10   serious charges, which creates an incentive to flee.  And as

11   the Court will know from reviewing the conventionally

12   submitted materials, especially item number four, the

13   defendant has stated in the past his desire to -- to flee.

14   He has the means to do so.  He's a savvy individual used to

15   creating fake identities and assuming those identities to get

16   credit.  And while he said in that statement that he planned

17   to go to Australia, and that might seem a bit far-fetched in

18   the age of COVID, I would say that the United States itself

19   is a very large country and the defendant's ability to leave

20   the jurisdiction, assume another identity, conjure money, and

21   then get treatment wherever he needs is ever present.

22          There is -- there are no conditions that will

23   satisfy that he is not a flight risk and that will prevent

24   him from further -- further wreaking economic havoc on the

25   community.

1          Probation has the same recommendation, and if you

2    go through their report you'll see a litany of crimes.  This

3    defendant is not deterred by supervision, he's not deterred

4    by arrest, and he's demonstrated time and time again that he

5    has no respect for the law, for the courts, or for law

6    enforcement.

7          For all the reasons set forth in the proffer, the

8    Government submits that he's a flight risk and a danger to

9    the community and asks for his detention.

10          THE COURT:  Thank you, Mr. Fields.

11          Mr. Johnson.

12      (Brief pause)

13          THE COURT:  Mr. Johnson, are you on mute?

14      (Brief pause)

15          THE COURT:  Because I can't hear you.

16      (Brief pause)

17          THE COURT:  Mr. Fields, can you hear Mr. Johnson?

18          MR. FIELDS:  I cannot.

19          THE COURT:  All right.

20          MR. JOHNSON:  I'm showing --

21          THE COURT:  Oh, there you are.

22          MR. JOHNSON:  Okay.  I took myself off mute, but -

23    - can you hear me now?

24          THE COURT:  I can.

25          MR. JOHNSON:  All right, great.  Thank you, Your

1  Honor.

2         As I said, and I appreciate Your Honor mentioning

3  that you reviewed these submissions, and as I said in my

4  submission, Your Honor, a number of things that I intend to

5  respond to today that the government had filed tell us

6  (unintelligible).  Let me start, however, by responding to a

7  number of the points that the government has brought up

8  today.

9         First, the supposed misstatements that Mr. Vencel

10 (unintelligible) pretrial services.  In fact, there are no

11 misstatements.  The government points out -- the government

12 says that Mr. Vencel told pretrial services that he had

13 cancer.  The pretrial services report does not show any such

14 thing.  The pretrial services report states that Mr. Vencel's

15 father disclosed that he believed Mr. Vencel had cancer, but

16 it doesn't say anything about Mr. Vencel reporting that he

17 had cancer.  And as it was reported, his -- the cancer

18 concern was a misdiagnosis.

19        Now, there was also a statement about as you

20 (unintelligible), so there is no lack of clarity on -- on

21 that.  There's a lack of clarity about his medical condition,

22 as I'll talk to in a moment.

23        As it relates to his education.  Now, Mr. Vencel

24 did not tell his state attorney that he had a Master's

25 degree.  He had -- it was a -- it was a mistake that his

1    state attorney had put in the bond motion that was filed in

2    the state proceedings.  But Mr. Vencel does -- has attended -

3    - has had some -- completed some college courses, has

4    attended some courses in college, but he does not have a

5    degree, and I clarified that in my motion.  I was very

6    upfront about that, and Mr. Vencel has been upfront readily

7    with me about that, as well.

8              So again, there are no misstatements that Mr.

9    Vencel has supposedly been making.  The government is wrong

10   about that.

11             The second thing the government talks about today

12   is the Boulder County Jail's referral documents and that we

13   don't know what it's based upon.  Again, the government is

14   not correct about that.

15             The -- now, let me -- I have never heard of a

16   county jail writing a letter or a memorandum to a court to

17   recommend that a person get a bond.  That is exactly what we

18   have in this case.  The Boulder County Jail, the Boulder

19   County Sheriff's Office, submitted a memorandum on behalf of

20   the health services office at the Boulder County Sheriff's

21   Office, which I have submitted, and they had -- they made it

22   very clear why they are recommending bond for Mr. Vencel.

23   And ultimately, the state court granted Mr. Bond vencel --

24   I'm sorry, Mr. Vencel bond.  And they made their

25   recommendation, the basis for their recommendation, very

1   clear.

2             Boulder, and I'm reading here and I will quote.

3             "Inmate Shawn Vencel has an eye condition called

4   Keratoconus.  He was seen by Boulder eye surgeons on February

5   20th, 2020 who are recommending a corneal transplant.  A

6   referral was sent to two," now unquote.

7             They, though, go on to talk about how a referral

8   was sent to two different hospitals and both hospitals, both

9   facilities, turned Mr. Vencel down because of his inmate

10  status.

11            The memorandum written by Boulder County Sheriff's

12  Office could not have been more clear.  I don't understand

13  how the government can say we don't know what it was based

14  on.  It was based on Boulder eye surgeons' diagnosis and the

15  confirmation that Boulder County Jail had received that Mr.

16  Vencel is in need of a transplant.

17            Now, doctors don't recommend transplants lightly.

18  Mr. Vencel is at a stage of his -- of this disease where a

19  transplant is his only treatment option.  You know, I --

20  contacts, glasses, are not going to treat Mr. Vencel's

21  condition.  The only thing that doctors have concluded will

22  treat Mr. Vencel's condition to prevent him from going blind

23  is a coronial transplant, and that is why, it is exactly why

24  Boulder County Jail worked to get Mr. Vencel to obtain that

25  transplant, because time was of the essence.

1            The first hospital that they sought reference from

2   -- that they sought a referral from, denied him.  They then,

3   the same day that he was denied from that hospital, they

4   sought a referral to another hospital.  Because, again, they

5   recognized that time was of the essence.  And so that same

6   day that it was denied from the first hospital, they sought

7   referral from the second hospital, and that hospital was, and

8   they're very clear in their memorandum, I don't understand

9   why the government is miss -- does not understand this, was

10  Denver Health Correctional Care Medical Facility, and they

11  denied the referral because they are not accepting patients

12  from other jurisdictions, namely from outside of the Denver

13  County jail system, which is -- which is what the medical

14  facility and the basement (phonetic) of Denver Health

15  services.

16            Mr. Vencel will not -- there is no

17  (unintelligible) -- I'm not asking the Court to presume

18  anything.  I'm asking the Court to recognize what has already

19  been established, which is that Mr. Vencel will not -- he's

20  not able to get the treatment that he needs to prevent him

21  from going blind.

22            The government asks that we -- the government

23  argues that this court shouldn't presume that he doesn't get

24  -- that he's not going to get constitutionally adequate care,

25  but we have -- the court -- Mr. Vencel has already attempted

1   to receive treatment from the exact facility that the

2   marshals receive medical treatment from.  I have been -- I

3   have had clients in the past with medical conditions and the

4   marshals service at times have to refer people to hospitals,

5   and in all of my experiences the provider that they referred

6   them to for these types of things is the exact one listed in

7   the Boulder County memorandum that they've already tried to

8   get a referral to and was denied, the Denver Health

9   Correction Care Medical Facility.

10            So this is -- it is not premature to ask for bond

11   in this case in order to ensure that Mr. Vencel does not go

12   blind.

13            Now, Mr. Vencel at a stage -- now the government

14   argued in their filing that Mr. Vencel will flee and then

15   seek treatment; that's just unrealistic.  Mr. Vencel has

16   every incentive to stay, get his eye treatment that he needs

17   to prevent him from going blind, and address all of his

18   pending state matters, as well as his federal matters.

19            Another -- a few other things I wanted to respond

20   to that the government argued today regarding the guideline

21   range.  Apparently from Tuesday to today, the guide -- the

22   government has come up with increasing the guideline range.

23   The government made a representation on Tuesday as far as

24   what they thought the guideline range was, from -- from

25   Tuesday to their filing last night, the guideline has

1    increased.

2           Also, I'll note that -- so I don't know if it's

3    very reliable, first of all.

4           Second of all, I'll also note the guideline does

5    not -- the calculation that they have been putting forth does

6    not include an acceptance of responsibility reduction which

7    Mr. Vencel -- well, which is important, because that is a way

8    to lower Mr. Vencel's guideline range, should he accept

9    responsibility, which there is reason to believe that if

10   somebody does abscond they shouldn't get the acceptance of

11   responsibility reduction.  So there is another incentive for

12   Mr. Vencel to have to comply with his bond conditions.

13          Now, the government also mentioned his stated

14   desire to flee.  Now, and that was a -- that was an argument

15   the government brought up in their filing.  And so let me

16   address some of the points in the filing that I was -- of the

17   government's points in their filing that I was not able to

18   address in my written filing.  The first one being this

19   assertion that Mr. Vencel has made previous statements about

20   a desire to flee.

21          What the government is referring to -- one moment,

22   please.

23       (Brief pause)

24          MR. JOHNSON:  What the government is referring to

25   is a -- a jail phone call referring to going to Australia.

1          Now, according to the prosecutor, according to the

2     government's filing, that call was made on October 18th,

3     2019, and in that call Mr. Vencel specifically says that he

4     is getting out soon.

5          Now, what's important about that is that Mr.

6     Vencel, in fact, did get out of custody after making that

7     statement.  He was out of custody from early November, all

8     the way until December 7th of 2019.  He had -- if Mr. Vencel

9     was going to -- if that was a serious statement on Mr.

10    Vencel's part about -- and a serious intention to flee, to

11    leave the jurisdiction, he had the opportunity to do so for

12    about a month, a little bit over a month, and he didn't.

13         He was out of custody.  He didn't ride his bike to

14    California and then flee, as the -- as the -- as what is

15    explained in the -- in the jail phone call.  No, he stayed,

16    and he was ultimately arrested, and he has been in continuous

17    custody since December 7th, 2019.  So his behavior

18    demonstrates that this professed desire to flee was not a

19    serious one.

20         In addition to that, he has his 4-year-old

21    daughter, and he is not going to leave his daughter.  In

22    fact, one of Mr. Vencel's main concerns is that he be able to

23    see his daughter, and see is a -- is a -- and I mean

24    literally see his daughter before he has to atone for his

25

1    possible consequences in this case, and that is incentive to

2    abide by bond conditions.

3           The government also stated in their filing that

4    Mr. Vencel has sought to avoid accountability.  I'd point out

5    that Mr. Vencel has, on two occasions, waived his Miranda and

6    interviewed with law enforcement.

7           The government also talked about in their filing

8    how Mr. Vencel is a potential risk for suicide.  I think when

9    you look at it in -- that's -- that's not the case.  First of

10   all, Mr. Vencel -- the government's assertion for that risk

11   is a test from December 3rd.  Now, Mr. Vencel had been hit by

12   a car on that day and he was bleeding and that's what

13   prompted the test to his family member.  So the government

14   doesn't give the entire context about why the text had a

15   photograph of him bleeding.  It was because he had been hit

16   by a car.

17          But more importantly, it was a cry for help.

18   Because Mr. Vencel was at rock bottom.  And Mr. Vencel was

19   out and he didn't attempt suicide; that's the important part.

20   He did not attempt suicide.  He made no effort to do so.  And

21   he was out of custody, again until he was arrested until

22   October -- or, I'm sorry, December 7th, and there were no

23   suicide attempts from that text message when he had just been

24   hit by a car to when he was arrested on December 7th.  So Mr.

25   Vencel is not a suicide risk.

1          More importantly, again relating to his daughter,

2    Mr. Vencel is not going to leave his daughter permanently by

3    committing suicide.  It's just not a -- it's not a theory

4    that is plausible and this court should not rely on it.

5          The government talks about how Mr. Vencel is not

6    deterred by supervision or by arrests.  Well, the government

7    seems to believe that people do not change, that people do

8    not recover from addiction, but that is exactly what has

9    happened with Mr. Vencel over the last several months.

10          As I said, Mr. Vencel has been in custody,

11    continuous custody, since December 7th, 2019, in the Boulder

12    County Jail.  When he was taken to the Boulder County Jail,

13    almost immediately he -- he enrolled himself, he voluntarily

14    participated in their MAT program, medically assisted

15    treatment program.  He completed that.  Once he completed

16    that, that moved him onto their jail behavioral health

17    services treatment program.

18          As the records demonstrate, he worked his way all

19    the way up into phase three.  And the only phase higher than

20    phase three is if the person is out on -- out on the streets,

21    not in a -- not in a confinement setting.  So he couldn't get

22    any higher than phase three while he was in the Boulder

23    County Jail, and Mr. Vencel obtained that.  And that's what

24    Mr. Vencel -- that's what's important to Mr. Vencel right now

25    is getting out to get -- to make sure that he doesn't go

1  blind and also proving that he is worthy of the trust of the

2  Court and can be -- and can demonstrate phase four, because

3  he is ready to.

4          Mr. Vencel has participated in one-on-one

5  treatment sessions while in custody with counselors,

6  undergoing therapy.  He has participated in workbook programs

7  and homework is a part of his treatment.  He has participated

8  in the comprehensive opioid abuse program while he's been in

9  custody.  He's worked, ultimately, very closely with a

10  counselor at the facility who he's -- who he's obtained --

11  who he has a very good working relationship with and has --

12  and as I said in my filing, it has changed his life.

13          Mr. Vencel, it is not an understatement in his

14  mind that the arrest and him being in custody and getting

15  this treatment which he had never had before, changed his

16  life, and that is -- that is the difference.  When the

17  government talks about his unability to be deterred by

18  supervision or arrest, they act as if he's still that same

19  addict who was arrested, when, in fact, he is not.

20          In fact, when Mr. Vencel was arrested recently,

21  taken -- picked up from the Boulder County Jail to be brought

22  to Denver County -- I'm sorry, to be brought to this court,

23  to be brought to federal court, he -- he -- his appearance

24  was remarkably different from the last time that they had

25  seen him, from the December time period.

1          Mr. Vencel now, in talking with his state attorney

2    has -- has -- he has seen the transformation of Mr. Vencel.

3    He has put on weight.  He has -- he the -- the ability for

4    him to discuss and talk about his ways of keeping clean and

5    keeping sober is -- is demonstrative and his pallor when you

6    talk with him, and it appear -- and it, again, is apparent

7    from his physical appearance, as well.

8          So we -- this is not just an appeal for Mr. Vencel

9    to be released as the same person he was when he was

10   arrested, but it was a person who has now been treated and

11   who has been clean for about seven, eight months and wants to

12   demonstrate sobriety not in a controlled, confinement jail

13   setting, because that is what he is ready to do, and that is

14   what he's committed to doing.

15         And ultimately, at the end of the day, a lot of

16   people can make that commitment, but Mr. Vencel, at the end

17   of the day, has to make that commitment because if he doesn't

18   he go -- he risks going blind.  You cannot get more of an

19   incentive to comply with bond conditions in that.

20         And that is exactly why Mr. Vencel is in the

21   court, in front of this federal court today, because that is

22   what the state court recognized in Boulder County.  After he

23   was granted bond as a result of that, he now has to come to

24   this court where he is asking for bond to be granted so he

25   can get the treatment, he can abide by bond conditions, and

1    he can demonstrate that -- the compliance with those bond

2    conditions.

3              Now, I have suggested -- the government has talked

4    about a number of things as far as how he's going to pay for

5    it.  I have talked with Mr. Vencel's father, he will assist

6    him in -- in paying for any type of medical care that he has,

7    number one.  Number two, Mr. Vencel is also eligible for

8    Medicaid.

9              As far as where Mr. Vencel will live.  Mr. Vencel

10   -- I asked him if he would either be placed in a -- in a --

11   well, I -- one of the conditions that I propose is halfway

12   house placement.  And, at least until a time that an

13   alternative, stable residency can be established.

14             Mr. Vencel's father has discussed that he is

15   willing to help Mr. Vencel get an established residence, an

16   apartment, and -- but until that happens, I ask that he be

17   given bond and be in a halfway house.

18             And finally, the government talks about how his

19   condition progresses slowly over time.  And as I have said

20   earlier, that is just not the case.  In fact, from the time

21   that Mr. Vencel was told on February 20th that this was one

22   of the most severe cases of corona -- of Keratoconus that the

23   doctor had seen, until now, his vision has gotten worse and

24   it's deteriorating, and it's scary to Mr. Vencel.

25             It's scary to go blind, and be in the process of

1   going blind, and to be told that you will go blind in a jail

2   setting.  And as I said, that is -- that is the most powerful

3   incentive for Mr. Vencel to maintain -- to comply with bond

4   conditions.

5          This is -- this court's conditions that I'm asking

6   to -- that are -- that be imposed on him, again, I ask that

7   stringent conditions be imposed, I laid them out in my

8   filing, but -- but this court's supervision is not the only

9   supervision that Mr. Vencel would be under.  He has numerous

10  other cases with bond conditions, including already a GPS

11  monitoring condition that has been imposed upon him that he

12  will have to comply with if this court gives him bond in

13  order to comply with the state court's bond condition.

14         He's also posted surety -- sureties in numerous

15  cases, again further incentives for Mr. Vencel to comply and

16  to not flee because those sureties have been posted, large

17  amounts, in those other cases.

18         You put all of that together and you see Mr.

19  Vencel, as multiple levels of supervision of Mr. Vencel,

20  including from this court, including from the state courts,

21  multiple layers of -- of -- of safety assurances, including

22  GPS monitoring that has already been imposed upon him, my

23  request for a halfway house placement or other verified,

24  stable residency.

25         If the Court is consider -- if the Court believes

1    that the government's concern about his access to the

2    internet is a concern, Mr. Vencel will abide by a condition

3    to not access the internet, which we sometimes see in other

4    types of cases, but we can impose it on -- in this case.

5            The bottom line, and I've said "bottom line" a few

6    times, but Mr. Vencel is willing to comply with any condition

7    that this court feels necessary to ensure that he can get the

8    treatment for his advanced Keratoconus that he needs and not

9    go blind, and address all of these cases, address his state

10   case, address his federal case, because he knows if he

11   doesn't it only gets worse for him.

12           And these are realizations that people make when

13   they're clean and sober.  Often times, you're not making

14   those realizations when you're in the state that you are in

15   as -- as an addict in the throes of their addiction.

16           Mr. Vencel does have a number of failures to

17   appear and I want to point out, though, that it's from, by my

18   count, about 18 of them were based upon very minor cases

19   relating to underage consumption, to speeding, to not having

20   a license.  I believe that there were seven failures to

21   appear on a license plate case.  And also a number of the

22   failures to appear, I couldn't figure out all of them, but

23   relating to his pending cases that he was in custody at -- on

24   some of the pending cases when some of those failures to

25   appear were issued.

1          But with the conditions that I propose, including

2    halfway house placement, monitoring, restricting his ability

3    to -- where he can be at certain times, anything else that

4    this court can imagine, quite frankly, that is necessary Mr.

5    Vencel will abide by.

6          If I may have a moment, Your Honor?

7      (Brief pause)

8          MR. JOHNSON:  All right, unless Your Honor has any

9    questions, I have nothing further.

10         THE COURT:  I don't.

11         Mr. Fields.

12         MR. FIELDS:  Your Honor, by way of a response, I

13   just want to note a couple of things.

14         First, with regard to the defendant's father, that

15   was attached to the filing at Exhibit Number 16.  The

16   defendant's father said that he would help pay if the

17   defendant maintains sobriety and generally help, but in jail

18   calls the defendant talked to his father accusing him of

19   being drunk, and his father, himself, has a substance abuse

20   problem.  Numerous family members have referenced that, and

21   the defendant himself referenced that.

22         The government's reference to the comment on Page

23   3 of the pretrial services report about the defendant still

24   having cancer, the defendant continues to represent to his

25   own father that he has cancer, or at least does not change

1    that impression.  That is false and it again shows that this

2    is a defendant who manipulates other people.

3              With regard to the care.  At this stage in time,

4    Your Honor, the defendant has not proven by a preponderance

5    of the evidence that he will not be able to get care in

6    federal custody.  No efforts have been made to see if he can

7    get that care in federal custody.  And if the Court believes

8    that he is a flight risk, the appropriate response is to

9    detain him and then to see what the marshals can do.  The

10   defendant can always reopen proceedings if necessary.

11             With regard to the fact that he's on multiple

12   levels of supervision.  As I've pointed out, he was on

13   multiple levels of supervision throughout this crime spree

14   and it did not stop him.

15             As for how well he's done in prison.  All I would

16   say about that is that it shows that incarceration is the

17   right place for the defendant.  He does very well when he is

18   in a heavily structured, heavily supervised environment,

19   incapable of accessing drugs, other people's identities, or

20   the temptations to create wealth out of thin air using the

21   various means at his disposal.

22             So I don't think any of that mitigates the facts

23   set forth in the government's proffer.

24             Could I have just one moment, Your Honor?

25        (Brief pause)

1          MR. FIELDS:  There's also the -- Your Honor, even

2    if he's denied access to the internet, one, I think that

3    would be easily circumvented, and two, the defendant is still

4    going to have access to their personal identifying

5    information.  So while those victims have done what they can

6    to protect themselves, that wasn't enough.  Throughout this

7    crime spreeing those victims they've ruined their credit,

8    they have taken other protective means, that did not stop the

9    defendant from continuing to harm them and it imposed

10   enormous chaos on their lives.

11         This is a defendant that has demonstrated time and

12   time again that he will not be deterred.  So for all of these

13   reasons he should be detained.

14         THE COURT:  All right.

15         A couple of housekeeping matters.  There is a

16   pending motion for leave to restrict by the United States,

17   that's Docket Entry Number 11.

18         Mr. Johnson, do you have any opposition to the

19   restriction?

20         MR. JOHNSON:  I do not, Your Honor.

21         And, you know, in reviewing my notes there is one

22   other -- there are a few other things I would like to point

23   out.

24         THE COURT:  Okay.  Quickly, Mr. Johnson.

25         MR. JOHNSON:  But as far as your question --

1          THE COURT:  Because you have been on the record

2    for more than half an hour and you've reiterated many of the

3    things that you've put in the written opposition.  So if you

4    could proceed, that would be appreciated.

5          MR. JOHNSON:  What I was going to say is that as

6    it relates to the government's talking about that

7    incarceration does well, well, Mr. Vencel does have access to

8    aftercare -- aftercare treatment at the -- through the jail

9    based treatment program that he was participating in at the

10   Boulder County Jail.  I have confirmed that they -- there are

11   after -- after you get out of jail, you -- they do provide

12   aftercare treatment, so to speak.  That is available to Mr.

13   Vencel and he does plan to take advantage of to continue that

14   -- that positive treatment that he has received while in

15   custody so that he can demonstrate the phase four success.

16         So this argument about how incarceration works,

17   well, you know, incarceration isn't the only option.  In

18   fact, there are resources for Mr. Vencel that are available

19   to him even out of custody that he intends to take advantage

20   of.

21         THE COURT:  All right.  Thank you.

22         Anything further, Mr. Bryan -- or Fields?

23         MR. FIELDS:  No, Your Honor.  Thank you.

24         THE COURT:  Okay.

25         So the Court will grant Docket Entry Number 11,

1  which is the motion to restrict.

2           Pending before the Court is the request for the

3  government and the motion to detain that was filed at Docket

4  Entry Number 14, to detain the defendant, Shawn Vencel,

5  pending trial in this matter.

6           In considering this request I'm guided by several

7  general principles.

8           First, at all times the defendant is entitled to a

9  presumption of innocence.  Nothing that takes place in this

10 hearing or that I set forth in my findings is intended or

11 should be construed to affect that presumption.  Rather, the

12 purpose of this hearing is to determine whether or not

13 withstanding the presumption of innocence the defendant

14 should be tained [sic] pending trial in this matter.

15          Second, under the Bail Reform Act, pretrial

16 detention is an exceptional step.  Under the Act the

17 defendant must be released prior to trial unless a judicial

18 officer finds that no conditions or a combination of

19 conditions exists which will reasonably assure the appearance

20 of the defendant or reasonably assure the safety of any other

21 person or the community.

22          The Act requires that the least restrictive

23 conditions be imposed that are necessary to provide those

24 reasonable assurances.  If I cannot find the conditions that

25 will reasonably assure the appearance of the defendant as

1    required, or the safety of another to the community, then I'm

2    required by the Act to order the defendant be held in

3    custody.

4            In this case the government argues that the

5    defendant should be held based on both a risk of flight and a

6    danger to the community.  When pursuing detention based on a

7    risk of flight the government showed by a preponderance of

8    the evidence that no conditions or combination of conditions

9    will reasonably assure the defendant's presence as required.

10           With respect to danger to another or the community

11   the government has a higher burden.  It must show by clear

12   and convincing evidence that no conditions or a combination

13   of conditions will reasonably assure the safety of another to

14   the community.

15           There is no presumption of detention, so I will

16   turn to four specific factors that the Act requires me to

17   consider under 18 U.S.C 3142(g).

18           First, the nature and circumstances of the alleged

19   offense;

20           Second, the weight of the evidence against the

21   defendant;

22           Third, the history and characteristics of the

23   defendant including physical and mental condition, family

24   ties, employment, length of residence in the community,

25   community ties, past conduct, criminal record, history of

1  drug or alcohol abuse, record of appearance at prior court

2  proceedings, and whether the defendant was on conditional

3  release of some sort at the time of the new alleged offense;

4          Four, the nature and seriousness to danger of

5  others in the community.

6          I've considered all of the factors, including the

7  defendant's and the plaintiff -- or the government's

8  submissions today.  I've also given due consideration to the

9  recommendation of pretrial services, which in this case is to

10  detain the defendant pending trial.  And based on the proffer

11  and the information in the record before this Court, I find

12  that the government has met its burden of showing that

13  detention is required based on a risk of flight, as well as a

14  danger to others in the community.

15          In making this ruling I do not discount the health

16  challenges that this defendant makes, and so I will be making

17  some additional instructions to the parties in this case.

18  But in particular, I find that you cannot look at the

19  pretrial services report and conclude that this defendant in

20  particular does not pose a risk of flight.  In particular,

21  though his felonies might not have started until he was 33,

22  his failures to appear, his revocations of probation, his

23  failures to comply, span well before that.

24          In addition, in reviewing the conventional filings

25  of the government in this matter, the Court is significantly

1  concerned that this defendant is particularly adept at -- at

2  presenting in a manner that is inconsistent with

3  truthfulness.  He's failed to appear on 49 occasions, in each

4  of those incidents a warrant was issued.  He is currently

5  unemployed.  He has been in multiple jurisdictions with

6  multiple types of offenses, not simply just identity fraud.

7  And I simply cannot look at this record and take on faith

8  that there has been a transformation.

9          I hope there has been a transformation, since he

10  has been in custody since December 2019.  But he is -- he

11  has, currently, 13 pending cases, he's been revoked on 18

12  occasions, he's failed to comply on 14 occasions, and he's,

13  again, failed to appear on 49 occasions.

14          Now, that being said, I have no doubt that there

15  may be some extenuating circumstances, given his vision

16  issues, that need to be addressed in short order and/or may

17  or may not be able to be addressed by the Bureau of Prisons.

18          In addition, I have no information in front of me

19  that indicates how long he would be on a transplant list, how

20  common a corneal transplant might be, what recovery might be

21  required by such transplant, and there's just simply no

22  information that suggests to me that I simply should leave

23  him released on bond without any sort of information.

24          He is here on complaint, and so, therefore, the

25  Court will -- the Court will need to set a status conference

 1    in this case if he is not indicted.  I think at that point

 2    the government and defense counsel should be prepared to

 3    address whether or not he can get the treatment that he needs

 4    within Bureau of Prison custody.  I think it might be

 5    slightly different at Denver Health given the contract

 6    between the Bureau of Prisons and Denver Health, but I don't

 7    know that for certain.  And I would be the judicial officer

 8    that would hear any motions to reopen and to reconsider his

 9    release pending trial in this matter.

10           So I invite you all to meet and confer and work

11    diligently on those issues before he appears for that status

12    conference, or if he is indicted, for his arraignment and

13    discovery hearing.

14           So I'm going to order him detained pending trial

15    in this matter.

16           We need to set this for a status conference.

17    Since he's going to be in custody, I believe it's 14 days

18    from when he was taken into custody, which I believe was on

19    the 14th.

20           So, Mr. Fields, will you all be ready to proceed

21    with a status conference, or should I set that for the 28th?

22           MR. FIELDS:  Your Honor, the government can

23    proceed with a status conference that week.  I would just

24    note, as the Court's probably aware, that the next grand jury

25    doesn't meet until the week of August 3rd.  So as a matter of

1  efficiency it might be best to set this matter for August 6th

2  or 7th.

3        THE COURT:  All right.

4        Mr. Johnson, what's your position on that?

5        MR. JOHNSON:  I would be available on August 6th

6  or 7th.

7        I believe that the government has 30 days from his

8  initial appearance in order to return the indictment.  I

9  believe the 14-day period --

10        THE COURT:  Oh, the 14 days is --

11        MR. JOHNSON:  -- that you may have --

12        THE COURT:  -- if he doesn't -- the preliminary

13  hearing.  Okay.

14        All right.  So let's set this for August 6th.

15        Is that Magistrate Judge Neureiter?

16      (No audible response.)

17        THE COURT:  At 2:00 p.m. before Judge Varholak.

18        Again, I am strongly suggesting in that time

19  period both Mr. Johnson and Mr. Fields undertake a good faith

20  analysis as to whether or not Mr. Vencel can get the

21  treatment he needs within custody, as well as giving the

22  Court an opportunity to understand the parameters of what

23  this transplant might entail and how long Mr. Vencel might be

24  on a waiting list for a transplant donor, as well as how the

25  prognosis is with respect to his vision.  Because all I'm

1  right now looking at is attorney argument on both sides and

2  that's not entirely helpful for the Court making these

3  determinations.  Okay?

4         MR. FIELDS:  Thank you, Your Honor.  Understood.

5  I'll work with Mr. Johnson to make sure the order is

6  addressing the situation appropriately.

7         THE COURT:  All right.

8         Anything further on this matter?

9         MR. JOHNSON:  Yes, Your Honor.  Thank you.

10        THE COURT:  All right.

11                (Time noted:  4:40 p.m.)

12                      *  *  *  *  *

13                      CERTIFICATE

14     I, RANDEL RAISON, certify that the foregoing is a

15  correct transcript from the official electronic sound

16  recording of the proceedings in the above-entitled matter, to

17  the best of my ability.

18

19

20  _____          November 18, 2020

21  Randel Raison

22

23

24

25