UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 20-cr-00245-RBJ

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHAWN MICHAEL VENCEL,

Defendant.

_____

**EXHIBIT I TO
MOTION TO REOPEN DETENTION HEARING PURSUANT TO
18 U.S.C. § 3142(f) AND FOR RELEASE FROM CUSTODY ON CONDITIONS
AND REQUEST FOR HEARING**

_____

# CASHING IN ON CRUELTY

Stories of death, abuse and neglect at the GEO immigration detention facility in Aurora





Cover photo: Dave Russell, *Don't Look Away*, 2019. Vigil at GEO Aurora Contract Detention Facility. © Buffalo Heart Images.

ACLU of Colorado

# CASHING IN ON CRUELTY

Stories of death, abuse and neglect at the GEO immigration detention facility in Aurora

ACLU of Colorado

# TABLE OF CONTENTS

**Executive Summary**................................................ 1

**Profit and Unspeakable Loss**........................................ 3

George Zoley

Kamyar Samimi

**Mistreated and Left to Die**.......................................... 12

Evalin-Ali Mandza

Dan Courson

Ronnie Keyes

Mohammed Dirshe

**Nightmares and Neglect**.............................................. 17

John Mathews

Diana Lopez

Jane Smith

**Suffering in Silence**................................................. 20

Fabian Vasquez

Elias Salgado

**How Long Can Hope Last**.............................................. 22

Miguel Angel Avila Arce

**The Final Hours of Kamyar Samimi** ................................ 25

**Policy Recommendations**............................................. 29

**Acknowledgments**.................................................... 34

**Methodology**........................................................ 35

**End Notes**.......................................................... 37

# Executive Summary

On November 17, 2017, federal immigration agents arrested Kamyar Samimi, a Legal Permanent Resident who had lived in the U.S. for over four decades, at his home in Thornton, Colorado. He was taken to the Aurora Contract Detention Facility, operated by the for-profit prison company The GEO Group, Inc. Two weeks later, he died in their custody.

Mr. Samimi's tragic death reflects the atrocious conditions at ACDF, which holds close to 1,500 detainees, most of whom are in civil immigration proceedings. Having come to the U.S. in search of a better life, they are confined without access to sufficient medical care, adequate nutrition, legal resources or in many cases basic human decency. Regardless of these deficiencies, GEO posted a net income of $33.4 million in the fourth quarter of 2018, and is valued at over $2.3 billion today.

To date, 31 immigrants, including at least seven children, have died in immigration custody during the Trump administration. The conditions in U.S. Immigration and Customs Enforcement (ICE) detention, including those at ACDF, have drawn criticism from the Department of Homeland Security's Office of the Inspector General, legislators and advocacy groups. Yet ICE has failed

to hold GEO accountable or otherwise improve the conditions of immigration detention. Following an initial glossing-over by GEO, an ICE internal review of Mr. Samimi's December 2017 death found numerous violations of ICE standards. Nonetheless, in early 2019, ICE reached an agreement with GEO to increase the capacity of ACDF from 1,000 to 1,500, even as detainees sat in quarantines due to outbreaks of mumps and chicken pox. Despite its expanded capacity, the facility still has only one full-time physician.

> "
>
> ## To date, 31 immigrants, including at least seven children, have died in immigration custody during the Trump administration.
>
> "

In Mr. Samimi's case, that doctor made the medically unjustifiable decision to cut him off from his prescribed methadone. ACDF's medical staff was woefully unprepared to deal with Mr. Samimi's condition, wrote him off as a drug-seeker, missed doses of medication



In 1986 ACDF was the first GEO detention center to be awarded a contract with ICE. At that time, ACDF housed 150 detainees. Now, the facility holds 10 times as many people. Photo: ACLU of Colorado.

and failed to respond adequately or humanely as he neared death. Mr. Samimi's three children lost a father whose patriotism and entrepreneurial spirit embodied the American dream. ICE, GEO and the Trump administration's cruel immigration practices crushed that dream and shattered a family.

The ACLU of Colorado is able to shine a light on the atrocities inside ACDF after suing ICE under the Freedom of Information Act for records about Mr. Samimi's death, visiting the facility multiple times, and interviewing numerous individuals victimized by GEO and ICE's mistreatment. The stories told in this report include the following:

- Evalin-Ali Mandza died of a heart attack at ACDF in 2012 after medical staff showed incompetence in connection with EKGs and heart medication.

- Ronnie Keyes had his leg amputated after staff ignored his repeated complaints about bedsores.

- Mohamed Dirshe's head injuries went untreated after he was attacked by other detainees when he was supposed to be in a protective environment.

- A detainee was told by the psychologist treating his depression that no one cared about him and that he should sign voluntary deportation papers.

- Diana Lopez endured excruciating pain during and after a botched tooth extraction.

- Fabian Vasquez lived in confusion and isolation after not receiving the hearing aids he needed.

- Elias Salgado grew more depressed as he continued to suffer from retaliation, arbitrary punishment and neglect at ACDF.

- Miguel Angel Avila Arce suffered broken fingers after his hand was slammed in a cell door by a guard.

This cruelty must end. One tool is improvements to state and local policy, including increased oversight of ACDF, decreased cooperation with ICE and funding for legal counsel and bond money for detainees. We have the power to ensure that the death of Kamyar Samimi, and the suffering by too many others, is not in vain.

# Profit and Unspeakable Loss

Kamyar Samimi arrived at the Aurora Contract Detention Facility (ACDF) in good condition in the fall of 2017.[1] Three days later, he struggled to eat, his stomach ached and he cried out in constant, agonizing pain.[2] Mr. Samimi told the nurses he was experiencing withdrawal after being cut off the methadone he'd been on for more than 20 years.[3] But no one seemed to care. Over the course of his stay at ACDF, Mr. Samimi's circumstances became unbearable.[4] Soon, he was shivering, vomiting and suffering from dehydration, unable to swallow or stand up.[5] On Nov. 19, 2017, Mr. Samimi called a friend and told him he was "sicker than hell."[6] Before hanging up with his friend that day, Mr. Samimi said he was "dying here."[7] Fifteen days after U.S. Immigration and Customs Enforcement (ICE) agents arrested him and brought him to ACDF, a University of Colorado Medical Center physician pronounced him dead.[8]

\*\*\*

At 11 a.m. on a Thursday in February 2019, The GEO Group, Inc.'s executive leadership team held a conference call with the company's shareholders to discuss fourth-quarter earnings and to give participating investors the opportunity to ask questions.[9] After a brief introduction, GEO Group Chairman and Chief Executive Officer George Zoley took over the call and announced, "We are pleased with our overall operational and financial results during the very active fourth quarter of 2018."[10]

Over the years, Mr. Zoley has made millions operating a business that detains immigrants in questionable conditions before all-too-frequently deporting them to the very countries they fled. Born in Florina, Greece, in 1950 — the year after the end of a hard-fought, three-year civil war[11] — Mr. Zoley immigrated to the United States at the age of 3, along with his mother, Anastacia, his grandmother and his older brother, Larry.[12] The Zoley family first set foot on U.S. soil on Ellis Island, in the shadow of the Statue of Liberty.[13] Years later, in 2002, Mr. Zoley received the Ellis Island Medal of Honor, even as he profited off the forced confinement of men,

women and children seeking refuge in the U.S. — just as he and his family once did.[14] Today, Mr. Zoley is worth an estimated \$49.9 million.[15] According to a recent Bloomberg report, GEO paid Mr. Zoley a \$1.1 million salary and an overall compensation package worth nearly \$7 million in 2018.[16] GEO's net worth was valued at more than \$2.3 billion, making it the largest private-prison company in the U.S.[17]

Before Mr. Zoley's tenure, GEO was previously known as Wackenhut, after ex-FBI agent George Wackenhut.[18] With deep connections within law enforcement and the military, Wackenhut's management team and board of directors included former members of the FBI and CIA.[19] In 1984, the company formed a new division, the Wackenhut Corrections Corporation and began regularly securing contracts to house federal and state prisoners as well as immigration detainees.[20] Mr. Zoley, then 34, helped transform Wackenhut into The GEO Group, where he has served as the CEO since the company went public in 1994.[21] Today, GEO has the capacity to hold 96,000 detainees in 135 facilities throughout the world and across the U.S., including the Aurora Contract Detention Facility.[22]



George Zoley  chairman and CEO of The GEO Group, Inc. 2003 Staff photo by Bob Shanley. ©ZUMA Press, Inc. Alamy Stock Photo.

While the shareholders' call continued, Zoley noted two "operational milestones" for the company.[23] Zoley said, "The GEO Corrections and Detention business unit served over 300,000 individuals throughout 2018, while managing an average daily population of over 60,000 in the United States."[24] Zoley continued, "This past

year was also the most active with respect to contract renewals and extensions in our company's history. During 2018, we successfully executed contract renewals or extensions for approximately 22,000 beds in the U.S. and overseas."[25]

For decades, the GEO-run ACDF has been under contract with ICE and the U.S. Department of Homeland Security (DHS) to hold undocumented immigrants and non-citizens.[26] Approximately 85% of those held at ACDF are immigrants waiting for asylum or other legal proceedings.[27] A recent spike in detainees at ACDF, estimated to be approximately a 60% increase, stems from a recent wave of asylum seekers at the U.S.-Mexico border.[28] The facility also houses citizen detainees for the U.S. Marshals Service awaiting criminal trials.[29] In 1986, ACDF was the first GEO detention center to be awarded a contract with ICE. At that time, ACDF housed 150 detainees.[30] Now, the facility holds 10 times as many people.[31] Earlier in 2019, GEO quietly entered into a new contract with ICE for a 432-bed annex located a few steps away from the main Aurora facility.[32] Although the initial deal was meant to last for only three months, GEO and ICE signed a one-year $319 million extension when the contract was set to expire despite numerous health and safety issues at ACDF.[33]

Mr. Zoley wrapped up the investor call by saying, "I would like to thank all our employees worldwide, whose dedication and professionalism has made all the achievements we've discussed today possible."[34] GEO reported fourth quarter 2018 net income of $33.4 million and reported total revenues for the fourth quarter 2018 of $599.4 million up from $569 million for the fourth quarter 2017.[35]

*\*\**

ACLU of Colorado filed a Freedom of Information Act (FOIA) request on Dec. 20, 2017, seeking documents explaining what caused Mr. Samimi's death.[36] In response, ICE produced only five pages, none of which gave an explanation about his death.[37] ACLU of Colorado appealed and ICE responded on July 3, 2018, stating that its investigation of Mr. Samimi's death had been completed and more documents would be forthcoming.[38] Those documents were not produced. On April 9, 2019,

the ACLU of Colorado filed a lawsuit seeking previously requested records related to Mr. Samimi's arrest, detention, and subsequent death.[39] ICE released the detainee death review of Mr. Samimi in May 2019.[40] The summary letter attached to the report is stamped May 22, 2018. The report had been completed and held by ICE for a year, not only from ACLU but most important from his family.[41]

> "
>
> ## Chief Executive Officer George Zoley took over the call and announced, "We are pleased with our overall operational and financial results during the very active fourth quarter of 2018."
>
> "

The last call Neda Samimi-Gomez made to her father was to invite him to Thanksgiving dinner. She left messages but he never answered. A few days later his friend let her and her aunt know he had been picked up by ICE. "The fact that it was Immigration that picked him up was terrifying," Mrs. Samimi-Gomez said. But they stayed updated through her father's friend and were under the impression that everything was fine and that he'd be coming home soon. "We never could have imagined what would happen next," she said.

The second of his three children, Mrs. Samimi-Gomez, 25, was the first to hear that her dad was dead — two days after the fact. An ICE officer came to notify her at her workplace but she wasn't in yet. He left his card with her co-worker who took a picture of it and texted it to her. Instantly, she knew something was wrong. "I got [his] voicemail but I kept calling, four, maybe five times until someone picked up," she said. As she pulled into the parking lot at work, she heard a stranger's voice say I'm sorry to tell you, your dad passed over the weekend. Dazed and numb, she went into the office, shut the door and asked how he died. All she was told was cardiac arrest. She called her mother, brother and husband and then went into shock. Mrs. Samimi-Gomez slept for five

days. Later, she'd talk to the coroner but there was no more communication with ICE — no further explanation about his death or why it took two days to notify the family. The only other thing she would get from ICE were her father's belongings, a few coins and a receipt.

\*\*\*

Like Mr. Zoley, Mr. Samimi was an immigrant. Born in 1953 in Iran, he came to New York in 1976 on a student visa and attended college in Wisconsin and Colorado, studying computer science.[42] Three years later, he married a U.S. citizen, and applied to be a Lawful Permanent Resident (LPR), commonly referred to as a Green Card holder. Mr. Samimi and his wife had a son, Tony, and later divorced. He remarried and had two daughters, Neda and Negeen. Mrs. Samimi-Gomez remembers her dad as a man who loved cars and racing and that he'd often have NASCAR blasting on the television. He channeled his love for cars into his work as a mechanic and prided himself on doing repairs for friends and family. She described her father as a doer and a dreamer, always talking to her about the mechanic shop he was going to open up or his latest "inventions." He once tried to convince her that he'd

invented the bidet after rigging an old toilet seat. Both entrepreneurial and patriotic, Mr. Samimi thoroughly believed in the American dream.

As a father, Mr. Samimi was supportive without being overbearing. He treated her and her sister as equals. He showed his love through simple pleasures and acts of service. Anytime Mrs. Samimi-Gomez moved he'd be the one to strap the mattress to the top of the car. "He was the one who always took me to the movies and then fell asleep and snored." Her mother and father remained good friends even after they divorced when she was 14. When she "ran away" at 16 to stay with him, Mr. Samimi didn't push her to talk about it or rush her to go back, instead he brought her all the cereal she wanted while they watched "Law & Order" side by side. Cereal was his thing, enormous bowls of the sugary kind that he'd add honey to. After four days of loving care from her dad she returned to her mother's house, where Mr. Samimi was always welcome. He loved Persian food and Neda's mother would make his favorite dishes whenever he came over to visit or for Persian New Year. Regardless of any separation they were still very much a family.

"Every time I hung out with my dad — from getting a



Neda Samimi-Gomez. Denver, Colorado, September 5, 2019. Mrs. Samimi-Gomez was married for only a few months when she received news that her father died in ACDF detention. "If I was ever in trouble my dad is the person that I would call." Photo: ACLU of Colorado.

meal to picking out a tire — was an experience," she said. "That's what I'll miss most."

Mrs. Samimi-Gomez remembers her father was always wearing a back brace, having disc issues and chronic pain. But her memories aren't of a man who malingered. For her, Mr. Samimi wasn't difficult, or the "drug-seeking" detainee ACDF medical staff eventually dismissed, he was simply — Dad. A lighthearted man who loved the U.S. and Western culture so much that he tried to do a Texas accent the first time he met Neda's husband. He was easy to please, loved caramels, Pepsi — preferably out of a can — and American fast food. Mr. Samimi once asked his daughters if they ever heard of this chick-a-something restaurant and if they could go. When they took him to Chick-fil-A for lunch he was over the moon and couldn't stop gushing about his sandwich. It was a few months before he would be taken to ACDF. They had no idea it would be the last meal and memory they'd ever share together.

\*\*\*

Mr. Samimi did not have his Green Card with him the day he was picked up by ICE, but he did have a copy of it, which he provided to the agents.[43] The agents told Mr. Samimi that because he'd been convicted for possessing less than one gram of a controlled substance 12 years prior, he had violated his LPR status and was now under arrest.[44]

For the next five hours, Mr. Samimi sat in a holding cell waiting for an officer to complete a standard intake screening.[45] While he waited, a guard in the holding cell noted that Samimi seemed ill. He was taken to see a nurse and informed her of a back injury he had from a car accident.[46] For 20 years, he took between 150mg to 190mg of methadone daily to manage his chronic pain.[47] The first line on the medical section of Mr. Samimi's GEO intake form reads "How do you feel today?"[48] The nurse who filled out the form noted that Mr. Samimi stated, "I have withdrawal symptoms."[49]

In fact, Mr. Samimi disclosed that he was on his way to a methadone clinic when he was brought to ACDF.[50] Section 17 on the same form calls for specifying what symptoms a detainee had previously experienced

related to withdrawal, but the nurse failed to complete that section.[51] By 10:30 p.m. that night, then ACDF medical director — and sole full-time physician — Jeffrey Elam Peterson, M.D.,[52] reviewed Mr. Samimi's intake screening form and recommended that he be held in the medical unit.[53] Dr. Peterson discontinued Mr. Samimi's methadone and instead ordered multiple lab studies, prescribed Ativan, Clonidine, Cyclobenzaprine, ibuprofen and Phenergan, recommended increased fluids, and indicated that Mr. Samimi's vital signs should be taken every eight hours until further notice.[54] But Dr. Peterson did not order monitoring of Mr. Samimi's symptoms using any standardized instruments such as the Clinical Opiate Withdrawal Scale (COWS).[55] After more than 20 years of methadone maintenance, Mr. Samimi was cut off in one day.



Kamyar Samimi loved cars. Here he is posing with a race car during a family vacation. Photo courtesy the Samimi family.

"Opioid withdrawal can be fatal, even for previously healthy individuals," said JK Costello, M.D., senior consultant with The Steadman Group, who reviewed Mr. Samimi's death report. "While exact numbers are unknown, it is clear that many of the deceased were confined in correctional facilities, suffering from untreated or under-treated withdrawal. Opioid withdrawal deaths are not sudden, unforeseeable events. Rather, they involve prolonged, evident symptoms and obvious suffering, usually over the course of several days."

The symptoms and suffering Mr. Samimi endured at ACDF could have been avoided entirely had he never been taken off methadone in the first place. In March 2019 the National Academies of Science, Engineering

and Medicine published a report that medications to treat opioid use disorder (OUD), like methadone, are effective and lifesaving.[56] "Methadone, buprenorphine, and extended-release naltrexone — approved by the FDA to treat OUD — work by alleviating withdrawal symptoms, reducing opioid cravings, or decreasing the

> ## Opioid withdrawal deaths are not sudden, unforeseeable events. Rather, they involve prolonged, evident symptoms and obvious suffering, usually over the course of several days.

response to future drug use. Patients who receive these medications are less likely to die from overdose or other causes related to their addiction, have higher treatment retention rates and better long-term outcomes, or are also less likely to inject drugs and transmit or contract infectious diseases. In addition, risk of death is cut in half for people with OUD who are treated long term with methadone or buprenorphine."[57]

\*\*\*

While GEO was finalizing a business deal to expand its capacity in Aurora to 1,532 detainees, there was an outbreak of mumps and chicken pox among the general population in the main building.[58] According to a letter dated Feb. 22, 2019, and signed by officials at the Colorado Department of Public Health and Environment and Tri-County Health Department, there were at least five confirmed cases of mumps at ACDF.[59]

The outbreak led to a lengthy quarantine at the facility, which prevented hundreds of detainees from leaving their pods for court hearings, recreation time, or visits with family or attorneys.[60] At least 50 detainees launched a hunger strike to protest the lock-down.[61] The conditions also caught the attention of newly elected Congressman Jason Crow and City of Aurora Councilwoman Allison Hiltz, in whose district the mass quarantines were taking

place.[62] Congressman Crow and Councilwoman Hiltz attempted to tour the facility on Feb. 20, 2019 to check on those detained and evaluate ACDF conditions but were turned away.[63] They held a press conference outside and Congressman Crow drafted a letter, addressed to the acting director of ICE, expressing concern about the outbreak in Aurora and similar outbreaks at other GEO facilities in Arizona and Texas.[64] He also questioned the adequacy of the medical care that GEO provides for detainees.[65]

"We write with serious concerns about the public health risks and treatment of detainees at detention facilities operated by U.S. Immigration and Customs Enforcement ("ICE") and contract facilities nationwide," Congressman Crow wrote.[66] (The letter was signed by nine other members of Congress, including Colorado Representatives Diana DeGette, Ed Perlmutter and Joe Neguse.) "We believe that recent viral disease outbreaks at detention facilities across the country merit strengthened oversight, and evaluation of existing procedures (including reporting to local, state, and federal public health agencies), and an assessment of your agency's response to emergent health issues."[67]

Congressman Crow's letter also quoted an Oct. 2018 report by the Department of Homeland Security (DHS) Office of Inspector General (OIG) indicating that there have been "serious issues relating to safety, detainee rights, and medical care" at a GEO detention facility in Adelanto, California.[68] The OIG report reveals how inspectors found nooses made from bed sheets in more than a dozen cells and 14 detainees who had been inappropriately placed in administrative segregation.[69]

Congressman Crow's interventions were not the first time the private detention industry, and the GEO Group in particular, came under fire this year. In March, Reuters reported that JPMorgan Chase & Co. divested from the private prison industry, including GEO, as a response to the Trump administration's "zero tolerance" immigration policy.[70] In May, GEO majority shareholders passed a resolution that demanded more accountability from the company on its human rights policies and violations. Shareholders requested that GEO report annually on its website to investors, beginning in September 2019, and ensure that its employees

Steven Brown, *Say His Name*, 2019. Vigil at GEO Aurora Contract Detention Facility. © Monument Photography.



are aware of, and know how to apply, the company's commitment to inmate/detainee human rights. The resolution read, in part, "The GEO Group ("GEO") represents itself as 'the world's leading provider of correctional, detention, and community reentry services' and promotes itself as having 'always been committed to protecting human rights.' However, the company faces increasing scrutiny and expectations from investors and clients regarding its human rights performance."[71]

At least four lawsuits have been filed against GEO concerning wage violations asserted by detainees, including one in Colorado.[72] The Colorado complaint was certified as a class-action lawsuit in 2017 and applies to 62,000 GEO inmates over a 10-year period who worked at the Aurora facility for as little as $1 a day.[73] The lawsuits are still working their way through the legal system.[74]



Congressman Jason Crow and City of Aurora Councilwoman Allison Hiltz outside GEO Aurora Contract Detention Facility. Photo: Conor McCormick-Cavanagh, courtesy *Westword*.

Congressman Crow later introduced a bill that would allow members of Congress to tour an ICE facility within 48 hours of a request.[75] He wasn't allowed to tour the facility until 24 days after his first attempt.[76] As of July 15, staffers from Crow's office or Congressman Crow himself have been able to inspect the ACDF on a weekly basis, though not much has changed.[77] During an ACLU stakeholder visit on July 31, 2019 more than two dozen detainees reported issues related to substandard living conditions, medical care and services at ACDF.

\*\*\*

While in detention, Mr. Samimi's condition continued to deteriorate. He refused meals because the nausea and pain in his abdomen made it too difficult to eat.[78] According to a Medical Unit Logbook, on Friday, Nov. 24, 2017 at 4 a.m., Mr. Samimi requested ice chips, and,

two hours later, cried out for a nurse due to abdominal pain.[79] An entry in the medical logbook at 7:45 a.m. reads, "Detainee Samimi keeps on screaming."[80]

That afternoon, Mr. Samimi again reported that his stomach hurt and that he wanted to see the nurse. On his way to the door of his cell, he fainted spread-eagle on the floor.[81] After a nurse entered the cell to help, Mr. Samimi vomited.[82] According to a third-party review of Mr. Samimi's stay in ACDF, conducted by the Texas-based private consulting firm Creative Corrections, this incident was logged as "dehydration and possible drug-seeking behavior."[83] The Creative Corrections review states there is no documentation indicating that a doctor was contacted regarding this incident.[84] Medical logs show a nurse performed Mr. Samimi's next follow-up more than five hours later.[85] In ICE records obtained by the ACLU in July 2019, one ACDF officer noted that he felt Mr. Samimi was not faking his condition and that "medical could have done more."[86] An observation that came too late.

By Tuesday, Nov. 28, 2017, Mr. Samimi's symptoms were worsening.[87] That morning, he collapsed on his way to a mental health appointment.[88] He reported that he hadn't eaten in days and that he'd been flushing his food down the toilet because he couldn't stand the smell.[89] The nurse noted in the logs that the reason Mr. Samimi fell was likely due to "dehydration, nutritional needs not met."[90] The Creative Corrections review found that, "In spite of the nursing assessment of dehydration, likely worsening due to vomiting, sweating, and inadequate fluid intake,"[91] Dr. Peterson was not informed of Mr. Samimi's condition.[92] "Given the totality of the

circumstances, notification of a provider would have been proper nursing practice."[93]

By nightfall, Mr. Samimi's condition had become dire.[94] At roughly 8:45 p.m., a guard performing a security check saw that Mr. Samimi had tied a dark blue bed sheet around his neck and was now tugging on each end.[95] The guard attempted to call in the emergency but her hand-held radio was dead.[96] She ran down the hallway to find a phone and call central control for help. Approximately two minutes later, the guard returned and removed the sheet from around his neck.[97] Security camera footage shows several officers arriving and speaking with Mr. Samimi.[98] The guards removed Mr. Samimi's property, his bed linens and the trash bin from his cell.[99]

According to the logs, a nurse called ACDF physician Dr. Peterson after Mr. Samimi's suicide attempt, a frequent and predictable response to methadone withdrawal, and reported what happened.[100] Dr. Peterson did not examine Mr. Samimi in person and ordered only that he be moved to a special room and put on suicide watch.[101] His clothes and linens were swapped out for a suicide gown, blanket and pillow.[102] Additionally, Dr. Peterson's instructions called for Mr. Samimi to receive finger food with a paper spork, no more than 10 sheets of toilet paper at a time, one small book or Bible and no underwear.[103] Lastly, he told the nurse to schedule Mr. Samimi for a mental health appointment.[104] A review of Mr. Samimi's case indicates Dr. Peterson made no documentation of his verbal orders.[105]

The ICE standards for contract detention facilities, known as the Performance-Based National Detention Standards (PBNDS), require clinical staff to check anyone placed on suicide watch every eight hours.[106] According to the log book, after Mr. Samimi's suicide attempt that evening, no one from the GEO medical staff checked on him for another 14 hours.[107]

\*\*\*

Every detention facility under an ICE contract receives an annual inspection to ensure it meets ICE's detention standards.[108] The Nakamoto Group, a private Maryland-based company, performed the inspections and covered

seven categories — safety, security, order, care, activities, justice and administration and management.[109] The most recent Nakamoto inspection of ACDF took place in October 2018.[110]



Timeline of ACLU of Colorado's Investigation Into the Death of Kamyar Samimi

**SAMIMI IS PRONOUNCED DEAD.**
DECEMBER 2, 2017

DECEMBER 20, 2017
FIRST REQUEST FILED SEEKING DOCUMENTS EXPLAINING SAMIMI'S DEATH.

INITIAL DENIAL. ICE PROVIDES 5 PAGES OF DOCUMENTS IRRELEVANT TO SAMIMI'S DEATH.
MARCH 8, 2018

MAY 22, 2018
**ICE COMPLETES DEATH REVIEW OF SAMIMI.**

ACLU OF COLORADO APPEALS REQUEST DENIAL.
MAY 25, 2018

JULY 3, 2018
ICE STATES THE INVESTIGATION OF SAMIMI'S DEATH IS COMPLETE AND MORE DOCUMENTS WOULD BE FORTHCOMING.

ACLU OF COLORADO FILES LAWSUIT SEEKING PREVIOUSLY REQUESTED RECORDS RELATED TO SAMIMI'S ARREST, DETENTION AND SUBSEQUENT DEATH.
APRIL 9, 2019

MAY 2019
**DEATH REVIEW OF SAMIMI RELEASED BY ICE.**

LAWSUIT IS STILL ONGOING.
TODAY



Detainees wave through an ACDF window as demonstrators chant, "We love you." Desert and Detention demonstration, June 2019. GEO Aurora Contract Detention Facility. Photo: ACLU of Colorado.

The Nakamoto Group found that ACDF failed to meet required standards in three components: "Hold Rooms in Detention Facilities," "Special Management Units," (SMU) and "Grievance System." [111] SMUs are used for administrative segregation, and a "detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility," among other reasons.[112] In contrast, hold rooms "are used for detention of individuals awaiting removal, transfer, Executive Office for Immigration Review (EOIR) hearings, medical treatment, intra-facility movement, or other processing into or out of a facility."[113] The standards mandate that detainees are not held in "hold rooms" for more than 12 hours at a time.[114] According to the Nakamoto Group report, GEO did not maintain accurate logs of when detainees entered or left hold rooms.[115] Another guideline requires medical staff to conduct face-to-face medical evaluations daily with all detainees held in a SMU.[116] The report states, "Interviews conducted with the medical staff, SMU officer and SMU detainees confirmed that all detainees (in SMU) are not being seen on a daily basis."[117]

Issues identified with the hold rooms and SMUs were both considered "priority components" by Nakamoto.[118] Yet, the report provides only general recommendations for fixing the problem with little guidance on how to hold GEO staff accountable or implement the recommendations. One Nakamoto recommendation reads: "Procedures should be developed and implemented to ensure that intake officers are entering the time a detainee is placed into and released from a hold room."[119]

The Nakamoto Group isn't the only organization that investigates or inspects ICE operations. DHS's Office of Inspector General (OIG) also provides independent oversight of ICE-contracted facilities such as ACDF. In January 2019, the OIG released a 36-page report titled, "ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards."[120] The report found that only 28 out of 106 reviewed detention facility contracts contained a quality assurance surveillance plan (QASP).[121] According to the OIG report, the GEO contract for ACDF does include a QASP.[122] QASPs instruct ICE to recommend financial penalties for contractors that fail to meet the performance standards or PBNDS, but the OIG report indicates, "Between October 1, 2015, and June 30, 2018, ICE imposed financial penalties on only two occasions, despite documenting thousands of instances of the facilities' failure to comply with detention standards."[123] Since the beginning of fiscal year 2016, ICE has paid more than $3 billion to contractors operating the 106 facilities covered in the report.[124]

> "
>
> ## ICE has a Constitutional responsibility to provide for the well-being of detainees while they are held in its facilities.
>
> "

Moreover, according to the OIG report, in lieu of imposing financial penalties ICE issues waivers to facilities found to have deficient conditions.[125] "However, ICE has no formal policies and procedures about the waiver process and has allowed officials without clear authority to grant waivers. ICE also does not ensure key stakeholders have access to approved waivers. ... Finally, ICE does not adequately share information about ICE detention contracts with key officials ...which limits their ability to access information necessary to perform core job functions."[126] The deficiencies in question include "failing to notify ICE about sexual assaults and failing to

forward allegations regarding misconduct of facility staff to ICE ERO."[127]

In June 2019, OIG released another lengthy report critical of private detention facilities under ICE contracts, calling out four in particular: the Adelanto ICE Processing Center in California, the LaSalle ICE Processing Center in Louisiana, the Essex County Correctional Facility in New Jersey and ACDF.[128] (The GEO Group operates three of the four facilities; the Essex County Department of Corrections runs the detention center in New Jersey.) The OIG performed spot inspections at the facilities and found a variety of violations, "including nooses in detainee cells, overly restrictive segregation, inadequate medical care, unreported security incidents, and significant food safety issues."[129] At ACDF, the report found issues with food safety, administrative and disciplinary segregation of detainees, failure to provide outdoor space/recreation and a lack of in-person visitation.[130]

# Mistreated and Left to Die

The inhumane conditions in which immigrants are detained also caught the attention of some elected officals, notably Massachusetts Senator Elizabeth Warren.[131] At the end of May, Sen. Warren opened an investigation into the private prison accreditation process run by the American Correctional Association (ACA).[132] "It appears the ACA is a conflicted party with twisted incentives, a lack of transparency and lax inspection policies that appear to have turned accreditation into a rubber-stamp process that does little to hold facilities accountable," Sen. Warren wrote in a letter.[133] "Perverse incentives, conflicts of interest, and a failure to adequately oversee conditions at private detention facilities have put detainees in danger."[134]

A month earlier, a group of 11 senators, including Warren, questioned the quality of the Nakamoto Group's work. A press release from Sen. Warren's office noted, "The senators' investigation revealed that neither the private prison companies nor their private auditor have taken responsibility for grievous failures identified by

the Department of Homeland Security (DHS) Office of Inspector General (OIG) — and also revealed an ongoing dispute between the Nakamoto Group ... and the OIG about the quality of Nakamoto's inspections."[135]

The senators went on to write in a letter to ICE, "The response to our investigation was distressing. We wish to bring these issues to your attention and request information about how your agency plans to address these severe management deficiencies, which appear to be contributing to conditions that cause considerable harm to immigrants in detention."[136]

The senators were not alone in their criticism of Nakamoto. Sarah Varney of Kaiser Health News stated in an article published by the LA Times, "A review by Kaiser Health News of thousands of pages of inspection reports from 2007 to 2012, and 2017 to 2019 — made available through litigation and new federal reporting requirements — reveals disturbing patterns about the company's audits, including a general willingness to accept the accounts of the facilities that the company is paid to scrutinize, and to discount detainees' complaints."[137] Varney went on to state that, "the findings show that Nakamoto has rarely reported bad news about conditions at the for-profit and government-run facilities it audits. Violations in the quality of medical care and safety of detainees are infrequent and cursory, according to a review of federal records and court documents."[138]

***

In June 2018, while serving as a member of Congress, now-Governor Jared Polis sent a letter to ICE Acting Director Thomas Homan conveying "grave concern" over "grossly unacceptable and inadequate medical and mental health services faced by detainees," at ACDF.[139] He demanded to know what measurable actions would be implemented to ensure that ICE upheld its Constitutional duty to provide adequate medical care to detainees as per the Due Process Clause of the Fifth Amendment.[140] Additionally, Gov. Polis asked for documentation detailing the expertise and training level of each medical staff member at ACDF.[141]

"It is important you keep in mind that detainees ICE holds in its facilities are held in civil, not criminal,

custody," Gov. Polis concluded. "ICE has a Constitutional responsibility to provide for the well-being of detainees while they are held in its facilities."[142]

In his letter, Gov. Polis cited several examples of men who'd suffered greatly and died while living under ICE's roof.[143] One was Mr. Samimi in 2017, the other was Evalin-Ali Mandza in 2012.[144]

On the morning of April 12, 2012, at approximately 5:24 a.m., 46-year-old Evalin-Ali Mandza clutched his chest and rolled back and forth in pain. A lieutenant saw Mr. Mandza and notified the medical staff, who transported him to a trauma room.[145] There, a nurse took his vitals and fumbled with an electrocardiogram machine. A subsequent DHS investigation revealed that the nurse could not get a proper reading "due to her unfamiliarity with the machine."[146] The nurse later stated she was not trained to interpret the test results so she relied on "gut instinct" to send Mr. Mandza to the hospital an hour later.

At 6:20 a.m. the nurse instructed a lieutenant to call 911. The ambulance arrived at 6:26 a.m. and Mr. Mandza was

transported to an emergency room 17 minutes later.[147] The EMS crew gave Mr. Mandza aspirin but he couldn't keep it down and vomited. At the hospital, he went into cardiac arrest and the clinicians were unable to revive him; a doctor pronounced him dead at 8:38 a.m.[148] The DHS review of Mr. Mandza's death found that "Mandza did not have access to appropriate medical care while detained" in ACDF.[149] In Mr. Mandza's case, Creative Corrections found that "medical staff were unfamiliar with the institution's Chest Pain Protocol, appropriate cardiac medication was not administered, and the time it took to transport the patient to a higher-level care facility all may have been contributing factors to the death of the patient."[150]

Seven years later, ACDF failed to learn the lessons of Mr. Mandza's death. Had Dan Courson been having an actual cardiac emergency like Mr. Mandza he might be dead too. While experiencing chest pains and shortness of breath at ACDF, Mr. Courson said the medical staff was completely incompetent. "They couldn't operate the gurney, didn't give me any oxygen, nitroglycerin or aspirin," Mr. Courson said. "The nurse couldn't even operate the EKG. I had to put on my own leads." The

Timeline of Kamyar Samimi's Suffering and Death at the Aurora Contract Detention Facility



SAMIMI CALLED A FRIEND AND TOLD HIM HE WAS "SICKER THAN HELL". BEFORE HANGING UP WITH HIS FRIEND THAT DAY, SAMIMI SAID HE WAS "DYING HERE."
**NOVEMBER 19, 2017**

7:45 A.M. – AN ENTRY IN THE MEDICAL LOGBOOK AT 7:45 A.M. READS, "DETAINEE SAMIMI KEEPS ON SCREAMING."
**NOVEMBER 24, 2017**

SAMIMI RECEIVED AN EVALUATION BY A TELE-PSYCHIATRIST.
**NOVEMBER 29, 2017**

**NOVEMBER 17, 2017**
SAMIMI WAS ADMITTED TO THE AURORA CONTRACT DETENTION FACILITY.

**NOVEMBER 24, 2017**
4 A.M. – SAMIMI REQUESTED ICE CHIPS AT 4 A.M. AND, TWO HOURS LATER, CRIED FOR A NURSE DUE TO ABDOMINAL PAIN.

**NOVEMBER 28, 2017**
8:45 P.M. – A GUARD PERFORMING A SECURITY CHECK SAW THAT SAMIMI HAD TIED A DARK BLUE BED SHEET AROUND HIS NECK AND WAS NOW TUGGING ON EACH END.

**DECEMBER 1 , 2017**
3 A.M. – SAMIMI WASN'T ABLE TO GET HIMSELF WATER. A NURSE TRIED TO LIFT HIS ARM TO TAKE HIS VITALS. SAMIMI SCREAMED "IT HURTS SO FUCKING BAD. I JUST WANT TO DIE." NURSE ALLEGEDLY RESPONDED WITH "STOP BEING DIFFICULT."

EKG was normal but Mr. Courson was not relieved, he'd seen too much at ACDF already.

Mr. Courson, a U.S. Marshal detainee, was a state and nationally certified physician assistant for six years prior to being detained at ACDF. Held with the other Marshal detainees from December 2018 until August 2019, Mr. Courson said he saw numerous examples of GEO medical staff lacking basic caring or competence. "Medications are often mixed up, multiple requests to see a clinician are ignored, written medical grievances never returned, and men are sent back to housing units untreated, confused, in pain, and without follow-up," Mr. Courson said.

He described 10 more instances of subpar medical care at ACDF including: an elderly diabetic not getting his blood sugar checked, nurses only giving Mr. Courson half his daily meds, nurses ignoring severe allergy warnings leading to terrible reactions, long delays receiving pain medication, improperly treating wounds and causing infections, nurses repeatedly giving him and others incorrect medications and doses, a case of appendicitis that was ignored and later burst, no doctor or physician assistant on duty overnight, and ignoring very painful toothaches from two inmates.

"I'm surprised more inmates don't die as a result of the incompetence here," Mr. Courson said. So far, 31 immigrants have died in ICE custody during the Trump administration, including at least seven children.[151]

"The conditions at ACDF represent the worst of what currently plagues our society and government," ACLU of Colorado Staff Attorney Arash Jahanian said. "GEO Group is profiting off caging people and denying them conditions consistent with human decency, including basic medical care. Instead of holding GEO accountable, the Trump administration stuffs the company's pockets by placing more people in its care with dire consequences."

\*\*\*

A year before Mr. Samimi entered ICE custody, David Lane and Liana Orshan of the Denver law firm Killmer, Lane & Newman, LLP filed a lawsuit in Adams County on behalf of a U.S. Marshal detainee, Ronnie Keyes,



DECEMBER 1, 2017
SAMIMI FALLS OUT OF HIS WHEELCHAIR ON HIS WAY TO THE TELE-PSYCHIATRY OFFICE, LANDING ON THE FLOOR FACE-FIRST. HIS NOSE STARTED TO BLEED AND HE URINATED HIMSELF. HE COULD NOT TAKE IN A MEAL REPLACEMENT DRINK.

DECEMBER 2, 2017
11:10 A.M. – A LIEUTENANT CALLED 911.

DECEMBER 2, 2017
11:40 A.M. – AMBULANCE LEAVES WITH SAMIMI HEADED TO THE HOSPITAL. EMTS PERFORMED CPR FOR 19 MINUTES.

DECEMBER 2, 2017
SAMIMI COMPLAINED OF STOMACH PAINS ALL DAY. A NURSE WHO TOOK SAMIMI'S VITALS CONCLUDED THAT HE SMELLED LIKE HE HAD LIVER FAILURE. SAMIMI VOMITED BLOOD AT LEAST ONCE.

DECEMBER 2, 2017
11:18 A.M. – PARAMEDICS ARRIVED AT SAMIMI'S CELL.

DECEMBER 2, 2017
12:02 P.M. – SAMIMI IS PRONOUNCED DEAD.

against GEO and some of its Aurora employees. The first line of the lawsuit, which has since been settled, reads: "Ronnie Keyes is dying."[152]

Born in Illinois, Mr. Keyes is the oldest of eight brothers. He moved to the Denver area in 2009 after being in a severe car accident that left him paralyzed from the waist down. From that moment on, he relied on a wheelchair for mobility. In 2016, Mr. Keyes was charged with a federal crime — he'd purchased a firearm but had two previous charges on his record that barred him from doing so. While Mr. Keyes was awaiting trial on the firearm charge, the U.S. Marshals placed him at ACDF.

Mr. Keyes was prone to developing bedsores and usually slept on an air mattress to help relieve pressure on his skin. According to the lawsuit, Mr. Keyes repeatedly requested an air mattress at ACDF but his requests were ignored. He never received the appropriate mattress, and therefore began to develop severe skin ulcers.[153] He arrived in Aurora with two minor sores that quickly became major wounds. Mr. Keyes requested medical supplies to care for the wounds. Again, he was denied. When he asked if an outside nurse could come in to treat the wounds he was told that wasn't going to happen.[154]

In his first four months at ACDF, Mr. Keyes filed more than 50 written grievances regarding his treatment.[155] According to the lawsuit, every one was ignored. Mr. Keyes even expressed his concerns to the warden directly. Still, nothing changed. According to Mr. Keyes, three of the nurses at ACDF openly admitted to him that they were not adequately trained to care for his medical needs and had never treated wounds like his before.[156]

In August of 2016, Mr. Keyes submitted another grievance, this time detailing how the wounds on his legs had expanded. He noted that they were "bleeding" and "smelled bad." According to the lawsuit, "By this point, the wound on Mr. Keyes' ankle was a crater and the tissue inside was completely black. The wound had also begun to connect to a new pressure ulcer on the back of his heel, which meant the wounds were rapidly deteriorating."[157] Still, Mr. Keyes received no attention, and his repeated requests to go to the hospital were ignored. At one point, the health service administrator responded to one of Mr. Keyes' complaints by listing the dates that a nurse had seen him. "It appears your assertions [that nothing is being done to address your medical concerns] are baseless."[158]

When Mr. Keyes wrote yet another grievance later that month it was marked "rejected." He wrote four more grievances by the end of August, requesting a visit to the hospital. The staff responded to his complaints and hospital requests by noting that he was denied."[159] Mr. Keyes' mother visited him during this time and saw that his toe had turned purple. She requested that her son be taken to the hospital. That request was also denied.[160] It wasn't until guards found Mr. Keyes unconscious in his wheelchair after he'd developed a high fever due to the infection in his leg, that they finally took him to the emergency room. At the hospital, doctors diagnosed Mr. Keyes with advanced infections in his blood and in his bones. On September 20, the doctors had no choice but to amputate his left leg below the knee to try to keep the infection from spreading to the rest of his body.[161]

Still awaiting trial, Mr. Keyes was discharged from the hospital and returned to ACDF. According to the suit, "Dr. Peterson apologized to him for not listening to his concerns more [and] told him that he had prejudged him because of his criminal history."[162]

\*\*\*

Mohamed Dirshe had a bad feeling about ACDF from the moment he arrived in December 2016. As a gay man, Mr. Dirshe didn't feel safe among the general population and said he shared his concerns with the guards within a few weeks of his arrival. They told him his only choice was to voluntarily move into a solitary cell in an area known as the Restrictive Housing Unit (RHU).[163] Mr. Dirshe agreed, thinking at least there he would be safe. At that time, U.S. Marshal detainees were also held in the RHU. When Mr. Dirshe moved to the unit, some of those men began taunting him whenever they were escorted past his cell on their way in or out of the unit. At one point, according to court records, one of the men told Mr. Dirshe, "I'm going to beat the shit out of you."[164]

On May 2, 2017, when a guard escorted Mr. Dirshe back to his unit, the men who had taunted him were standing outside their cells at the end of a long hallway near the



Steven Brown, *Asylum Seekers are Not Criminals*, 2019. Vigil at GEO Aurora Contract Detention Facility. © Monument Photography.

showers. The guard escorting Mr. Dirshe asked the guard on the other side of the door to lock down the men so she could safely escort him back to his cell. Instead, according to Mr. Dirshe, the guard waved for the men to step out of the hallway and inside the shower area. The men remained uncuffed.[165]

When Mr. Dirshe and the guards escorting him were waved through, Mr. Dirshe made it only a few steps before two of the three detainees rushed him.[166] The first blow hit him in the head, knocking him into the edge of a window frame. Mr. Dirshe collapsed onto the ground and curled into a fetal position; he briefly blacked out as the men stomped and kicked at his ribs and neck. "They had so much rage in them," Mr. Dirshe said. "I didn't know how much longer I could take the beating." The guards attempted to pull the men off Mr. Dirshe, but they struggled to keep the Marshal detainees restrained. Eventually, additional GEO guards arrived and ended the assault. "I was in shock," Mr. Dirshe said. "I was crying so much. I could not believe what had just happened to me."

Mr. Dirshe could barely stand after the attack. A few guards helped him into a wheelchair and brought him to the facility's medical area. He recalls bleeding underneath his eye and that there were bumps and bruises on his head. He says a nurse performed a cursory examination, and, according to court records, gave him Tylenol. He received no emergency care. For the next 36 hours, the guards left Mr. Dirshe in his wheelchair in an empty room, dazed and alone.[167]

On May 2 of this year, Danielle Jefferis, an attorney working with Denver's Novo Legal law firm, filed a complaint in Adams County District Court against GEO on behalf of Mohamed Dirshe. The lawsuit seeks punitive and compensatory damages for, among other things, "emotional distress, suffering, humiliation, inconvenience, and mental anguish."[168]

Ms. Jefferis sees parallels in Mr. Dirshe's case and what the Creative Corrections review recently detailed about the way GEO staff treated Kamyar Samimi. "A year and a half later, it is alarming that much of the ways GEO

and ICE operate the Aurora detention center remain the same: Staff still insist people who report medical concerns are malingering, and significant delays to see a physician persist."

According to Mr. Dirshe's lawsuit, the guards at ACDF moved all of the U.S. Marshal detainees out of the RHU and to their own unit on the night of the assault.[169] Mr. Dirshe was eventually transported from the medical unit back to his cell, where he requested additional medical treatment. On May 31, about a month after the incident, he was finally taken to Denver Health for an examination.[170] According to GEO records, "This was the first available appointment to conduct routine assessment to ascertain if any residual objective findings were identifiable stemming from an assault you suffered on 5/2/2017."

The Denver Health doctor diagnosed Mr. Dirshe with a head injury due to trauma, a neck injury, vertigo due to brain injury and double vision. Mr. Dirshe also received an MRI that showed sensitivity to light, blurriness and pain in the right orbit of his eye. When Mr. Dirshe returned to ACDF, he requested the lights in his cell be dimmed to ease the discomfort from his light sensitivity. GEO denied his request.[171]

# Nightmares and Neglect

A 2018 complaint by the American Immigration Council (AIC) and the American Immigration Lawyers Association (AILA) spoke of similar problems at ACDF, detailing a "failure to provide adequate medical and mental health care."[172] The complaint states, "It is difficult to get a clear picture of medical and mental health care at Aurora because there is limited transparency and public accountability regarding many aspects of detainee care. Nevertheless, the many well-documented cases of substandard care are cause for alarm and call for immediate investigation. There have been two deaths reported at the facility in the last six years, at least one involving lack of access to appropriate medical care. There also have been multiple reports of detainees being denied essential medical or mental health care even though the facility was on notice of these detainees' specific needs and of official policies

on mandated care."[173]

John Mathews[174] was one of those cases. Mr. Mathews, 26, first came to the U.S. from Honduras when he was just 9 years old. Fleeing violence in his home country, he traveled by himself to Houston where he lived alone on the streets for several years. Mr. Mathews was eventually deported but later returned to the U.S. and made it to Colorado in 2016 where he began to build a life for himself. Before getting picked up by ICE again, Mr. Mathews said he finally felt like he had it all: a job, a nice place to live and a family. Then, he said, "The world just fell on me." Mr. Mathew's son was only 11 days old when ICE agents picked Mr. Mathews up at his front door. They brought him to ACDF where he said, "They treated me like an animal."

Dressed in athletic shorts, a T-shirt and Chicago Bull's ball cap during an interview in June 2019, Mr. Mathews looked like a typical 26-year-old. But when asked about ACDF, his face fell and he alternated between not making eye contact or crying. The pain of all that he endured at ACDF was palpable. Having lived most of his life without parents or any real stability, Mr. Mathews was devastated to pass along that legacy to his son and acknowledges that at times he was depressed at ACDF. He was placed on suicide watch for long stretches of time away from the general population and was taken to see the former GEO staff psychologist, but said those visits did more harm than good.[175] Mr. Mathews said that on more than one occasion that psychologist told him to stop complaining and that he was no longer a child. Mr. Mathews, who suffered childhood abandonment and trauma for years before being detained at ACDF, was still visibly upset as he recalled that psychologist telling him — no one cares about you.

If the goal of any psychiatric care at ACDF was to get Mr. Mathews well, it failed miserably. Mr. Mathews said that when he first arrived at ACDF he weighed 155 pounds, but by the end he had lost more than 30 pounds. He sometimes went without food for days. Mr. Mathews described the suicide watch room like a fishbowl. The guards would watch him through the glass but did not talk to him. He said the room was freezing and he was kept in it for weeks. Sometimes he had a pillow, blanket and mattress. Most times he said he slept on the floor.


John Mathews. Denver, Colorado, June 17, 2019. Mathews listens to music to help cope with the trauma he experienced at ACDF. Photo: ACLU of Colorado

He didn't get to go outside and was extremely lonely. Mr. Mathews felt like the psychologist wanted him to go crazy. "He said if I didn't want to be here suffering I should sign [deportation papers] and go back to Honduras," said Mr. Mathews. He repeatedly asked to see a different psychologist but every request was denied.

Those six months at ACDF derailed the life Mr. Mathews was building in every possible way. His son's mother remarried and Mr. Mathews has been able to see his son only a few times since his release. He is worried his son will think that he abandoned him but does not have the means to fight for visitation. Work is sporadic and home is now a small unfurnished room in a shared house. "I wanted to build a better future and help others but right now, in this moment, I can't even help myself," Mr. Mathews said. Prior to being detained, Mr. Mathews sustained a traumatic jaw injury that required surgery on his jaw and chin. Since then, he has been unable to get the follow-up care he needs. Recently he's been told by a dentist that he needs braces to reset the jaw properly and help his mouth heal. With no money for orthodontic care, he said the wound is opening up again and getting infected.

***

Diana Lopez knows Mr. Mathew's pain all too well. Ms. Lopez came to the U.S. from Honduras in 2004 when she was 11 years old. Her grandparents had been living in the U.S. for nearly 30 years. Ms. Lopez was brought to ACDF the same year as Mr. Mandza, where she had what she described as a scarring experience after requesting to see the dentist for a simple toothache.[176]

Ms. Lopez said the GEO dentist who examined her recommended she have two teeth pulled: the one that was bothering her as well as another tooth on the other side of her mouth.[177] The operation was scheduled for a few days later. During the procedure, the dentist gave her an injection in her gums that was supposed to numb the pain. However, Ms. Lopez said she could still feel the dentist's tools digging in her mouth. Still, the dentist assured her it was just pressure and that it was "normal."[178]

The procedure continued for almost three hours. "I was crying," Ms. Lopez said. At one point, the dentist's assistant called in a GEO guard who asked the dentist if something was wrong. The guard eventually stopped the procedure.[179] Unable to pull the entire first tooth, the dentist left fragments behind. The second tooth was never touched. That night, according to a grievance filed by Ms. Lopez, the dentist gave her "seven or eight pills of Tylenol and ibuprofen."[180] She ate oatmeal for dinner but after that she felt weak and experienced double vision. An hour later, she was nauseated and couldn't breathe. Ms. Lopez passed out trying to get out of bed.

> "
> # They treated me like an animal.
> "

A nurse called 911 and paramedics transferred Ms. Lopez to a hospital and gave her a pill for cardiac pain. Later, while detailing the event in a grievance form, Ms. Lopez wrote "I think my life was really in danger and all this could have been prevented if the dentist would've stopped when she didn't have the tools to extract my tooth and everything was getting complicated."[181]

Days later, GEO guards took Ms. Lopez for a follow-up appointment off-site with a Denver Health dentist. According to Ms. Lopez, the dentist extracted the remains of her first tooth in 15 minutes and left the second tooth alone. She said the guards later told her they couldn't do anything about the incident because the dentist had already quit. "I think she got fired," Ms. Lopez said. She received a response to her grievance three days later. The first line reads, in part, "It appears the dentist gave you good care."[182]

During a stakeholder visit on July 31, 2019, Jane Smith[183] told ACLU of Colorado Public Policy Director Denise Maes about the nightmare she faced due to dental neglect at the facility. Ms. Smith, came to the U.S. seeking asylum and has been at ACDF for 13 months. During that time, she suffered from a toothache that lasted several days. The only medical attention she received was ibuprofen for the pain. Ms. Smith continued to ask about seeing a dentist to no avail. She said she filed at least one grievance, if not more but help never came. Eventually, the pain got so bad that she felt she had no choice but to pull out her own tooth. The other women in her pod helped clean her up.

"Ms. Smith's story is just one of the many brutal and shocking examples we heard of medical neglect at ACDF," said Ms. Maes. "From insufficient dental care to medical incompetence it's clear that ICE and GEO lack both the will and the ability to provide even the most basic level of care."

\*\*\*

Fourteen hours after his suicide attempt on November 28, 2017, Mr. Samimi received an evaluation by a tele-psychiatrist.[184] At some point during or after the appointment, that doctor noted that opiate withdrawal "is generally not life threatening, although dehydration is possible."[185] The doctor said to make sure Mr. Samimi received fluids and prescribed medicine for anxiety and sleep.[186] There is nothing in the follow-up logs or documentation indicating that anyone ever asked Mr. Samimi why he attempted suicide.[187]

Two days later, Mr. Samimi woke up at 3 a.m. desperate for water. Lying on a mattress on the floor, he sat up, grabbed a cup, and reached for the sink above the toilet.[188] Unable to steady himself, Mr. Samimi collapsed back onto the floor. On the way down, he hit his arm and his hand dropped into the toilet. Mr. Samimi tried a second time, but as he brought the cup down from the sink to his mouth, he dropped it into the toilet and again fell to the floor.[189] A few minutes later, an officer entered the cell, helped Mr. Samimi to a seated position and briefly left him with a cup of water.[190] After the officer left the cell, Mr. Samimi took a sip, set the cup on the floor and collapsed again.[191]



**One Doctor for 1,500 Detainees**

In 2019, GEO expanded its capacity at the Aurora Contract Detention Facility to 1,532 detainees but kept only one full time physician on staff. There is still no mandatory ratio for doctors and medical staff to detainees.

A minute later, a nurse entered. She handed Mr. Samimi a cup of water and took his blood pressure. It's unclear if Mr. Samimi drank the water, but shortly thereafter, while the nurse was still in his cell, he attempted to dip the cup in the toilet and drink the water from the toilet bowl.[192] The nurse then tried to take Mr. Samimi's vitals with a mobile vital sign monitor.[193] When she lifted his arm, Mr. Samimi screamed in pain and reportedly said, "It hurts so fucking bad. I just want to die."[194] According to the Creative Corrections review, a nearby officer overheard the nurse tell Mr. Samimi to "stop being difficult."[195]

# Suffering in Silence

Last year, in Denver, Elizabeth Jordan launched the Immigration and Detention Accountability project at the Civil Rights Education and Enforcement Center (CREEC).[196] She recently represented a client detained in Aurora with a hearing disability. Despite notifying the guards of his disability and that he needed a proper set of hearing aids — his had cracked when he arrived at ACDF — it took several months for him to finally get a pair that worked. Section 504 of the Rehabilitation Act, prohibits DHS, ICE and federal contractors from discriminating against people with disabilities.[197] Aside from the few statements he was able to make out by reading lips, Fabian Vasquez couldn't hear the other inmates around him or understand what the guards were saying. "It was stressing me out," Mr. Vasquez said. "I didn't know what was going on around me."

On at least one occasion, Mr. Vasquez's inability to hear led to an incident where a guard yelled at him, inches from his face. Ms. Jordan helped Mr. Vasquez secure a working pair of hearing aids, but even then, he said the batteries would run out and he'd be in silence again. "Everyone out there is supposed to be informed there's an inmate who's hard of hearing," Ms. Jordan said. "Unfortunately, that wasn't the case with Fabian."

The law states that anyone whose disability requires "reasonable accommodations," must receive them, such as a sign language interpreter, video or captioned telephone, wheelchair or accessible restroom and shower. The accommodations ACDF failed to provide



The ACDF waiting room is a mix of gray linoleum tile and hard, brown plastic chairs. Photo: ACLU of Colorado.

Mr. Vasquez prevented him from being able to call immigration attorneys. Despite his hearing disability, Mr. Vasquez's visits were also held in the main visitation area, a narrow space crammed with many people speaking loudly, including small children crying. After yelling back and forth during one visit through the hand-held phone on the wall, Mr. Vasquez gave up. "Of course, they didn't make accommodations for him," Ms. Jordan said.

On August 19, 2019 CREEC along with Disability Rights Advocates (DRA), Southern Poverty Law Center (SPLC), and Orrick, Herrington & Sutcliffe, LLP filed a class action lawsuit against ICE and DHS for their failure to ensure detained immigrants receive appropriate medical and mental health care, their punitive use of segregation and their failure to ensure that detained immigrants with disabilities are provided accommodations and do not face discrimination.[198] The lawsuit was brought on behalf of 15 individuals detained at eight different facilities in six states, representing a class of approximately 55,000 immigrants detained by ICE on any given day.[199]

***

Elias Salgado was 20 years old the first time he was sent to ACDF and was completely unprepared for what awaited him inside. "The food was either expired or contaminated," Mr. Salgado said. "My stomach was bad all the time. But the officers would get mad if I complained."

In 2007, after about a year at ACDF, Mr. Salgado was deported back to Mexico. Having been four years old when his parents immigrated to the U.S., Mr. Salgado couldn't bear to be in Mexico, away from the place he called home for more than 16 years. In 2008, he returned and over time began a new life with his wife, Candy.

"I grew up without support in my life and at the time I was not looking for a relationship but Eli was a good friend of mine and support [sic] me," Mrs. Salgado said. She'd been in an abusive relationship with the father of her three children prior to meeting Mr. Salgado. Candy was afraid he'd leave her if he knew the extent of the abuse that was still happening. But after witnessing it firsthand, Mr. Salgado confronted Candy's ex-husband and it never happened again. "This is the moment the kids accepted him as the protector," she said.

In 2014, while working as a manager at a fast food restaurant, he was picked up by ICE again and sent to ACDF for a second time. Like many undocumented immigrants working in the U.S., Mr. Salgado was penalized but his employer was not.[200] This stay in ACDF was even worse than Mr. Salgado's first detention. Now, he was a stepfather of three, and after a high-risk pregnancy and countless prayers, he and Candy added their daughter Grace to the family. She was 2 months old when he was taken away. After the stress of the pregnancy and an emergency C-section, Mrs. Salgado's health continued to decline and her depression deepened. Now she was on her own with four children, no support and the fear of what her ex-husband might do now that Mr. Salgado was gone.

"For each day that Elias has been gone, the life of my kids and I runs in danger because of my abusive ex-husband," Mrs. Salgado wrote in a letter to the judge handling his immigration case.[201] "This whole situation has been a traumatic experience to the whole family, has worsen [sic] my depression causing it to increase my doses of medication. I understand that for the Federal Government my medical situation is not important, but, for me [it] is very important to inform them that there are children under age that depend on Elias Salgado because they cannot depend on me due to my medical conditions."[202]

For a man whose identity revolved around providing for his wife and protecting his family, detention was gut-wrenching. Once, after someone smuggled a cell phone inside ACDF, Mr. Salgado said everyone in the pod was subjected to strip searches. "They were touching my private parts," he said. "It emasculated me."[203] Mr. Salgado said he received over one month in solitary confinement for not wearing his ID bracelet. The conditions and arbitrary punishments took their toll. Mr. Salgado said he begged to see a doctor and told the guards that he wanted to hurt himself. In response, he said they laughed it off and told him he was fine, just crazy, and put him in solitary



your honor, I am Candida Carranza; in my simple words I would like to ask for an opportunity to let Elias stay in the Unated states with his family, all of us are u.s citizen born and raise in this country. also Elias Salgado has grown up here since he was 4 years old, he has gone to school here. and he has been working since he was 14 years old to help his parents and the family.

This whole situation has been a traumatic experience to the whole family, has worsen my depression causing it to increase my doses of medication I understand that for the federal government my medical situation is not important, but, for me is very important to inform them that there are children under age that depend on Elias Salgado because they can not depend on me due to my medical conditions;

Handwritten letters from Mrs. Carranza Salgado. Courtesy the Salgado family.

 

"I've been waiting so long to talk to someone," Mrs. Salgado said. "He suffered abuse, emotional damage but I suffered too." Mr. and Mrs. Salgado, 2019. Photo: ACLU of Colorado.

confinement again. While stuck inside ACDF, Mr. Salgado said he wasn't the only one starting to lose hope. He said he witnessed a man swallow razor blades after saying he'd been there a very long time and he wanted it to end. According to Mr. Salgado, the man was bleeding profusely before the guards finally came. They handcuffed the man before taking him to medical, a process Mr. Salgado said, took at least an hour. He never saw the man again.

Mr. Salgado filled out several kite requests[204] and grievance forms about issues he had at ACDF but things only got worse.[205] He says the guards listened to his phone calls. When he complained about the conditions to Mrs. Salgado over the phone, they punished him by withholding food or recreation time. They would read Mrs. Salgado's letters in front of him and monitored what he wrote back. If she sent photos they sometimes mocked them and ripped them up. After learning that he would be deported again, Mr. Salgado told the guards, "One day I'll tell someone." He said they just laughed at him and taunted — who's going to believe you?

In the January 2018 interview notes about his death, Mr. Samimi wasn't believed either. In his statement an ACDF officer said he told the medical staff Mr. Samimi was very weak but that in his opinion the staff didn't believe it.[206] They characterized it as "detainee faking."[207]

The staff heard Mr. Samimi had talked to his lawyer the night before and was "jolly," then weak the next day, so the nurses didn't believe him. The officer remembers hearing Mr. Samimi calling for God and asking "Why aren't nurses helping?"[208]

# How Long Can Hope Last

In June 2019, AILA released a supplement to its initial complaint.[209] The introduction to the supplement reads, in part, "We remain concerned regarding the dangerously inadequate medical and mental health care at the Aurora facility, which threatens the health and welfare of detained individuals, as well as their ability to pursue their immigration and asylum claims."[210] The report continues, "Several circumstantial factors over the past year have made the situation for individuals detained in the Aurora facility measurably worse. In January 2019, GEO Group, Inc. (GEO) ... expanded the detention center by opening a 432-bed annex, increasing the facility's capacity to 1,532. Despite the drastic expansion, staffing of both GEO and ICE employees remains insufficient to manage the growing population. In fact, GEO continues to contract only one physician on staff at any one time to oversee the entire detained population."[211]

Miguel Angel Avila Arce, 34, has been at GEO for more than a year. ICE agents detained him in January 2018, first for several months at a facility in Richmond, California, before transferring him to ACDF in August 2018. Like those who have come and gone before him, Mr. Arce's stay at ACDF came with pain and injury. Mr. Arce said that on May 23, 2019, his left hand and middle and ring fingers were broken after a guard allegedly slammed them in a cell door.[212] Mr. Arce described the guard as a "new guy, but a really old guy," who froze after Mr. Arce yelled at him to get help. "Call medical," Mr. Arce said he shouted, "Code blue. This is an emergency." But the guard seemed more in shock than Mr. Arce, shaking and stalling for close to 25 minutes before getting him medical attention. Then, it was another long ordeal for Mr. Arce to get treated at the hospital.

> ## "
> # I had a regular life. Realizing it's not going to happen anymore — that's the hardest part. It's like you're dead.
> ## "

Every time a detainee leaves the facility their legs are shackled and they're handcuffed.[213] That day was no exception, even with a broken hand. "I was humiliated," he said describing the experience of walking into Denver Health like a violent criminal. "I've never seen people look at me that way. I don't know what was worse, the embarrassment or the pain."

A month later, Mr. Arce's hand was still wrapped with a bandage over a cast. His pain level was between five and six out of 10, and the pain had been managed with only ibuprofen since he was initially injured. The doctor at the hospital told him not to move his hand for four more weeks and that if it healed well, he may not need surgery down the road.[214] Yet, Mr. Arce said someone from the medical team at ACDF later manipulated his broken fingers back and forth during a follow-up exam. The pain was excruciating. "I got hurt and it seems like no one cares," Mr. Arce said. "It's like nothing happened. What if I don't heal right?"

The guard who closed Mr. Arce's hand in the cell door remained on duty, and while Mr. Arce saw him at least three times in his unit, he never once received an apology. "It's not good for me to see him," he said. After the incident, Mr. Arce was put in a private room for two days with no access to phone calls. Mr. Arce was supposed to have a hearing regarding his application for asylum on May 24, but the hearing was postponed because of his injury. He was told that the new hearing wouldn't be until sometime over the summer. "I don't know what to expect anymore." His hearing was rescheduled for July 26, 2019. Mr. Arce had to present testimony via video from Colorado while his proceedings took place in San Francisco.

A native of Mexico, Mr. Arce lived in Sacramento for 20 years before getting detained by ICE. He fled to the U.S. when he was 13 after being physically threatened by a drug cartel. He and his sister Marisol lived with their grandparents. "Life was beautiful," back then, he said. Most of his free time involved charity work and youth outreach with his church. For fun, he played semiprofessional soccer and described himself as a workaholic. He managed shipping and receiving for a plumbing, lawn and garden shop for 15 years and installed kitchens and tile with his brother-in-law, uncle and cousins in their family business on the side. "That's what I want to do if I heal," Mr. Arce said, motioning to his hand. "I can't wait to have my life back."

\*\*\*

The waiting room at ACDF is mostly a mix of women and children, several of them mothers holding babies. Many families wait, sometimes for hours just to get a glimpse of their loved ones. Licenses are traded for red visitor badges. Only five of the 48 lockers on the wall are reserved for visitor use. Guards, wearing blue shirts and blank stares, file in and out carrying lunch bags. A TV on the wall plays "Days of Our Lives" above a glossy poster advertising a Legal Library. Several others hang around the room showcasing what awaits inside; Telephones Provided in Housing, Dental Services, General Library, Housing Dayroom With TVs, and an Examination Room. The rest of the waiting area is a mix of grayish linoleum tile and hard, brown plastic chairs in rows of three. Given the number of children in the



Miguel Angel Avila Arce's broken hand and fingers after a guard closed it in a cell door. Aurora Contract Detention Facility, Aurora, Colorado, June 2019. Photo courtesy Esperanza Cuautle.

They wouldn't let him take his meds for high blood pressure and the man became ill. Three weeks later he finally saw a doctor. Another man passed out after expressing severe pain in his head and numbness on his left side. Again, an officer came only after the other detainees banged on the walls. The guard had performed CPR for several minutes. He was brought to the infirmary and then right back to the pod but Mr. Arce said he still wasn't quite right. They never took him to the hospital. A week later, he was deported. One of the men had a bad tooth and his face was severely swollen. He was told to sign something that said GEO was not responsible. Mr. Arce told him, "Don't sign." He acts as a translator for many of the detainees who don't speak English which has earned him the nickname "The mouth." Mr. Arce said he's also been called an instigator by guards for asking questions. "Who are we to complain? — Nobody."

When Mr. Arce first arrived at ACDF, he weighed around 170 pounds. Now, he estimates he's lost about 20 pounds. "People change," he said. "Especially here." Breakfast is served around 6 a.m. but he's reluctant to eat. He sticks to milk. Maybe some rice when he's really hungry. "It's not good," he said. "It's the same thing over and over. It looks ugly. I don't want to touch the food because of what I've heard." Henry Cruz Moreno arrived at ACDF a month after Mr. Arce and told his wife, Priscilla, that he was living on beans, rice and bologna sandwiches. There were no vegetables or fruit, just a sugary drink. Many times, he said he found worms in his food but when he told the guards he said they just laughed and called it extra protein.

To make it through the days Mr. Arce reads the Bible

waiting room one could expect to see a play area with toys, like in a doctor's office. The hallway heading to the visitation area is lined with more posters that read: Character, Passion and Accountability.

Mr. Arce shook his head and laughed when asked whether the posters match the reality at ACDF. "Everything they show is not true." The legal library is just a place to make copies. They rotate use of the recreation area with the Marshal and female detainees, so use is as limited as the area itself. A pale green, rectangular space, the only access it provides to the outdoors is a partial view of the sky through the roof. It's so small and overcrowded that Mr. Arce prefers to exercise in his cell, something he hasn't been able to do since his injury. His hand injury has not been his only health issue. Mr. Arce has asthma and at times said he wasn't given his inhaler until the following day. "My pod is crazy," Mr. Arce said. "Lots of medical cases. The health issues — that's what I'm worried about."

Mr. Arce said he once witnessed two men lose consciousness. They didn't get help until other detainees banged on the doors. He recalled another man who had a stroke before coming to ACDF in December.



Steven Brown, *Protestors*, 2019. Vigil at GEO Aurora Contract Detention Facility. © Monument Photography.

and meditates. Once a month he said there's a Catholic Mass and one Christian service. Two, if they're lucky. For Mr. Arce, the hardest part about being in ACDF isn't his own suffering, but that of his family. He doesn't get to speak much with his family because calls back home to California cost too much. His brother-in-law came out to visit a few months ago but Mr. Arce said it's too expensive to make them come all that way for an hour-long visit.

"I had a regular life," Arce said in June. "Realizing it's not going to happen anymore — that's the hardest part. It's like you're dead." Being at ACDF is "Weird, hard — suffocating." But Mr. Arce said, "I'm not giving up. I'm going to fight to the end." Since then, Mr. Arce's asylum application was denied on Aug. 22. While his attorney feels Mr. Arce has a strong appeal, the inhumane conditions at ACDF are compelling him to self-deport. Mr. Arce has until Sept. 22, 2019, to decide whether or not to return to a country he hasn't lived in for more than 20 years or appeal and stay even longer at ACDF.

# The Final Hours of Kamyar Samimi

After weeks of being forced to endure painful withdrawal, Mr. Samimi had little fight left. On Dec. 1,

2017, Mr. Samimi fell out of his wheelchair on his way to the tele-psychiatry office, landing on the floor face-first.[215] His nose started bleeding and he urinated on himself.[216] The guards offered a meal replacement drink to Mr. Samimi that afternoon; he took one sip and spit out the rest.[217] When the Creative Corrections team interviewed one of the nurses about Mr. Samimi's behavior in the early hours Friday morning, she said that, "leading up to this night the detainee's increasing demands for 'more, more, more' led her to conclude that he was drug-seeking, despite her best efforts to explain that medications may cause further stomach [sic] upset."[218] But according to one officer on duty that night it wasn't Mr. Samimi's behavior that was the problem. The officer claimed she heard nurses say things like, "He was an addict" and "If you're going to live like that it's expected you're going to die like that."[219]

The next day, an officer posted by Mr. Samimi's cell noted "There was a strange odor emanating from his room which I assumed was vomit."[220] Mr. Samimi requested to see a nurse.[221] The nurse who took his vital signs said, "It smells like he has liver failure."[222] In a written report, the officer stated that he "figured that if that was the case, the detainee should be taken to the hospital." Mr. Samimi complained of stomach pains all day Saturday.[223] At one point, after a nurse had visited Mr. Samimi for a third time, an officer documented asking the nurse what was wrong and that she replied,

"He's dying."[224] According to the Creative Corrections report, "The officer then asked why they were not calling 911 but neither nurse responded."[225] The nurse later said she regretted commenting that Mr. Samimi was dying and that "sometimes in a stressful situation people will say inappropriate things."[226] Mr. Samimi was in fact dying; but it was the nurse's failure to treat him, not her statement, that was inappropriate.

The logbooks from that morning document multiple hours where Mr. Samimi screamed for a nurse and vomited in his cell, including at least one instance where he vomited blood.[227] A nurse called Dr. Peterson who was supposed to be on call but didn't pick up.[228] In the Creative Corrections report, the nurse did not call 911 because the situation was not a "super emergency."[229] At 11:10 a.m., a lieutenant took matters into his own hands and dialed 911.[230] The paramedics arrived in Mr. Samimi's cell eight minutes later.[231] The EMTs positioned Mr. Samimi onto his back and checked for a pulse; they then pulled him into the hallway and started chest compressions.[232] The ambulance left with Mr. Samimi headed for the hospital at 11:40 a.m.[233] According to the report, emergency room records indicate that the EMTs performed CPR for 19 minutes but were unable to revive him after he stopped breathing.[234] A preliminary report indicated Mr. Samimi had suffered from cardiac arrest.[235] At 12:02 p.m., a University of Colorado Medical Center physician pronounced Mr. Samimi dead, exactly two weeks after he'd arrived at ACDF.[236]

Sixteen days after Mr. Samimi's death, ACDF's lone doctor, an HSA, an RN, a GEO quality assurance representative and Warden Johnny Choate, completed a Multi-Level Mortality Review of Mr. Samimi's death to determine what happened and what corrective actions, if any needed to be implemented going forward.[237] While

Choate met personally with the security personnel who interacted with Mr. Samimi, no security or Enforcement Removal Operations staff participated in the review, nor did the Review committee examine any of the related CCTV footage. The Review made only one recommendation: "Reemphasize to all nursing staff to use your clinical judgement and call 911 when presented with a life or death situation."[238] Then they cited "quick initiation of withdrawal protocol" and "monitoring of detainee while on withdrawal protocol" as a strength.[239] The committee's findings did not line up with the medical records examined by Creative Corrections.[240]

"On the first day of Mr. Samimi's incarceration, GEO's physician ordered that Mr. Samimi be cut off from the methadone he had been legally taking for 20 years, thus forcing Mr. Samimi to endure the all-consumingly painful, debilitating and life-threatening torture of opioid withdrawal," ACLU of Colorado Legal Director Mark Silverstein said. "That decision was medically unjustifiable, yet none of the internal investigations and reviews ACLU obtained through FOIA raise even a single question about the physician's role in precipitating the ugly and ultimately fatal consequences that ensued."

The inspection report on ICE's website quotes from an unknown source that Mr. Samimi's cause of death was "most likely... the result of asphyxia secondary to aspiration of bloody vomitus.'"[241] The Adams and Broomfield County Coroner's report from Dec. 6, 2017, cites his cause of death as "undetermined," but lists emphysema and gastrointestinal bleeding as contributing factors.[242] The forensic pathologist noted that while deaths due to methadone withdrawal are rare, in Mr. Samimi's case, "methadone withdrawal cannot be ruled out as the cause of death."[243]

---

urine. The wet mattress was removed from the cell and coffee spilled on the floor was mopped up by Officer [    ] and another officer. Officer [    ] documented that when nursing staff left the detainee's cell, the other officer asked LPN (b)(6),(b)(7)(C) what is wrong with the detainee to which she replied, "He's dying." The officer then asked why 911 was not being called but neither nurse responded. Officer [    ] noted in his report that this was the second time he thought 911 should be called but nursing staff did not agree.

Excerpt of U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi. May 2018.

 

Left: Kamyar Samimi with his son Tony's daughter, his only grandchild. Right: Mr. Samimi loved Persian food and celebrating the holidays with his family. Photos courtesy the Samimi family.

The decision to stop Mr. Samimi's methadone, and subsequent failure to recognize and treat his withdrawal properly, exposes a critical lack of competency, compassion and proper medical care inside the facility. "Many providers still do not recognize that addiction is not a moral failure, but rather a chronic disease with medical and behavioral manifestations," said Dr. Costello. "In any setting, the treatment of substance-use disorder should match those manifestations to the same extent that the treatment for diabetes alleviates the symptoms of high blood sugar. Never should anyone die from opioid withdrawal in any setting, especially in a correctional facility with constant supervision."

Creative Corrections cited numerous deficiencies regarding medical care in their compliance findings. Most notably Section (V)(K) which states, "Detainees experiencing severe or life-threatening intoxication or withdrawal shall be transferred immediately to an emergency department for evaluation."[244] Mr. Samimi exhibited pronounced, life-threatening withdrawal symptoms during the last 48 hours of his life. But he wasn't transferred to the ER until it was too late. The findings also state that per Section (V)(M), "Each facility's health care provider shall conduct a comprehensive health assessment, including a physical examination and mental health screening, on each detainee within 14 days of the detainee's arrival unless more immediate action is required due to an acute or identifiable chronic condition."[245]

Section 4.3 of the PBNDs highlights ICE's own standards to, "ensure that detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services." But those services fell short for Mr. Samimi and many others. Despite the increasing severity of his condition during his 15-day detention, ACDFs lone physician only talked with Mr. Samimi in the hallway and through the glass but never fully assessed him.[246] On the day of Mr. Samimi's death, Dr. Peterson failed to return two calls from nurses while on call. He claimed he never got them. Nurses held Mr. Samimi's methadone use in contempt and didn't take Mr. Samimi's symptoms seriously. When unable to reach Dr. Peterson, they failed to call 911 when Mr. Samimi became critical. There is not a mandatory ratio for doctors and medical staff to detainees. There is however, a mandate for operable toilets. Facilities must provide a "minimum ratio of 1 for 12 detainees in male facilities" and "1 for every 8 in female units." After outbreaks, quarantines, complaints of deficient medical and dental care and delays and two deaths, there is still only one doctor on staff at ACDF.[247]

"It's devastating," said Mrs. Samimi-Gomez of her father's death. "I will never have more memories. When I have a family, my own child will never have memories of their grandfather. I never want this to happen to another person, which is why it's been so important for me to work with the ACLU. We want everyone to know that this is happening and it needs to stop."

"
He always made a good impression on
people. You could spend a very small
amount of time with my dad and feel
like you've known him forever.
"

# Policy Recommendations

This policy brief enumerates ways that Colorado cities, counties and the state should respond to the expansion of private immigration detention centers with innovative policies designed to improve conditions of confinement, limit local cooperation with ICE and reduce the number of people deported from their homes and communities.

## HOLDING DETENTION FACILITIES ACCOUNTABLE

The most effective way to improve conditions of confinement at immigration detention centers is to create a system of oversight and accountability. For examples, Bernalillo County in New Mexico passed a municipal ordinance creating an advisory board of nine members with expertise in jail or corrections management, law, government, financial management, institutional medical care and behavioral health to oversee all adult detention in the county.[248] The board is tasked with ensuring that the standards for detention facilities in the county protect the health, safety and welfare of those detained.[249] The board also reviews data from the detention facilities compliance program. If a majority of the board finds that the detention facility's response to an incident or an investigation is inadequate, they may authorize audits or investigations to be conducted by an independent investigative firm for possible noncompliance with standards, potential violations of use of force policies or potential failures to meet best practices. In this way, the county has established a system of review and accountability, so that if detention centers fail to meet state standards, they may face investigations.[250]

California passed legislation that grants the attorney general the power to engage in reviews of county, local and private detention facilities in which non-citizens are being housed or detained for purposes of civil immigration proceedings.[251] The attorney general must create a report that provides an overview of conditions of confinement and a review of the standard of care and quality of due process provided to detainees. To do so, the attorney general is granted access to detainees, officials, personnel and records. The attorney general must provide this report to the legislature and governor. The report is also made publicly available.

Following California's example, New Mexico introduced House Bill 624 in 2019.[252] The bill directed the secretary of corrections to make announced or unannounced reviews of immigration detention facilities. The bill went beyond the California model by also establishing independent monitoring commissions under the office of the attorney general. Any member of the commissions could enter an immigration detention facility within the commission's geographic jurisdiction and be granted access to every individual detained within, including those in specialized housing. The commissions are tasked with conducting hearings on complaints made by persons detained in immigration detention facilities, and reviewing records, logs, memoranda, video or audio recordings and internal documents within an immigration detention facility.

Though the bill did not pass during the last legislative session, it provides a model for establishing two systems of oversight and regular public reporting to help prevent abuse of detainees. With so much of the deportation machinery shrouded from public view, elected representatives in Colorado have a responsibility to ensure that they can enter detention centers, review conditions of confinement and share the results of their review publicly. California and New Mexico's model legislation are important first steps in achieving this goal.

## DIVESTING FROM INVESTMENTS IN PRIVATE DETENTION OPERATORS

City, county and state legislatures in Colorado can also hold detention facilities accountable by passing policies divesting investments from the GEO Group and other private companies that detain immigrants. Detention centers rip families apart, treat law-abiding Coloradans as criminals and negatively impact communities across the state. The GEO group profits from this pain.

The GEO Group receives more taxpayer dollars for immigration detention than any other ICE contractor, and in 2018, earned $2.3 billion, more than 60% of which came from U.S. government contracts.[253] Over 600,000 Coloradans pay into the Colorado Public Employees' Retirement Association (PERA). PERA has invested about $400,000 into the GEO group.[254] The Colorado legislature should pass legislation requiring PERA to identify all companies engaged in immigration detention and to assemble those companies into a list of restricted companies. For each company on the list, PERA must send a written notice informing the company of its status and that it may become subject to divestment. If a company ceases activity that designates it as a restricted company, such as supporting the detention and deportation of immigrants, PERA will remove the company from the list. If a company remains a restricted company 180 days following PERA's first engagement, PERA is required to divest all direct holdings of the restricted company from its assets. PERA is also prohibited from acquiring direct holdings in any of the restricted companies.[255] Colorado cities and counties should also pass policies ensuring that public funds are fully divested from the GEO group and other private companies that make a profit by detaining immigrants.

## FREEING IMMIGRANTS FROM DETENTION FACILITIES

A system of oversight is necessary for improving conditions at GEO. However, it will not help the many immigrants currently detained and facing the threat of deportation without an attorney. Immigrants detained at the GEO facility in Aurora are held in punitive conditions, but unlike people facing criminal charges that could result in imprisonment, they have no right to government-appointed counsel. As a result, too many immigrants in Colorado, including legal permanent residents, unaccompanied children and asylum seekers, face the complex legal system alone. The National Immigration Law Center (NILC) explains, "Upholding true due process of law and the right to a fair trial — fundamental principles in the American legal system — requires the guarantee of actual, high-quality representation that is available to all immigrants in removal proceedings."[256] NILC, and many others, advocate for "universal representation," which means

that any detained immigrant who does not have a private lawyer and who meets certain income requirements, will be provided with representation.[257]

Providing universal representation is fiscally responsible because it reduces detention costs and ensures that overburdened immigration courts function more efficiently.[258] Additionally, providing universal representation is the only fair solution. According to the National Study of Access to Counsel, detainees who have a lawyer are 10.5 times more likely to be allowed to stay in the U.S. than those who do not.[259] In New York, over 38% of detained immigrants with an attorney won their case, compared to only 3.8% of immigrants without an attorney.[260] Whether or not someone will be permanently deported from the U.S. should not depend on their ability to afford an attorney. Unfortunately, at the national level, Congress has failed to pass legislation ensuring that immigrants are provided counsel in removal proceedings.

It is imperative that cities and counties throughout Colorado establish funds to provide legal representation for indigent immigrants facing deportation. Crucially, eligibility should not be restricted on the basis of an individual's criminal record. Several states have paved the way in providing universal representation. Programs in Chicago, Boston, Los Angeles, San Francisco, Houston, New Orleans, Atlanta and Miami all work to ensure that immigrant have access to legal representation.[261] The New York Immigrant Family Unity Project is a public defender program that provides universal representation. In two years, the project represented 1,554 clients and won in 71% of their trials.[262] The American Friends Service Committee in New Jersey testified that between 95% and 100% of detained immigrants are now represented by counsel compared to only 35% of detained immigrants prior to the launch of the project.[263]

Detained immigrants require effective counsel. Even misdemeanor offenses can have serious immigration consequences. Attorneys defending people accused of these offenses should be qualified to offer affirmative and competent advice. Because immigration cases are often complicated, New York has established funds to support the development of expert immigration legal resources

aimed at improving the quality of indigent legal services. A network of Regional Immigration Assistance Centers provides access to training and legal resources to assist attorneys in understanding the immigration consequences of criminal convictions when advising non-citizen clients.[264] Cities and counties in Colorado should invest resources from their legal defense funds to improve the quality of defense provided for detainees.

Beyond establishing a legal defense fund, cities and counties in Colorado should also establish an immigration detention bond fund to ensure that immigrants do not face months, or even years, in detention solely because they cannot afford the high price of bonds. Over 30% of detained immigrants have the opportunity to be released on cash bond while their immigration cases work their way through the courts.[265] The nonprofit Freedom for Immigrants has documented bonds ranging from $1,500 to $250,000 with a median of $4,250 and an average of $14,500.[266] Many families struggle to afford these high bonds. Lawful permanent residents, asylum seekers, survivors of domestic abuse and undocumented immigrants fleeing danger are held in jail-like conditions, unable to afford a way out. Companies like Libre offer ankle-monitoring technology and many families, desperate to free their loved ones, are driven into dept struggling to pay the fees.[267] This makes it even harder for families to afford legal defense and pushes the most vulnerable into poverty. By providing a fund to pay bond, Colorado cities and counties can ensure the release of those detained solely due to their poverty.

Finally, cities and counties in Colorado should establish a fund to support citizenship services and English classes. New York City, Atlanta, Chicago, Nashville and Seattle opened mayoral offices for immigrant affairs that provides services such as ESL classes, financial literacy and citizenship workshops.[268]

# LIMITING COOPERATION WITH ICE

It is not enough to simply improve the conditions of confinement in detention centers and establish avenues for immigrants to leave custody by either winning their cases or bonding out. Localities in Colorado should

also disrupt the system that sends immigrants from their communities into custody at the Aurora Contract Detention Facility. Too many immigrants are detained in Aurora as a result of local cooperation with ICE. Yet local governments are not required to implement policies that clearly harm their communities. If local police officers act as enforcers of federal immigration laws, immigrants will be less likely to work with police during investigations, report a crime or seek help.[269] In order to keep all communities safe, cities and counties in Colorado must stand up in defense of their immigrant communities and pass legislation preventing local enforcement of federal immigration laws.

Cities and counties in Colorado should begin by broadly prohibiting the use of local resources in the enforcement of immigration laws and by prohibiting local participation in any civil immigration enforcement operations including raids, investigations, interrogations, apprehensions or detentions.[270] Numerous counties across the U.S. have passed legislation stating that no department, agency, officer or employee can expend any time, funds, or resources on facilitating the civil enforcement of federal immigration laws.[271] It is important that these ordinances not include an exception based on criminal convictions, or people who may appear in law enforcement databases. People with criminal convictions are the most likely to be detained during their immigration cases and the least likely to have access to an attorney. By leaving them out of ordinances designed to protect immigrants, cities and counties push the most vulnerable into a system that risks violating their due process rights.[272]

Additionally, cities and counties in Colorado should implement policies to ensure that police officers are not inadvertently supporting ICE by arresting people for federal immigration violations. The National Crime Information Center (NCIC) database is maintained by the FBI to track criminal activity and includes an "immigration violators file." Though local law enforcement agencies cannot make arrests for civil immigration violations, some police officers continue to consider the appearance of someone's name on the NCIC list as reason to take them into custody.[273] Colorado cities and counties should pass ordinances such as that of Washington, D.C.'s, which states that, "Law

enforcement officers shall not make arrests solely based on administrative warrants for arrest or removal entered by ICE into the NCIC database."[274]

Sometimes, a relationship between ICE and local authorities will be codified in contracts. One of these contracts are 287(g) agreements. These delegate authority to local law enforcement officers to carry out certain federal immigration enforcement activities, providing them with access to federal immigration databases and potentially permitting them to interrogate and arrest anyone they believe to be in the U.S. in violation of federal immigration laws.[275] These agreements are extremely expensive and hurt the cities and counties that enter into them. In Harris County, Texas, the sheriff terminated his agreement due to at least $675,000 in annual costs.[276] Prince William County, Virginia initially planned to divert nearly $800,000 in "rainy day" funds to cover the cost of starting its 287(g) program and projected costs of $11.3 million over a five-year period.[277] Instead of promoting public safety and working on local issues, police officers were forced to enforce federal laws without adequate compensation from the federal government.[278]

Additionally, these agreements have led to racial profiling. The Department of Justice found, in two separate investigations, that 287(g) agreements in Alamance County, North Carolina, and Maricopa County, Arizona, led to the unlawful detention and arrest of Latinx people.[279] In Alamance County, police officers stopped Latinx drivers nine times more frequently than non-Latinx drivers and Latinx drivers were arrested for traffic violations in cases where non-Latinx drivers received only citations.[280] According to a 2015 Immigrant Legal Resource Center study, well over 2,000 counties have enacted measures prohibiting the implementation of 287(g) agreements.[281] To save money, protect communities and invest in actual measures that improve public safety, cities and counties in Colorado should pass measures so that no officer, agent or employee can enter into any contract, agreement or arrangement that would grant federal civil immigration enforcement authority to city agents or law enforcement officers.[282]

Another contract between the federal government

and local authorities aimed at supporting the mass deportation of immigrants are Intergovernmental Service Agreements. In these agreements, jails rent out space to ICE and hold those suspected of being in the country illegally. While some counties make money from these agreements, others end up subsidizing ICE's deportations by holding immigrants on their behalf.[283] These contracts risk violating the due process rights of those detained. People may be transferred from county custody to ICE custody and not even leave the building, limiting their ability to challenge their stay in ICE custody.[284] Cities and counties in Colorado should join the more than 2,000 counties that have prevented these agreements by passing legislation stating that officers, agents or employees cannot enter into any contract, agreement, or arrangement to detain immigrants in deportation proceedings, including but not limited to IGSAs.[285] Additionally, at least 30 days before applying for or renewing any contracts, agreements or arrangements including 287(g) agreements and IGSAs, Colorado counties should hold a public meeting to receive and consider community input.[286]

Cities and counties in Colorado should not only prevent ICE from holding immigrants in local jails. They should also deny ICE access to jail facilities. ICE agents can visit jails, access booking information about individuals, and interview detainees. These interviews frequently take place without an attorney present.[287] Colorado cities and counties should pass legislation stating that no officer, employee or agent can permit ICE officers access to city facilities, property, equipment, or databases absent a judicial criminal warrant specifying the information or individuals sought.[288] Counties throughout the U.S. have already passed legislation preventing ICE from interrogating inmates without their consent, including Washington, D.C., which passed legislation stating that they will not permit an ICE agent to conduct an interview without giving the inmate an opportunity to have counsel present.[289] If ICE is granted access to a Colorado jail, they should only be able to address the issues or interview the people described in the judicial warrant.

Even if jails require a warrant before ICE agents enter the facility, they may continue to share jail release dates with ICE. When ICE sends "requests for information,"

jails may respond with the exact day, time and location of a person's release, making it easy for ICE to arrive and arrest them. This punishes people who have already served their criminal sentence with an even more severe sentence – the threat of deportation. It also turns jails into a pipeline to deportation. Notification requests from ICE are not reviewed by a judge and require local governments to invest time and energy enforcing federal immigration laws. Cities and counties in Colorado should join the many counties that have passed legislation preventing local communication with ICE concerning the release of individuals in custody.[290] Additionally, Colorado cities and counties should require regular public reporting of the number of requests for notifications received and the number of requests for notifications honored.

It is also necessary for cities and counties in Colorado to prevent jails from sharing broader personal non-public information about a person with ICE, including people's address, phone number, country of birth, primary language, religious affiliation and place and nature of employment. This information can be used to help apprehend and deport individuals. Colorado cities and counties should also stop collecting sensitive information, including nationality and immigration status.[291] Cities and counties in Colorado should pass municipal ordinances stating that no agent, employee or officer can ask about or investigate the citizenship or immigration status of an individual unless such inquiry or investigation is required by state statute, federal regulation or court decision.[292]

## REFORMING AN UNJUST SYSTEM

In order to truly protect immigrant communities, major reforms to the Colorado criminal legal system are necessary. In areas with racially biased police practices, immigrants are more likely to be arrested and local policing will contribute to higher deportation rates. People with lawful immigration status may lose their right to stay in the U.S. as a result of a criminal conviction. Even low-level non-violent offenses can threaten someone's entire future. The Center for Popular Democracy explains, "Immigrants are often first pulled into the local criminal justice system through police practices that target them for their race, and then the

immigration system which targets them because of, and through, their contact with the criminal justice system."[293] Cities and counties in Colorado should pass legislation stating that agents, employees or officers cannot rely on actual or perceived national origin, immigration or citizenship status, race, ethnicity or language proficiency when deciding whether to stop, question, search, arrest or detain an individual.[294] By building in policies to prevent racialized policing, Colorado cities and counties can build safer communities for everyone.

Police officers are not the only actors in the criminal legal system with the power to determine whether someone will face deportation. Prosecutors have the power to determine which cases will be brought, what charges levied, what sentence requested and how the case will be resolved. Plea deals account for 97% of federal and 94% of state convictions, so prosecutors are often the key players determining the outcomes for most people entering the criminal legal system.[295] Even though prosecutorial decision-making can have serious consequences for non-citizens, including deportation, a 2011 study of the 50 largest county prosecutor offices found that most had no policies explaining how immigration consequences can affect case outcomes.[296] Cities and counties in Colorado should encourage prosecutors to use their discretion to deviate from general practice if the general practice may result in an unjust outcome due to the defendant's immigration status.[297] Additionally, prosecutors should be encouraged to agree to sentences under 364 days if the defendant is eligible for probation in order to avoid deportation.[298] Colorado cities and counties should pass legislation requiring officers, agents and employees entrusted with prosecuting criminal offenses to adopt written policies and practices that consider the avoidance of adverse immigration consequences, including the risk of deportation, when exercising their authority to resolve cases.[299]

## THIS IS THE TIME FOR OUR COMMUNITIES TO ACT

It is time for cities and counties throughout Colorado to stand up in the face of the human rights abuses detailed in this report and defend our most vulnerable

communities. By improving conditions at detention facilities, freeing immigrants from detention facilities and limiting the number of immigrants being placed in detention facilities, local governments in Colorado can boldly put an end to a system that tortures our neighbors in our own backyards. First, Colorado city, county and state legislatures must enforce a system of oversight, where elected representatives and public servants can review detention facilities and publicly release reports concerning conditions of confinement. Additionally, the Colorado legislature should divest from private companies that profit from the detention of human beings. To free our neighbors detained in Aurora, cities and counties in our state must implement funds to provide legal services so that immigrants can win their cases and return to their families. Cities and counties should also establish a fund to pay the high price of bonds in cases where poverty is the only barrier to freedom.

To ensure that more immigrants are not torn from their communities and placed in detention, Colorado cities and counties must limit local cooperation with ICE by prohibiting joint operations with ICE, including any 287(g) agreements and Intergovernmental Service Agreements. Cities and counties in Colorado must also pass legislation banning information sharing about a person's jail release date and other personal non-public data, collecting information about an individual's immigration status, arresting an individual due to immigration-related information in the National Crime Information Center database and allowing ICE access to jail facilities. More broadly, Colorado cities and counties should pass legislation to reform a criminal legal system that continually targets immigrant communities. As the federal government threatens communities across the country, expands detention facilities and accelerates mass deportations, our cities and counties must act.

# Acknowledgments

"There's really no such thing as the 'voiceless'. There are only the deliberately silenced, or the preferably unheard."

— Arundhati Roy

American Civil Liberties Union of Colorado would like to thank the people that enabled us to write this report. First and foremost, the family members, Neda Samimi-Gomez, Candida Salgado and Priscilla Cruz Moreno, who shared their memories with us so that we may better know their loved ones and the depth of their loss.

This report was principally investigated and authored by Deanna Hirsch, Media Strategist at the ACLU of Colorado. Vanessa Michel, Director of Communications at the ACLU of Colorado managed the production of this report. Deirdre Brooks, Communications Associate, was lead designer of this report. ACLU of Colorado Legal Director Mark Silverstein and Staff Attorney Arash Jahanian have investigated the death of Kamyar Samimi, including through their Freedom of Information Act requests and lawsuit. Jahanian also authored the Executive Summary. Former Paralegal, Jessica Howard supported the investigation through records requests. ACLU of Colorado Public Policy Director Denise Maes and Public Policy Associate Helen Griffiths authored the policy recommendations and citations. This report was edited by Vanessa Michel, Mark Silverstein, Denise Maes, Helen Griffiths, Arash Jahanian, Deanna Hirsch, ACLU of Colorado Field Director Delana Maynes, Director of Campaigns John Krieger and Immigration Campaign Coordinator Ana Temu.

We are grateful to our dedicated volunteers, interns and fellows who supported our investigation into the Aurora Contract Detention Facility. Legal Fellow Arielle Herzberg, contributed legal research and analysis and Public Policy Fellow Sam Fesshaie contributed examination of medical and safety grievances. Research was conducted by Field Interns Jackson Ingram, Daryn Miller and Caleb Walker Wilson, Public Policy Intern Kathryn Kenny and Campaigns Intern Tali Juliano. Communications Assistant Ivan Popov and Communications Intern Charlotte Spaeth contributed research and editing. This report was copy edited by Lori Smith. Chris Outcalt conducted initial research and reporting. Julian G.G. Wolfson conducted principal research, fact-checking and citations. We are grateful for the support of our community partners: Colorado Peoples Alliance (COPA), American Friends Service Committee (AFSC), Civil Rights Education and Enforcement Center (CREEC), Rocky Mountain

Immigrant Advocacy Network (RMIAN) and Pangea Legal Services, for connecting us with those affected by immigration detention in Aurora. We thank everyone who assisted with ACLU of Colorado's peer review process of this report: Liz Jordan, Jocelyn Jenks, Luis Angel Reyes Savalza, John Sullivan, David Lane, Danielle Jefferis, Hans Meyer, Dr. JK Costello, and ACLU Senior Advocacy and Policy Counsel Naureen Shah, ACLU Deputy Director of Immigrant Justice Campaigns Sylvia Ruiz and ACLU Deputy Director, Immigration Policy National Political Advocacy Department Ruthie Epstein. We thank Steven Brown for his photos and Dave Russell for the photo on our cover that so beautifully captures community. Thank you, ACLU of Colorado Director of Philanthropy, Rachel Pryor-Lease, Major Gifts Officer Jason Chavez and our many members and supporters who empower us to do this work.

Finally, we thank our brave neighbors who shared their personal experiences and allowed ACLU of Colorado to publicly share their stories despite fear of retribution or the pain of reliving the past. Thanks to Dan Courson, Ronnie Keyes, Mohamed Dirshe, John Mathews, Diana Lopez, Jane Smith, Fabian Vasquez, Elias Salgado and Miguel Angel Avila Arce we were able to shine a light on the critical need for change inside the Aurora Contract Detention Facility. Your collective courage is what makes any change possible.

This report is dedicated to Evalin-Ali Mandza and Kamyar Samimi. May you rest in power.

# Methodology

Over the course of nine months American Civil Liberties Union of Colorado conducted research and interviews into allegations of mistreatment, medical neglect and multiple deaths at the Aurora Contract Detention Facility (ACDF), including the death of Kamyar Samimi. From January to September 2019, a stakeholder visit and dozens of interviews were conducted with current and former detainees inside and outside the facility, as well as with their family members.

ACLU of Colorado began the process of investigating Kamyar Samimi's death and conditions of confinement at ACDF on Dec. 20, 2017, by seeking documents through a Freedom of Information Act (FOIA) request filed with U.S. Immigration and Customs Enforcement (ICE). ICE produced only five unrelated pages of information, and ACLU appealed. ICE responded seven months later that its investigation of Mr. Samimi's death had been completed and more documents would be forthcoming. Those documents were not produced. On April 9, 2019, the ACLU of Colorado filed a lawsuit seeking previously requested records related to Mr. Samimi's arrest, detention, and subsequent death. ICE released the detainee death review of Mr. Samimi May 2019. We provided that report to an independent physician with expertise in correctional health who separately reviewed the report and shared his conclusion with us. The medical expert who provided his opinion on the death investigations and medical records did so in his own personal capacity. His opinion does not represent the official view of his employer or affiliated institution.

The 11 cases we discuss in this report represent those believed to have suffered and in two cases died while in detention at ACDF from April 2012 to present day. They are a small fraction of the hundreds of people detained during the period in question and do not allow us to make general conclusions about the conditions in many of the facilities that ICE uses to detain immigrants. In some cases when the report highlights the narrative of a particular person making generalized comments about their treatment, or things that were said by guards, we felt that there was corroboration in the numerous unreported stories of people we interviewed that was emblematic of ACDF conditions. These interviews raise serious concerns about ICE's ability to appropriately address and respond to major deficiencies in medical care and safety. Those cases where sources have legal representation were peer reviewed by their counsel.

The External Reviews and Analysis Unit Detainee Death Review of Kamyar Samimi analyzed in this report was conducted by the U.S. Department of Homeland Security ICE Office of Professional Responsibility and made publicly available. Our analyses rely upon facts and conclusions included in the DHS report. The death review was analyzed by Dr. JK Costello, an expert in

correctional health and senior consultant with The
Steadman Group. Dr. Costello develops population
health plans for substance use disorder prevention,
treatment and recovery. Prior to entering public health,
he spent two years as chief medical officer for a chain of
medical clinics designing evidence-based care models for
more than a dozen physicians and mid-level providers.
Dr. Costello completed his Master of Public Health
capstone project at the Harm Reduction Action Center.
He has presented at state and regional conferences
on his work and is active in the Colorado Consortium
for Prescription Drug Abuse Prevention's Provider
Education and Treatment workgroups.

In the independent review conducted for this report,
Dr. Costello assessed whether Mr. Samimi's care was
adequate considering standard medical practices and
professional ethics and found that it was not. Detainees
are entitled to be treated humanely and with respect for
human dignity regardless of immigration status.

ACLU of Colorado also sent written questions and
requested comment from ACDF leadership and former
medical staff on the report's findings as well as findings
from interviews and our stakeholder visit. (Right.)
Neither party responded to our request for comment.

In addition to interviews, staff and independent
contractors provided additional research and fact
checking. In conducting the research assigned
by ACLU of Colorado, an independent contractor
largely relied on internet-based resources and/or
publications in addition to the materials provided
by the organization — some of which are not readily
accessible to the public. The contractor was mindful of
the sources cited and attempted to rely on individuals
and/or entities from reputable media outlets, official
governmental entities, and prestigious non-governmental
organizations, including but not limited to the Federal
Drug Administration (FDA), Department of Justice
(DOJ), Colorado Public Radio (CPR), NBC News and the
American Immigration Counsel.

In addition to these internet-based sources, the
contractor consulted and/or attempted to consult with
different organizations/individuals that have expertise
in the relevant subject matter, including but not limited

to the Civil Rights Education and Enforcement Center
(CREEC). Finally, contractor utilized Lexis Nexis to
conduct research on certain legal questions by reviewing
opinions rendered by federal courts throughout the
country.

For the policy recommendations, ACLU of Colorado
consulted legislation passed by other cities, counties
and states. ACLU of Colorado staff also relied on policy
guides by the National Immigration Law Center, the
Center for Popular Democracy, Local Progress, the
Immigrant Legal Resource Center and the National
Conference of State Legislatures.

---

**From:** Denise Maes
**Sent:** Tuesday, August 20, 2019 5:39 PM
**To:** 'jchoate@geogroup.com'
**Cc:** 'mike.j.williams@ice.dhs.gov'

Dear Warden Choate,

Thank you, again, for the opportunity to visit the
GEO facility on July 31, 2019 and for the time your
staff and those at ICE gave for the tour. Naureen
Shah sent you a follow up e-mail seeking some
additional information, but I don't either of us have
heard back from you. We are in the process of
preparing a report on our tour as well as some
interviews we have had with several current and
former detainees. We want to give you an
opportunity to respond to some of the concerns we
uncovered during our months of work on this report.

We have heard several issues related to inadequate
medical attention. There were complaints related to
staff ignoring requests for medical attention; staff
downplaying detainee medical complaints;
inattentiveness toward detainees with disabilities and
that facility personnel is not providing each detainee
with a comprehensive health assessment within 14
days of the detainee's arrival. Related, many
complain of inadequate or no dental care services.
Finally, detainees claim to be given simple pain
medication – ibuprofen – for major ailments.

Excerpt of email from Public Policy Director Denise Maes to Aurora
Contract Detention Facility Warden Johnny Choate. August 20, 2019. On
file with ACLU of Colorado.

# End Notes

1   U.S. DEPARTMENT OF HOMELAND SECURITY IMMIGRATION AND CUSTOMS ENFORCEMENT – OFFICE OF PROFESSIONAL RESPONSIBILITY, EXTERNAL REVIEWS AND ANALYSIS UNIT – DETAINEE DEATH REVIEW – KAMYAR SAMIMI (May 22, 2018) (on file with ACLU of Colorado).

2   *Id.*

3   *Id.*

4   *Id.*

5   *Id.*

6   *Id.*

7   *Id.*

8   *Id.*

9   *The GEO Group's (GEO) CEO George Zoley on Q4 2018 Results – Earnings Call Transcript*, SEEKING ALPHA (Feb. 14, 2019), https://seekingalpha.com/article/4241218-geo-groups-geo-ceo-george-zoley-q4-2018-results-earnings-call-transcript.

10  *Id.*

11  Richard Cavendish, *The Greek Civil War Ends*, HISTORY TODAY (Oct. 1999), https://www.historytoday.com/archive/greek-civil-war-ends.

12  Darden Livesay, *A Greek Immigrant's Company is Making Millions off Trump's "Zero Tolerance" Immigration Policy*, The Pappas Post (June 26, 2018), https://www.pappaspost.com/a-greek-immigrants-company-is-making-millions-off-trumps-zero-tolerance-immigration-policy/.

13  *Id.*

14  *Board of Directors: George C. Zoley*, THE GEO GROUP, INC., https://www.geogroup.com/board_of_directors.

15  *George Zoley Net Worth*, WALLMINE (2019), https://wallmine.com/people/34546/george-c-zoley.

16  *George C. Zoley: Executive Compensation*, SALARY.COM, https://www1.salary.com/George-C-Zoley-Salary-Bonus-Stock-Options-for-GEO-GROUP-INC.html.

17  The GEO Group, Inc., Annual Report (Form 10-K) (Feb. 25, 2019).

18  Adam Snitzer, *The nation's largest private prisons operator is based in Florida. And profits are up*, MIAMI HERALD (Apr. 22, 2019), https://www.miamiherald.com/news/business/biz-monday/article227477119.html.

19  *Id.*

20  *Id.*

21  Beryl Lipton, *Better know a private prison giant: GEO Group's Board of Directors*, MUCKROCK (Jun. 22. 2017), https://www.muckrock.com/news/archives/2017/jun/22/better-know-private-prison-geo/.

22  Adam Snitzer, *The nation's largest private prisons operator is based in Florida. And profits are up*, MIAMI HERALD (Apr. 22, 2019), https://www.miamiherald.com/news/business/biz-monday/article227477119.html.

23  *The GEO Group's (GEO) CEO George Zoley on Q4 2018 Results – Earnings Call Transcript*, SEEKING ALPHA (Feb. 14, 2019), https://seekingalpha.com/article/4241218-geo-groups-geo-ceo-george-zoley-q4-2018-results-earnings-call-transcript.

24  *Id.*

25  *Id.*

26  *Ask The Indy: What we know about the GEO Group and its Aurora ICE Processing Center*, THE COLORADO INDEPENDENT (Aug. 15, 2019) https://www.coloradoindependent.com/2019/08/15/geo-group-aurora-immigrant-detention-center/.

27  Caitlyn Kim, *ICE Defends the Treatment of Detainees At Aurora Facility During Media Tour*, CPR NEWS (Aug. 9, 2019), https://www.cpr.org/2019/08/09/ice-defends-the-treatment-of-detainees-at-aurora-facility-during-media-tour/.

28  Erika Gonzalez, *Increased detainees, virus outbreaks found at Aurora ICE Detention Center*, KDVR (Mar. 4, 2019), https://kdvr.com/2019/03/04/increased-detainees-virus-outbreaks-found-at-aurora-ice-detention-center/.

29  *Contract Award*, U.S. MARSHALS (Oct. 11, 2012), www.usmarshals.gov/foia/IGAs_Cap_Agreements/colorado/aurora_det_facility.pdf.

30  *Our Locations: Aurora ICE Processing Center*, THE GEO GROUP, INC., www.geogroup.com/FacilityDetail/FacilityID/31.

31  *Id.*

32  Elise Schmelzer, *The ICE detention center in Aurora added 432 beds last month. Those beds are expected to be filled almost immediately*, THE DENVER POST (Feb. 6, 2019), https://www.denverpost.com/2019/02/06/aurora-ice-detention-center-additional-beds/.

33  *Extension of Use for Surge Beds at Aurora CDF*, FEDERAL BUSINESS OPPORTUNITIES (Apr. 25, 2019), https://www.fbo.gov/index.php?s=opportunity&mode=form&id=24bf5af8f-106d92a3abc7bc98fb8a51f&tab=core&_cview=0.

34  *The GEO Group's (GEO) CEO George Zoley on Q4 2018 Results – Earnings Call Transcript*, SEEKING ALPHA (Feb. 14, 2019), https://seekingalpha.com/article/4241218-geo-groups-geo-ceo-george-zoley-q4-2018-results-earnings-call-transcript.

35  *The GEO Group Reports Fourth Quarter and Full-Year 2018 Results*, BUSINESS WIRE (Feb. 14, 2019), www.businesswire.com/news/home/20190214005232/en/GEO-Group-Reports-Fourth-Quarter-Full-Year-2018.

36  *ACLU of Colorado Sues ICE for Information about Death of Iranian Man at Detention Facility*, ACLU OF COLORADO (Apr. 9, 2019), www.aclu.org/press-releases/aclu-colorado-sues-ice-information-about-death-iranian-man-detention-facility.

37  U.S. DEPARTMENT OF HOMELAND SECURITY IMMIGRATION AND CUSTOMS ENFORCEMENT – OFFICE OF PROFESSIONAL RESPONSIBILITY, EXTERNAL REVIEWS AND ANALYSIS UNIT – DETAINEE DEATH REVIEW – KAMYAR SAMIMI (May 22, 2018) (on file with ACLU of Colorado).

38  *Id.*

39  Complaint, *American Civil Liberties Union of Colorado v. U.S. Immigration and Custom Enforcement* (D. Colo. Apr. 9, 2019) (No. 1:19-cv-01036).

40  U.S. DEPARTMENT OF HOMELAND SECURITY IMMIGRATION AND CUSTOMS ENFORCEMENT – OFFICE OF PROFESSIONAL RESPONSIBILITY, EXTERNAL REVIEWS AND ANALYSIS UNIT – DETAINEE DEATH REVIEW – KAMYAR SAMIMI (May 22, 2018) (on file with ACLU of Colorado).

41  *Id.*

42  Kieran Nicholson, *Medical Care for detainee who died in ICE custody in Colorado fell short of federal standards, report says*, THE DENVER POST (May 20,

2019), https://www.denverpost.com/2019/05/20/aurora-ice-detainee-died-medical-care/.

43  U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with ACLU of Colorado).

44  Id.

45  Id.

46  Id.

47  Id.

48  Id.

49  Id.

50  Id.

51  Id.

52  Katherine Hawkins, Medical Neglect at a Denver Immigration Jail, POGO (May 21, 2019), https://www.pogo.org/investigation/2019/05/medical-neglect-at-a-denver-immigration-jail/.

53  U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with ACLU of Colorado).

54  Id.

55  Id.

56  Medications to Treat Opioid Addiction Are Effective and Save Lives, But Barriers Prevent Broad Access and Use, Says New Report, The National Academies of Sciences, Engineering, and Medicine (March 20, 2019), http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=25310.

57  Id.

58  Meredith Hoffman, ICE's Rapid Expansion Has Led to Chickenpox, Quarantines, and Desperation, Vice Immigration, (Feb. 25, 2019), https://www.vice.com/en_us/article/wjm4qb/ices-rapid-expansion-has-led-to-chickenpox-quarantines-and-desperation.

59  Letter from the Colorado Department of Public Health and Environment and Tri-County Health Department to The GEO Group, Inc, Chief Medical Officer (Feb. 22, 2019) (on file with ACLU of Colorado).

60  Samn Tabachnik, Jason Crow Denied Entry in Surprise Visit to Aurora's ICE Detention Site Amid Another Rash of Illnesses, The Denver Post (Feb. 20, 2019), www.denverpost.com/2019/02/20/jason-crow-aurora-ice-surprise-visit/.

61  Conor McCormick-Cavanagh, Immigrant Detainees Launch Hunger Strike at Facility in Aurora, Westword (Mar. 6, 2019), https://www.westword.com/news/immigrant-detainees-launch-hunger-strike-at-facility-in-aurora-11258270.

62  Kara Mason, Aurora ICE prison refuses to let congressmen, city lawmaker in for unannounced tour, Sentinel (Feb. 20, 2019), https://sentinelcolorado.com/news/metro/aurora-ice-prison-refuses-to-let-congressman-city-lawmaker-in-for-unannounced-tour/.

63  Id.

64  Samn Tabachnik, Jason Crow Denied Entry in Surprise Visit to Aurora's ICE Detention Site Amid Another Rash of Illnesses, The Denver Post (Feb. 20, 2019), www.denverpost.com/2019/02/20/jason-crow-aurora-ice-surprise-visit/.

65  Id.

66  Letter from Congressmen Jason Crow to ICE Acting Director Ronaldo Vitiello (Feb. 28, 2019), https://crow.house.gov/sites/crow.house.gov/files/02-28-2019-Letter-to-ICE-Detention-Center-Oversight-SIGNED.pdf

67  Id.

68  Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California, Department of Homeland Security Office of Inspector General (Sept. 27, 2018) https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf.

69  Id.

70  David Henry and Imani Moise, JPMorgan backs away from private prison finance, Reuters (Mar. 5, 2019), www.reuters.com/article/us-jp-morgan-prisons/jpmorgan-backs-away-from-private-prison-finance-idUSKCN1QM1LE.

71  Jerry Iannelli, GEO Group's Own Shareholders Concerned About Human Rights in the Company's Prisons, Miami New Times (May 7, 2019) www.miaminewtimes.com/news/geo-group-shareholders-concerned-about-human-rights-violations-at-private-prison-giant-11166775.

72  See Menocal v. GEO Grp., Inc. (D. Colo. Oct. 22, 2014) (No. 14-cv-02887) Washington v. GEO Grp. (W.D. Wash. Sept. 20, 2017) (No. 17-5806); Chen v. GEO Group, Inc. (W.D. Wash. Sept. 26, 2017) (No. 3:17-cv-05769); Novo v. GEO Grp., Inc. (C.D. Cal. Dec. 19, 2017) (Case No. 17-2514).

73  Blair Miller, Class-action suit certified for 60K+ Detainees at Aurora ICE facility 'forced' to work for $1 a day, The Denver Channel (Mar. 3, 2017), www.thedenverchannel.com/news/politics/class-action-suit-certified-for-60k-detainees-at-aurora-ice-facility-forced-to-work-for-1-a-day.

74  Id.

75  Crow Introduces Bill to Require Congressional Access to ICE Detention Facilities, Office of Congressman Jason Crow (May 20, 2019), https://crow.house.gov/media/press-releases/crow-introduces-bill-require-congressional-access-ice-detention-facilities.

76  Conor McCormick-Cavanagh, Jason Crow's Office Will Begin Weekly Inspections of GEO Detention Facility, Westword (July 9, 2019), https://www.westword.com/news/jason-crow-staffers-will-visit-aurora-detention-facility-weekly-11404710.

77  Following First Weekly ICE Visit, Rep. Crow Releases Report on Aurora, CO Detention Center, Office of Congressman Jason Crow (July 16, 2019), https://crow.house.gov/media/press-releases/following-first-weekly-ice-visit-rep-crow-releases-report-aurora-co-detention.

78  U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with ACLU of Colorado).

79  Id.

80  Id.

81  Id.

82  Id.

83  Id.

84  Id.

85  Id.

86  Id.

87  Id.

88  Id.

89  *Id.*

90  *Id.*

91  *Id.*

92  *Id.*

93  *Id.*

94  *Id.*

95  *Id.*

96  *Id.*

97  *Id.*

98  *Id.*

99  *Id.*

100  *Statement by Douglas Throckmorton M.D., Deputy Center Director for Regulatory Programs in FDA's Center for Drug Evaluation and Research, on new opioid analgesic labeling changes to give providers better information for how to properly taper patients who are physically addicted to opioids*, U.S. Food and Drug Administration (Apr. 9. 2019), https://www.fda.gov/news-events/press-announcements/statement-douglas-throckmorton-md-deputy-center-director-regulatory-programs-fdas-center-drug-0.

101  *Id.*

102  U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with ACLU of Colorado).

103  *Id.*

104  *Id.*

105  *Id.*

106  *2011 Operations Manual ICE Performance-Based National Detention Standards*, U.S. Immigration and Customs Enforcement, 334 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

107  U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with ACLU of Colorado).

108  *Facility Inspections*, U.S. Immigration and Customs Enforcement (Aug. 15, 2019), https://www.ice.gov/facility-inspections

109  Letter from Lead Compliance Inspector of The Nakamoto Group, Inc. to Assistant Director for Detention Management (Oct. 4, 2018), www.ice.gov/doclib/facilityInspections/denverCdfCo_CL_10_04_2018.pdf.

110  *Id.*

111  *Id.*

112  *Performance-Based National Detention Standards 2011*, U.S. Immigration and Customs Enforcement, 174 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

113  *Id.* at 99.

114  *Id.*

115  Letter from Lead Compliance Inspector of The Nakamoto Group, Inc. to Assistant Director for Detention Management (Oct. 4, 2018), www.ice.gov/doclib/facilityInspections/denverCdfCo_CL_10_04_2018.pdf.

116  *Performance-Based National Detention Standards 2011*, U.S. Immigration and Customs Enforcement, 182 (Dec. 2016),

https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

117  Letter from Lead Compliance Inspector of The Nakamoto Group, Inc. to Assistant Director for Detention Management (Oct. 4, 2018), www.ice.gov/doclib/facilityInspections/denverCdfCo_CL_10_04_2018.pdf.

118  *Id.*

119  *Id.*

120  *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, U.S. Department of Homeland Security Office of Inspector General (Jan. 29, 2019) https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

121  *Id.* (explaining that the "QASP provides tools for ensuring facilities meet performance standards").

122  *Id.*

123  *Id.*

124  *Id.*

125  *Id.*

126  *Id.*

127  *Id.*

128  *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, U.S. Department of Homeland Security Office of Inspector General (June 3, 2019) https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

129  *Id.*

130  *Id.*

131  *Warren Opens Investigation into Private Detention Accreditation System After Widespread Reports of Substandard Conditions & Safety Concerns in Multiple Facilities*, Office of Senator Elizabeth Warren (May 31, 2019) www.warren.senate.gov/oversight/letters/warren-opens-investigation-into-private-detention-accreditation-system-after-widespread-reports-of-substandard-conditions-and-safety-concerns-in-multiple-facilities.

132

133  *Id.*

134  *Id.*

135  *Warren, Colleagues Demand Answers From ICE Following Investigation of For-Profit Contractors Running Immigration Detention Facilities*, Office of Senator Elizabeth Warren (Apr. 17, 2019), https://www.warren.senate.gov/oversight/letters/warren-colleagues-demand-answers-from-ice-following-investigation-of-for-profit-contractors-running-immigration-detention-facilities.

136  *Id.*

137  Sarah Varney, *Private inspectors paint a rosy picture of U.S. immigrant detention centers. Audits find otherwise*, LA Times (July 26, 2019), https://www.latimes.com/california/story/2019-07-25/immigration-detention-center-nakamoto.

138  *Id.*

139  Letter from Jared Polis, U.S. Congressman, to Thomas Homan, Acting Director of U.S. Immigration Customs and Enforcement (June 20, 2018), (on file with ACLU of Colorado).

140  *Id.*

141  *Id.*

142 *Id.*

143 *Id.*

144 *Id.*

145 Proxy Memorandum to the GEO Group Shareholders (Mar. 21, 2016), https://jesuits.org/Assets/Publications/File/GEO-Proxy-Memo.pdf.

146 *Id.*

147 *Id.*

148 *Id.*

149 *Id.*

150 *Id.*

151 Hannah Rappleye and Lisa Riordan Seville, *24 immigrants have died in ICE custody during the Trump administration*, NBC News (June 9, 2019), https://www.nbcnews.com/politics/immigration/24-immigrants-have-died-ice-custo-dy-during-trump-administration-n1015291.

152 Complaint at 2, *Keyes v. The GEO Group, Inc.*, (D. Colo. Feb. 1, 2017) (No. 17-cv-30166).

153 *Id.* at 4.

154 *Id.*

155 *Id.*

156 *Id.* at 5.

157 *Id.* at 6.

158 *Id.*

159 *Id.*

160 *Id.* at 7.

161 *Id.*

162 *Id.*

163 Complaint at 2, *Dirshe v. The GEO Group, Inc.* (D. Colo. May 2, 2019) (No. 19-cv-1816).

164 *Id.* at 5.

165 *Id.*

166 *Id.*

167 *Id.* at 6.

168 *Id.* at 8.

169 *Id.* at 6.

170 *Id.*

171 *Id.*

172 Letter from American Immigration Council & American Immigration Lawyers Association to Dr. Stewart D. Smith, Assistant Director Thomas D. Homan, Acting Director Ms. Cameron Quinn, and Acting Inspector General John Kelly (June 4, 2018), http://www.americanimmigra-tioncouncil.org/sites/default/files/general_litigation/complaint_demands_investigation_into_inadequate_medi-cal_and_mental_health_care_condition_in_immigration_de-tention_center.pdf.

173 *Id.*

174 In attempt to protect the privacy interests of the individual discussed in this passage, the report intentionally utilizes a pseudonym.

175 ACLU of Colorado made multiple attempts to reach the for-mer ACDF psychologist. Those attempts were unanswered.

176 Detainee Grievance Form: Diana Lopez, Case # 12-132 (on file with ACLU of Colorado).

177 *Id.*

178 *Id.*

179 *Id.*

180 *Id.*

181 *Id.*

182 *Id.*

183 In attempt to protect the privacy interests of the individual discussed in this passage, the report intentionally utilizes a pseudonym.

184 U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with ACLU of Colorado).

185 *Id.*

186 *Id.*

187 *Id.*

188 *Id.*

189 *Id.*

190 *Id.*

191 *Id.*

192 *Id.*

193 *Id.*

194 *Id.*

195 *Id.*

196 *CREEC Announces Immigration Detention Accountability Project*, Civil Rights Education and Enforcement Center (Sept. 4, 2018), creeclaw.org/creec-announces-immigra-tion-detention-accountability-project/.

197 *Assessment and Accommodations for Detainees with Disabilities*, U.S. Immigration and Customs Enforcement: Enforcement and Removal Operations (Dec. 15, 2016) (on file with ACLU of Colorado).

198 Julia Yates, *Press Release: Civil Rights Groups Charge that ICE Disregards Immigrants' Medical, Mental Health Needs and Ignores Discrimination Against Immigrants with Disabilities*, Civil Rights Education and Enforcement Center (Aug. 19, 2019), https://creeclaw.org/press-release-civil-rights-groups-charge-that-ice-disregards-immigrants-medical-mental-health-needs-and-ignores-dis-crimination-against-immigrants-with-disabilities/.

199 *Id.*

200 Sanya Mansoor, *Hundreds of Their Workers Were Arrested in Mississippi ICE Raids, But No Employers Have Been Charged Yet*, Time (Aug. 9, 2019), https://time.com/5649108/mississippi-ice-raids-no-employers-charged/.

201 Letter from Candida Carranza to Immigration Judge (on file with ACLU of Colorado).

202 *Id.*

203 Alice Speri, *Detained, Then Violated*, The Intercept (Apr. 11, 2018), https://theintercept.com/2018/04/11/immigration-detention-sexual-abuse-ice-dhs/.

204 In jail or prison, a "kite" refers to "a written request for something." *See "Kite?" Where did that come from?*, Jail Medicine, https://www.jailmedicine.com/kite-where-did-that-come-from/.

205 *See, e.g.*, Elias Salgado Trujillo, Aurora Detention Center (Request Form – Kite) (Jan. 7, 2015) (on file with ACLU of

Colorado).

206 U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with ACLU of Colorado).

207 Id.

208 Id.

209 Letter from American Immigration Council and American Immigration Lawyers Association to Assistant Director Stewart D. Smith, Officer Cameron Quinn, Acting Inspector General Jennifer Costello, and Acting Director Mark Morgan (June 11, 2019), https://www.aila.org/File/DownloadEmbeddedFile/80537.

210 Id.

211 Id.

212 Alex Burness, Colorado ICE detainee alleges mistreatment, denial of medical care. The Colorado Independent (June 5, 2019), www.coloradoindependent.com/2019/06/05/ice-detainee-broken-hand/.

213 Id.

214 Id.

215 U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with ACLU of Colorado).

216 Id.

217 Id.

218 Id.

219 Id.

220 Id.

221 Id.

222 Id.

223 Id.

224 Id.

225 Id.

226 Id.

227 Id.

228 Id.

229 Id.

230 Id.

231 Id.

232 Id.

233 Id.

234 Id.

235 Id.

236 Id.

237 Id.

238 Id.

239 Id.

240 Id.

241 Detention Review Summary Form (Form G-324A SIS (Rev. 9/3/08)), U.S. Department of Homeland Security Immigration and Customs Enforcement (Oct. 4, 2018), http://www.documentcloud.org/documents/5990256-Naka-moto-Inspection-of-Aurora.html#annotation/a499560.

242 U.S. Department of Homeland Security Immigration and Customs Enforcement – Office of Professional Responsibility, External Reviews and Analysis Unit – Detainee Death Review – Kamyar Samimi (May 22, 2018) (on file with the ACLU of Colorado).

243 Id.

244 Id.

245 Id.

246 Id.

247 Katherine Hawkins, Medical Neglect at a Denver Immigration Jail, POGO (May 21, 2019), https://www.pogo.org/investigation/2019/05/medical-neglect-at-a-denver-immigration-jail/.

248 Bernalillo County, N.M., ch. 50, art. IV, § 50-73 (2019).

249 Detention Facility Management Oversight Board, Bernalillo County (2019), https://www.bernco.gov/boards-commissions/detention-facility-management-oversight-board.aspx.

250 Detention Facility Management Oversight Board: 2018 Annual Report, Bernalillo County (Sept. 25, 2018), https://admin-bernco.sks.com/uploads/files/MDC/MDC%20-%20DFMO%20Annual%20Report%20Final%20September%2021.pdf.

251 Bill Text, AB-103 Public safety: omnibus., California Legislative Information (2017-2018), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180AB103.

252 H.B. 624, 54th Leg., First Sess. (N.M. 2019).

253 Alex Burness, Ask The Indy: What we know about the GEO Group and its Aurora ICE Processing Center, The Colorado Independent (Aug. 15, 2019), https://www.coloradoindependent.com/2019/08/15/geo-group-aurora-immigrant-detention-center/.

254 Alex Burness, Colorado PERA members are helping support private prisons, The Colorado Independent (July 19, 2019), https://www.coloradoindependent.com/2019/07/19/pera-geo-private-prisons/.

255 HB16-1284: Divest From Companies With Prohibitions Against Israel, Colorado General Assembly (2016), https://leg.colorado.gov/bills/hb16-1284.

256 Blazing a Trail: The Fight for Right to Counsel in Detention and Beyond, National Immigration Law Center, 6 (2016) https://www.nilc.org/wp-content/uploads/2016/04/Right-to-Counsel-Blazing-a-Trail-2016-03.pdf.

257 Id.

258 Id.

259 Ingrid Eagly & Steven Shafer, A National Study of Access to Counsel in Immigration Court, 164 U. Pa. L. Rev. 1-91 (2015).

260 Emily Tucker, Protecting Immigrant Communities: Municipal Policy to Confront Mass Deportation and Criminalization, Local Progress and The Center for Popular Democracy, 29 (2017), https://populardemocracy.org/sites/default/files/Sanctuary-Cities-Toolkit_web_051117%20%281%29.pdf.

261 Blazing a Trail: The Fight for Right to Counsel in Detention and Beyond, National Immigration Law Center, 14 (2016) https://www.nilc.org/wp-content/uploads/2016/04/Right-to-Counsel-Blazing-a-Trail-2016-03.pdf.

262 Id. at 20.

263 *Id.* at 19.

264 *RIAC General Information*, NYS Office of Indigent Legal Services, https://www.ils.ny.gov/content/riac-general-information (last visited Aug. 28, 2019).

265 *Freedom for Immigrants' National Immigration Detention Bond Fund*, Freedom for Immigrants, https://www.freedomforimmigrants.org/national-bond-fund (last visited Aug 28, 2019).

266 *Id.*

267 Steve Fisher, *Getting Immigrants Out of Detention is Very Profitable*, Mother Jones (2016), https://www.motherjones.com/politics/2016/09/immigration-detainees-bond-ankle-monitors-libre/.

268 Emily Tucker, *Protecting Immigrant Communities: Municipal Policy to Confront Mass Deportation and Criminalization*, Local Progress and The Center for Popular Democracy (2017), https://populardemocracy.org/sites/default/files/Sanctuary-Cities-Toolkit_web_051117%20%281%29.pdf.

269 *Id.* at 6.

270 *Id.* at 12.

271 *Id.* at 9.

272 *Id.* at 13.

273 *Id.* at 32.

274 *Id.* at 35.

275 Lena Graber, Angie Junck & Nikki Marquez, *Local Options for Protecting Immigrants: A Collection of City and County Policies to Protect Immigrants from Discrimination and Deportation*, Immigrant Legal Resource Center (2019), https://www.ilrc.org/sites/default/files/resources/local_options_final.pdf (last visited Aug 28, 2019).

276 James Pinkerton & St. John Barned-Smith, *Sheriff Cuts Ties with ICE Program Over Immigrant Detention*, Hous. Chron., Feb. 21, 2017, https://www.houstonchronicle.com/news/houston-texas/houston/article/Sheriff-cuts-ties-with-ICE-program-over-immigrant-10949617.php.

277 Faith Burns & Laura Goren, *Federal Responsibility, Local Costs: Immigration Enforcement in Virginia*, Commonw. Inst., Sept. 26, 2018, https://www.thecommonwealthinstitute.org/2018/09/26/federal-responsibility-local-costs-immigration-enforcement-in-virginia/.

278 Emily Tucker, *Protecting Immigrant Communities: Municipal Policy to Confront Mass Deportation and Criminalization*, 2017, at 24, https://populardemocracy.org/sites/default/files/Sanctuary-Cities-Toolkit_web_051117%20%281%29.pdf (last visited Aug 28, 2019).

279 Letter form Thomas E. Perez, Assistant Attorney General, U.S. Dep't of Justice, to Bill Montgomery, Cnty. Attorney, Maricopa Cnty. (Dec. 15, 2011), https://www.justice.gov/sites/default/files/crt/legacy/2011/12/15/mcso_findletter_12-15-11.pdf. Press Release, Dep't of Justice, Justice Department Releases Investigative Findings on the Alamance County, N.C., Sheriff's Office (Sept. 18, 2012), https://www.justice.gov/opa/pr/justice-department-releases-investigative-findings-alamance-county-nc-sheriff-s-office.

280 Emily Tucker, *Protecting Immigrant Communities: Municipal Policy to Confront Mass Deportation and Criminalization*, 2017, at 27, https://populardemocracy.org/sites/default/files/Sanctuary-Cities-Toolkit_web_051117%20%281%29.pdf (last visited Aug 28, 2019).

281 *Id.* at 9

282 *Id.* at 26

283 Lena Graber, Angie Junck & Nikki Marquez, *Local Options for Protecting Immigrants: A Collection of City and County Policies to Protect Immigrants from Discrimination and Deportation*, Immigrant Legal Resource Center (2019), https://www.ilrc.org/sites/default/files/resources/local_options_final.pdf (last visited Aug 28, 2019).

284 *Id.*

285 Emily Tucker, *Protecting Immigrant Communities: Municipal Policy to Confront Mass Deportation and Criminalization*, 2017, at 9, https://populardemocracy.org/sites/default/files/Sanctuary-Cities-Toolkit_web_051117%20%281%29.pdf (last visited Aug 28, 2019).

286 *Id.* 26

287 Lena Graber, Angie Junck & Nikki Marquez, *Local Options for Protecting Immigrants: A Collection of City and County Policies to Protect Immigrants from Discrimination and Deportation*, Immigrant Legal Resource Center (2019), https://www.ilrc.org/sites/default/files/resources/local_options_final.pdf (last visited Aug 28, 2019).

288 Emily Tucker, *Protecting Immigrant Communities: Municipal Policy to Confront Mass Deportation and Criminalization*, 2017, at 23, https://populardemocracy.org/sites/default/files/Sanctuary-Cities-Toolkit_web_051117%20%281%29.pdf (last visited Aug 28, 2019).

289 *Id.* at 9

290 *Id.*

291 Emily Tucker, *Protecting Immigrant Communities: Municipal Policy to Confront Mass Deportation and Criminalization*, 2017, at 7-8, https://populardemocracy.org/sites/default/files/Sanctuary-Cities-Toolkit_web_051117%20%281%29.pdf (last visited Aug 28, 2019).

292 Lena Graber, Angie Junck & Nikki Marquez, *Local Options for Protecting Immigrants: A Collection of City and County Policies to Protect Immigrants from Discrimination and Deportation*, Immigrant Legal Resource Center (2019), https://www.ilrc.org/sites/default/files/resources/local_options_final.pdf (last visited Aug 28, 2019).

293 Emily Tucker, *Protecting Immigrant Communities: Municipal Policy to Confront Mass Deportation and Criminalization*, 2017, at 6, https://populardemocracy.org/sites/default/files/Sanctuary-Cities-Toolkit_web_051117%20%281%29.pdf (last visited Aug 28, 2019).

294 *Id.* at 32

295 *Id.* at 33

296 *Id.* at 12

297 *Id.* at 36

298 *Id.*

299 Lena Graber, Angie Junck & Nikki Marquez, *Local Options for Protecting Immigrants: A Collection of City and County Policies to Protect Immigrants from Discrimination and Deportation*, Immigrant Legal Resource Center (2019), https://www.ilrc.org/sites/default/files/resources/local_options_final.pdf (last visited Aug 28, 2019).

