## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case Nos. 20-cr-00245-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SHAWN MICHAEL VENCEL,

      Defendant.

---

## PLEA AGREEMENT

     The United States of America (the "Government"), by and through Bryan David Fields, Assistant United States Attorney for the District of Colorado, and the Defendant, SHAWN MICHAEL VENCEL, personally and by and through his counsel, Martha Eskesen, Esq. hereby submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1 and FED. R. CRIM. P. 11(c)(1)(A) and (B):

## I. AGREEMENT

A.    <u>Defendant's Obligations</u>

1.    The Defendant agrees to (1) plead guilty to the Indictment charging mail fraud in violation of 18 U.S.C. § 1341 (Count One), aggravated identity theft in violation of 18 U.S.C. § 1028A(a) (Count Two), and obtaining a controlled substance through misrepresentation, fraud, forgery, deception or subterfuge in violation of 21 U.S.C. § 843(a)(3) (Count Three); (2) pay

1

Court Exhibit 1

restitution to the victims as later determined by the court at the time of sentencing; (3) agree to

forfeiture, as detailed below; and (4) waive his appeal rights, as detailed below.

B.     Government's Obligations

2.     In exchange for the Defendant's pleas of guilty and his waiver of appeal rights,

the government agrees to (1) file no other federal criminal charges against the Defendant arising

from the conduct described in the stipulation of facts below and (2) recommend a three-level

reduction for acceptance of responsibility per United States Sentencing Guideline ("U.S.S.G.")

§3E1.1(a) provided that the defendant does not do anything that is inconsistent with accepting

responsibility between and including the date of the guilty plea and the date of sentencing.

C.     Defendant's Waiver of Appeal

3.     The Defendant is aware that 18 U.S.C. § 3742 affords a Defendant the right to

appeal the sentence imposed, including the manner in which the sentence is determined.

Understanding this and in exchange for the concessions made by the Government in this

agreement, the Defendant knowingly and voluntarily waives the right to appeal any matter in

connection with the prosecution, conviction, or sentence imposed in this case unless it meets one

of the following three criteria: (1) the sentence imposed is above the maximum penalty provided

in the statute of conviction, (2) the sentence exceeds a total sum of months equal to the top of the

advisory guideline range that applies to a total offense level of **20** (the "total offense level" is the

offense level that results after applying all adjustment from Guideline Chapters 2-4, including

acceptable of responsibility) plus the 24-month consecutive sentence required by 18 U.S.C. §

1028A; or (3) the government appeals the sentence imposed.   If any of these three criteria apply,

the Defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

4.      The Defendant also knowingly and voluntarily waives his right to challenge the prosecution, conviction, or sentence in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255.   This waiver provision, however, does not prevent the Defendant from seeking relief otherwise in a collateral attack on any of the following grounds: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the Defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct.

D.      Forfeiture of Assets

5.      The Defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States or in the possession or control of the Defendant or Defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but are not limited items seized pursuant to the search warrant executed on October 17, 2019 identified as items 1-13, 15-18, and 20-72; a black apple iPhone originally seized pursuant to a separate search warrant also executed on October 17, 2021; a black Alcatel flip cellular telephone, a compact disc, documents and equipment left by the defendant at VICTIM DEALERSHIP 3 and collected by the FBI, and items found inside the defendant's vehicle when he was arrested at VICTIM DEALERSHIP 2. The Defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil and/or administrative forfeiture action.

3

## II. <u>ELEMENTS OF THE OFFENSES</u>

6.     The parties agree that the offense set forth in Count One of the Information

charging mail fraud, a violation of 18 U.S.C. § 1341 has the following elements:

      a.     The defendant devised or intended to devise a scheme to defraud;

      b.     The defendant acted with specific intent to defraud;

      c.     The defendant mailed, or caused to be mailed something through a
commercial interstate carrier for the purpose of carrying out the scheme;

      d.     The scheme employed false or fraudulent pretenses, representations or
promises that were material.[1]

7.     The parties further agree that the offense set forth in Count 2 of the information

charging aggravated identity theft in violation of 18 U.S.C. § 1028A(a) has the following

elements:

      a.     The defendant knowingly transferred, possessed or used without lawful
authority, a means of identification of another person;

      b.     The defendant knew that the means of identification belonged to another
person;

      c.     The defendant transferred, possessed or used the means of identification
during an in relation to a felony specified in 18 U.S.C. § 1028A(c), to wit Mail Fraud as alleged
in Count One.[2]

      "The term 'means of identification' means any name or number that maybe used, alone

---

[1] Tenth Circuit Pattern Jury Instructions (Criminal Cases), § 2.57 (2021 ed.)

[2] Eighth Circuit Pattern Jury Instruction No. 6.18.1028A (modified); *United States v. Chavez-Quintana*, 330 F. App'x 724, 726 (10th Cir. 2009) (reversing conviction where parties did not incorporate knowledge requirements described in *Flores-Figueroa v. United States*, 556 U.S. 646, 647 (2009)).

4

or in conjunction with any other information, to identify a specific individual, including any —

(A) name, social security number, date of birth, official State or government issued driver's

license of identification number . . . . " 18 U.S.C. §   1028(d)(7).

       8.     The parties further agree that the offense set forth in Count 3 of the information

charging the acquisition of a controlled substance by means of misrepresentation, fraud, forgery,

deceit or subterfuge in violation of 21 U.S.C. § 843(a)(3) has the following elements:

         a.     The defendant knowingly or intentionally;

         b.     obtained a controlled substance;

         c.     by means of misrepresentation, fraud, forgery, deceit or subterfuge[3]

### III. STATUTORY PENALTIES

       9.     The maximum statutory penalty for a violation of 18 U.S.C. § 1341 is not more

than 20 years' imprisonment; a fine of not more than $250,000 or both; not more than three years

of supervised release; restitution; and a $100 special assessment fee.

       10.     The maximum statutory penalty for a violation of 18 U.S.C. § 1028A is two

years' imprisonment to run consecutively to any other term of imprisonment, a fine of not more

than $250,000, or both; not more than 3 years of supervised release; and a $100 special

assessment fee.

       11.     The maximum statutory penalty for a violation of 21 U.S.C. § 843(a)(3) is not

more than 4 years' imprisonment; a fine of not more than $250,000; not more than 1 year of

---

[3] *United States v. Wilbur* , 58 F.3d 1291, 1292 (8th Cir. 1995) ("focus of the statute is on how the defendant obtained the drugs"); *United States v. Wells*, 211 F.3d 988, 1000 (6th Cir. 2000); *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir. 1982).

supervised release; and a $100 special assessment.

12.     If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV. COLLATERAL CONSEQUENCES

13.     The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. STIPULATION OF FACTS

14.     The parties agree that there is a factual basis for the guilty pleas that the Defendant will tender pursuant to this Plea Agreement.   That basis is set forth below.   Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of this Plea Agreement.

15.     This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree as follows:

The date on which the relevant conduct began is November 2018.

6

A.    The Identity Theft Scheme, Generally

16.    Between November 2018 and December 2019 the defendant devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises.   The object of the scheme was for the defendant to enrich himself through false pretenses, representations and promises in transactions to obtain loans, leases, lines of credit, trucks, a motorcycle, a boat, prescription drugs and other things of value. As part of the scheme, the defendant pretended to be IDENTITY THEFT VICTIMS 1 -3, whose identities are known to the parties, and used those victim's personal identifying information ("PII")   — among other things, their dates of birth and social security numbers — to further his pretenses and to make false and fraudulent representations and promises to others.   The defendant used those victims' PII without lawful authority. The defendant knew that IDENTITY THEFT VICTIMS 1-3 were real people with well-developed credit histories. He knew that he did not have lawful authority to use their PII to enrich himself with loans and other things of value.

17.    The defendant used interstate communication facilities for the purpose of carrying out his scheme.   For example, on or about February 23, 2019, as part of his effort to appropriate IDENTITY THEFT VICTIM 1's identity, the defendant uploaded a photograph of himself to create a social media profile in the name of IDENTITY THEFT VICTIM 1. The defendant also created email accounts using portions of the names and identifiers of IDENTITY THEFT VICTIMS 1-3 and then used those accounts to send emails in and through interstate commerce in which he falsely represented himself to be those victims and in which he made other false and fraudulent promises and representations.

7

18.     The defendant also executed his scheme by creating counterfeit driver licenses, paystubs, utility bills, lease agreements, checks and other documents falsely representing his identity and credit-worthiness.

B.      The April 2019 Execution of the Scheme Against VICTIM CAR DEALERSHIP 2

19.     On or about April 19, 2019 an employee of VICTIM CAR DEALERSHIP 2, the identity of which is known to the parties, reported that an approved loan in the amount of $52,514.04 on April 1, 2019 was fraudulent.   The loan had been obtained by the defendant, using the name of IDENTITY THEFT VICTIM 1 who presented a Texas driver's license in IDENTITY THEFT VICTIM 1's name as well as supporting documents bearing IDENTITY THEFT VICTIM 1's name; specifically, a supposed waste management service bill and automobile insurance.   The defendant used the loan obtained with IDENTITY THEFT VICTIM 1's identity to purchase a grey Ford F150 pickup truck.   The defendant's application for the loan, containing false statements and representations regarding his identity, was sent by VICTIM CAR DEALERSHIP 2 to the bank funding the loan via an interstate commercial carrier on or about April 8, 2019.

20.     On April 25, 2019, a Broomfield Police Department (hereinafter BPD) Detective identified and interviewed IDENTITY THEFT VICTIM 1 in Texas.   IDENTITY THEFT VICTIM 1 reported that he had filed a police report with the Houston Police Department. IDENTITY THEFT VICTIM 1 said: he did not know SHAWN MICHAEL VENCEL; that VENCEL had attempted to purchase several automobiles; opened numerous credit cards: and attempted to lease rental property using IDENTITY THEFT VICTIM 1's identity.   IDENTITY

8

THEFT VICTIM 1 later sent the detective a list of inquiries and calls related to fraudulent activity on IDENTITY THEFT VICTIM 1's credit report, which included multiple inquiries regarding: credit cards; bank accounts; car loans; a rental property; and a Sallie Mae loan.

21.     On April 30, 2019 BPD Officers interviewed the defendant when he arrived at VICTIM CAR DEALERSHIP 1 driving the Ford F150 pickup truck he had obtained using a loan in IDENTITY THEFT VICTIM 1's name.   The defendant identified himself using his real name and presented a Colorado identification card.   The defendant falsely told the officers that the Ford F150 pickup truck belonged to his boss, IDENTITY THEFT VICTIM 1, and that he and IDENTITY THEFT VICTIM 1 worked at a company called Mile High Defenders.   The defendant also falsely said that he had purchased the Ford F150 pickup truck for IDENTITY THEFT VICTIM 1.   Moreover, the defendant falsely stated that he and IDENTITY THEFT VICTIM 1 were "basically brothers."   Upon concluding the interview, the Officers arrested VENCEL.

22.     BPD Officers searched the Ford F150 pickup truck SHAWN MICHAEL VENCEL drove to VICTIM CAR DEALERSHIP 1.   Officers found two baggies with substances that field-tested positive for heroin, meth, and suboxone.     Inside the middle console the officers found syringes, pipes, a cap with cotton, and a needle containing a substance that field-tested positive for liquid heroin.   They also found title paperwork for a house in foreclosure and mail from banks addressed to IDENTITY THEFT VICTIM 1.   The officers also found two checks to VICTIM TITLE COMPANY, described below.

9

C.   Other Executions of the Scheme

23.   From November 2018 to December 2019, the defendant also intentionally defrauded VICTIM CAR DEALERSHIPS 1, 2 & 3-8, VICTIM LANDLORDS 1-3, FLORIDA VICTIM 1, FLORIDA VICTIM 2, VICTIM BANKS 1-5, VICTIM CREDIT UNION, VICTIM RETAIL STORE, and VICTIM TITLE COMPANY, the identities of which are known to the parties, through materially false and fraudulent pretenses, representations and promises.

24.   In connection with the scheme detailed above, the defendant engaged in the following additional transactions:

| Approx. Dates | Execution | Intended Loss |
|---|---|---|
| 11/14/2018 | The defendant obtained a 2014 Land Rover Range Rover with a purchase price of approximately $35,994.00 from VICTIM DEALERSHIP 1 using means of identification for IDENTITY THEFT VICTIM 3 | $35,994.00 |
| 11/14/2018 | The defendant applied for $65,819.64 of financing to purchase a 2015 Land Rover Range Rover via website operated by ONLINE VEHICLE MARKETPLACE using means of identification for IDENTITY THEFT VICTIM 3 | $65,819.64 |
| 01/29/2019 – 02/12/2019 | The defendant deposited a fraudulent check in the amount of $2,788.56 into an account at VICTIM BANK 1 on February 6, 2019 and a fraudulent check in the amount of $2,500 on February 7, 2019 and then quickly withdrew $5,387.78 via automatic transaction machines and debit card purchase | $5,387.78 |
| 03/25/2019 | The defendant deposited a fraudulent check purportedly issued by the State of Colorado and made payable to IDENTITY THEFT VICTIM 1 in the amount of $1,989 into an account at VICTIM BANK 3 | $1,989.00 |
| 03/28/2019 | The defendant deposited a fraudulent check purportedly issued by the State of Colorado and made payable to IDENTITY THEFT VICTIM 1 in the amount of $2,989 into an account at VICTIM BANK 2 | $2,989.00 |

| Input Date | Execution | Amount |
|---|---|---|
| 03/25/2019 – 04/04/2019 | The defendant defrauded FLORIDA VICTIM 1 by taking $8,500 as the down payment of a $25,000 sale of the 2014 Land Rover Range Rover he had fraudulently acquired from VICTIM DEALERSHIP 1. | $25,000.00 |
| 03/29/2019 | The defendant submitted an application for a $40,000 loan from VICTIM BANK 5 under the false pretense that he was IDENTITY THEFT VICTIM 1 | $40,000.00 |
| 03/29/2019 | The defendant submitted an application for an additional $40,000 loan from VICTIM BANK 5 under the false pretense that he was IDENTITY THEFT VICTIM 1 | $40,000.00 |
| 04/01/2019 | As set forth above, the defendant submitted a false application to receive a loan for $52,514.03 to fraudulently obtain a Ford F-150 pickup truck from VICTIM CAR DEALERSHIP 2 | $52,514.03 |
| 04/03/2019 | The defendant submitted an application for a $25,000 loan from VICTIM CREDIT UNION under the false pretense that he was IDENTITY THEFT VICTIM 1 | $25,000.00 |
| 04/04/2019 | The defendant submitted an application for a $24,500 loan from VICTIM BANK 5 under the false pretense that he was IDENTITY THEFT VICTIM 1 | $24,500.00 |
| 04/04/2019 | The defendant submitted an additional application for a $40,001 loan from VICTIM BANK 5 under the false pretense that he was IDENTITY THEFT VICTIM 1 | $40,001.00 |
| 04/04/2019 | The defendant submitted an application to VICTIM BANK 4 for a student loan in the amount of $105,00 to attend flight school, falsely representing that IDENTITY THEFT VICTIM 1 had agreed to be a co-signer | $105,000.00 |
| 04/09/2019 | The defendant sent a fraudulent check for $8,200, drawn on an account in the name of IDENTITY THEFT VICTIM 1 at VICTIM CREDIT UNION to FLORIDA VICTIM 2 as payment for a boat with identification number LYGJA165H900 | $8,200.00 |
| 04/17/2019 | The defendant presented two fake checks, purportedly drawn on funds at VICTIM BANK 6, to VICTIM TITLE COMPANY. The checks, respectively for $32,492.89 and $18,631.19 caused VICTIM TITLE COMPANY to issue the defendant a check for $16,547.07 | $51,124.08 |
| 05/21/2019 | The defendant presented a fake check to VICTIM LANDLORD 3 as part of an effort to obtain a lease. | $3,000.00 |

| Count/Dates of Execution | Execution | Amount |
|---|---|---|
| 06/08/2019 | The defendant obtained a 2019 GMC Sierra AT4 with a purchase price of approximately $93,448.88 from VICTIM DEALERSHIP 3 through the artifice of pretending to have authority for the purchase from IDENTITY THEFT VICTIM 2 and by submitting documents with false representations related to IDENTITY THEFT VICTIM 2 | $93,448.88 |
| 06/10/2019 | The defendant submitted an application to VICTIM BANK 4 for a student loan in the amount of $145,000 to attend flight school, falsely representing that IDENTITY THEFT VICTIM 2 had agreed to be a co-signer | $145,000.00 |
| 06/11/2019 | The defendant used a fraudulent check for $2,004.09 to obtain a hard drive and a computer from VICTIM RETAIL STORE | $2,004.09 |
| 06/12/2019 | The defendant used a fraudulent check for $1,108.93 to obtain a hard drive and a computer from VICTIM RETAIL STORE | $1,108.93 |
| 06/13/2019 | The defendant used a fraudulent check for $2,428.01 to obtain computer from VICTIM RETAIL STORE | $2,428.01 |
| 07/05/2019 – 07/19/2019 | The defendant submitted an application to purchase an approximately $79,322.60 2019 GMC Sierra AT4 from VICTIM DEALERSHIP 4 through the artifice of pretending to have authority for the purchase from IDENTITY THEFT VICTIM 2 and by submitting documents with false representations related to IDENTITY THEFT VICTIM 2 | $79,322.60 |
| 07/18/19 | The defendant submitted an application to finance $16,084.97 towards the purchase of a $17,094.00 2018 Ducati Hypermotard 939 from VICTIM DEALERSHIP 5 through the artifice of pretending to have authority for the purchase from IDENTITY THEFT VICTIM 2 and by submitting documents with false representations related to IDENTITY THEFT VICTIM 2 | $16,084.97 |

| Approx. Date | Execution | Amount |
|---|---|---|
| 09/07/2019 | The defendant obtained a 2015 Cadillac Escalade with a purchase price of approximately $38,805.06 from VICTIM DEALERSHIP 6 by means of false and fraudulent pretenses, representations and promises relating to his creditworthiness and the down payment for the car.   Specifically, the defendant falsely stated and represented that he had gross annual income of approximately $146,000, submitted fake paystubs purporting to support that income, and presented a fraudulent check in the amount of $20,000 as a down payment on the truck | $38,805.06 |
| 09/09/2019 – 10/02/2019 | The defendant obtained a 2019 GMC Sierra from VICTIM DEALERSHIP 7 with a purchase price of approximately $77,989.89 by means of false and fraudulent pretenses, representations and promises, relating to his creditworthiness and the down payment for the truck.   Specifically, the defendant falsely stated and represented that he made approximately $12,500 per month, submitted fake paystubs purporting to support that income, and presented a fraudulent check in the amount of $40,000 as a down payment on the truck | $77,989.89 |
| 09/09/2019 – 10/19/2019 | The defendant obtained a 2014 Jeep Wrangler from VICTIM DEALERSHIP 8 with a purchase price of approximately $29,999 by means of false and fraudulent pretenses, representations and promises, relating to his creditworthiness and the down payment for the jeep Specifically, the defendant falsely stated and represented that he made approximately $12,500 per month, submitted fake paystubs purporting to support that income, and presented a fraudulent check in the amount of $40,000 as a down payment on the truck | $29,999.00 |
| **MINIMUM TOTAL INTENDED LOSS** | | **$1,012,709.96** |

*[handwritten annotations: Matthew Cole - $15,000 ... (signatures)]*

D. Obtaining a Controlled Substance by Fraud or Deceit

    25.    On June 29, 2019 at approximately 10:00 a.m. the defendant attempted to fill an

unsigned prescription for 360 30mg tablets of oxycodone at PHARMACY, the identity of which

is known to the parties.   PHARMACY refused to fill the prescription.

26.     Later that same day, at approximately 2:00 p.m. on June 29, 2019, the defendant came back to PHARMACY with a version of the prescription for 360 30 mg tablets of oxycodone bearing a signature in the name of VICTIM DOCTOR, whose identity is known the parties.  This time, PHARMACY dispensed the prescription to the defendant.  The defendant provided PHARMACY with a check for $999.99.

27.     The prescription presented by the defendant to PHARMACY stated that the defendant needed the prescription to treat pain associated with an upcoming cancer surgery. The prescription was false.  The defendant did not have cancer, was not a patient of VICTIM DOCTOR, and had no medical need for oxycodone.  The defendant had created the fake prescription himself and forged VICTIM DOCTOR's signature.  In addition, the defendant further deceived PHARMACY to obtain the prescription by providing a fraudulent check for $999.99.  That check was false and fraudulent because the defendant did not have $999.99 and did not intend to actually pay for the prescription.

28.     The defendant presented to other pharmacies additional fraudulent prescriptions for oxycodone on or about June 12, September 5, and September 26, 2019.  Each purported to be from VICTIM DOCTOR to the defendant for oxycodone.  The defendant also presented to other pharmacies additional fraudulent prescriptions for oxycodone on March 19, April 13, June 12, July 18, August 16, and September 13, 2019.  These prescriptions purported to be from VICTIM DOCTOR to the defendant's grandmother.

## VI. <u>ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT</u>

29.     The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553.  In determining the particular sentence to be imposed, the Court is

14

required to consider seven factors. One of those factors is the sentencing range computed by the

Court under advisory guidelines issued by the United States Sentencing Commission.   In order

to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline

range called for by the United States Sentencing Guidelines.   To the extent that the parties

disagree about the guideline computations, the recitation below identifies the matters which are

in dispute.

      30.    Advisory Guideline Computation:

      A.    Under U.S.S.G § 2B1.1(a)(1), the base offense level for Count One

charging mail fraud is 7.

      B.    Pursuant to U.S.S.G. § 2B1.1(b)(1)(H) there is a 14-level enhancement for

intended losses of greater than $550,000 but less than $1,500,000.

      C.    Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) and (iii) there is a 2-level

enhancement because the offense involved more than 10 victims and substantial financial

hardship to one or more victims.

      D.    With respect to Count Two, the parties agree that the an enhancement

under U.S.S.G. § 2B.1(b)(11)(C) ("the unauthorized transfer or use of any means of

identification unlawfully to produce or obtain any other means of identification") does not apply

because the defendant is pleading to 18 U.S.C. § 1028A, and U.S.S.G. § 2B1.6 app. n. 2 explains

that "any specific offense characteristic for the transfer, possession, or use of a means of

identification" does not apply when a sentence for aggravated identity theft is imposed in

conjunction with a sentence for an underlying offense.

      E.    The parties agree that pursuant to U.S.S.G. § 2D2.2 the total offense level

for obtaining a controlled substance in Count Three by deceit is 8.

      F.     Because this offense level for Count Three is 9 or more levels less serious than the offense level for mail fraud, there is no increase to the combined offense level under Chapter 3 and no increase in the offense level pursuant to U.S.SG. § 3D1.4.

      G.    <u>Acceptance of Responsibility</u>:  Provided the Defendant does nothing inconsistent with acceptance of responsibility between the date of the change of plea hearing and the date of the sentencing hearing, the Defendant should receive a 3-level downward adjustment, pursuant to U.S.S.G §§ 3E.1.1(a) & (b) for accepting responsibility.  The resulting offense level would be **20.**

      H.    <u>Criminal History Category</u>: The parties understand that the Defendant's criminal history computation is tentative.  The criminal history category is determined by the Court based on the Defendant's prior convictions.  Based on information currently available to the parties, it is estimated that the Defendant's criminal history category would be **Category III**.

      I.     Assuming the (tentative) criminal history set forth above, the career offender/criminal livelihood/armed career criminal adjustments pursuant to USSG § 4B1.1 - § 4B1.4 would not apply.

      J.     The defendant understands that, pursuant to 18 U.S.C. § 1028A(b)(1) he cannot receive a sentence of probation.  He further understands, pursuant to 18 U.S.C. § 1028A(b)(2) and U.S.S.G. § 2B1.6 that he is subject to a sentence of 24 months that must be imposed *consecutive* to the sentence imposed on Count 1.

      K.    <u>Imprisonment</u>:  Assuming the calculation set forth by the government above, the advisory guideline range resulting from its calculations (a combined base offense

level of **20** and **Criminal History Category III**) is **41-51 months**.   With the consecutive 24-month sentence required by 18 U.S.C. § 1028A(b)(2) the sentence would be **65 – 75** months. However, in order to be accurate as possible, with the criminal history category undetermined at this time, the estimated offense levels could conceivably result in a range from 33 months (the bottom of the range corresponding to offense level 20 and Criminal History Category I) to 87 months (the top of the range corresponding to offense level 20 and criminal history category VI). The defendant understands that he is subject to a mandatory minimum sentence of 24 months pursuant to 18 U.S.C. § 1028A(b)(2).

       L.     <u>Fine</u>: Pursuant to USSG § 5E1.2, the fine range for an offense level of 20 is $15,000 - $150,000, plus applicable interest and penalties.

       M.     <u>Supervised Release</u>: Pursuant to USSG § 5D1.2(a)(2), if the Court imposes a term of supervised release, that term is at least 1 year but not more than 3 years.

       N.     <u>Restitution</u>: The defendant agrees to make restitution to the victims as later determined by the Court at time of sentencing.   In advance of the sentencing hearing, the parties intend to confer and endeavor to reach an agreement as to the restitution amount.

      31.     The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range.   In doing so, the Court is not bound by the position of any party.

      32.     No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not

adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

33.     The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. <u>ENTIRE AGREEMENT</u>

34.     This Plea Agreement states the parties' entire agreement.   There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances,

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

18

express or implied.   In entering this Plea Agreement, neither the Government nor the Defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 4/29/21

SHAWN MICHAEL VENCEL
**Defendant**

Date: 5-3-2021

**Martha Eskesen, Esq.**
Attorney for Defendant

Date: 5/3/21

Bryan David Fields
Assistant United States Attorney

19