IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  20-cr-00245-RBJ

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**SHAWN MICHAEL VENCEL**

    Defendant.

## GOVERNMENT'S SENTENCING STATEMENT

The defendant is a one-man crime wave whose undeterred and unrepentant criminal decisions upended the lives of three identity theft victims, defrauded local businesses, and generally tore at the bonds of trust that keep markets functioning, families together, and communities intact.  He lied to get money.  He stole intimate personal identifiers and then ruined the reputations and credit histories of his victims.  He cheated to abuse opiate medications.  Then, when confronted on several occasions about his lying, cheating and stealing, he lied about his lying, cheating and stealing.  Arrests in connection with his schemes by Broomfield police in April 2019, Arvada police in May 2019, and Denver police in October 2019 did not deter him.  Even after he caught the attention of the Federal Bureau of Investigation (FBI) and was interviewed in October 2019, the defendant maintained a criminal lifestyle.  He was arrested again by the Boulder Sheriff's Office in December 2019 and only then — only when permanently detained — did his crimes stop.  The best way to stop the defendant was, and is, incarceration.  For all of the reasons set forth below the Court should impose the maximum recommended Guideline sentence of 75 months' imprisonment (the "Recommended Sentence) at

1

the sentencing hearing in this matter scheduled for September 13, 2021.

**I.     ALL OF THE FACTORS THAT THE COURT MUST CONSIDER WEIGH IN FAVOR OF THE RECOMMENDED SENTENCE**

In fashioning a sentence, the Court must address each of the factors set forth at 18 U.S.C. § 3553(a), including (1) the applicable United States Sentencing Guidelines (the "Guidelines"), (2) the nature, circumstances, and seriousness of the offense, (3) the history and characteristics of the defendant, and (4) the need to promote respect for the law, afford adequate deterrence, and protect the public from further crimes. Each fully supports the Recommended Sentence.

**A.     The Guidelines Recommend a Substantial Prison Sentence**

One of the factors the court must consider is the range recommended by the Guidelines. The plea agreement between the parties sets forth the relevant Guidelines calculation. ECF No. 120. His offense level, which includes enhancements for intended losses of over a million dollars, and for an offense involving more than 10 victims, is 20. Even before the slew of criminal decisions that landed him in federal court, the defendant had an extensive criminal history that puts him in Criminal History Category III. In that category, an offense level of 20 yields a recommended Guidelines range of 41-51 months' imprisonment. Adding the mandatory minimum sentence of 24 months for aggravated identity theft yields a final guidelines range of 65-75 months.

The Guidelines Range provides a useful framework for evaluating all of the other factors together because it provides a "rough approximation" of sentences that will achieve all of § 3553(a)'s objectives. *Rita v. United States*, 551 U.S. 338, 350 (2007); *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006). As set forth in more detail below this conclusion is not an abstract or academic one. The particular facts of this case viewed through the prism of § 3553(a) fully support the highest sentence recommended by the Guidelines: 75 months' imprisonment.

### B. The Serious Harms Wrought by the Defendant's Predatory Crime Spree Fully Justify the Recommended Sentence

Paragraph 24 of the plea agreement in this case chronicles the defendant's criminal conduct between November 2018 and December 2019. ECF No. 67. But those bullet points elide the intensity and callous disregard for others that characterized the defendant's criminal conduct. In November 2018 he successfully used Identity Theft Victim 3's personal identifying information to fraudulently obtain a Land Rover Range Rover. Once aware that someone was using his identifiers, Identity Theft Victim 3 put a freeze on his credit. The defendant responded not by stopping his criminal conduct, but by finding other avenues to fraudulently enrich himself. Between January and February 2019 he got a couple thousand dollars with a bogus check. After a failed attempt to use Identity Theft Victim 3's information to obtain another Land Rover, the defendant turned the Land Rover into cash by selling it to a victim in Florida.

The defendant's treatment of that Florida Victim is an indication of his approach to others. When Florida Victim 1 complained about the condition of the vehicle and refused to release funds from escrow, the defendant threatened him and his family. On March 28, 2019 he texted Florida Victim 1 "I WISH I LIVED CLOSER SO I COULD SHOW YOU WHAT WE DO TO PEOPLE LIKE YOU WHERE I COME FROM." Then, in an email on April 2, 2019, he claimed Identity Theft Victim 3 was his grandfather and accused Florida Victim of a crime. On April 5, 2019 he again threatened Florida Victim 1, again claiming that his "grandfather" (Identity Theft Victim 3) was reporting the vehicle stolen and that he would be calling the police. He ended the email by saying that Florida Victim should not get the money in escrow "because pieces of shit like him deserve to be ass raped in prison."

In February 2019 he took his identity theft to another level: instead of just using identifiers to make fraudulent purchases, he began a systematic effort to fully *become* and

3

publicly displace Identity Theft Victim 1. That month, he created a fake Facebook account with Identity Theft Victim 1's name, but with his own picture, to lay claim to that identity in social media. *See* ECF No. 14-15.[1] He also used a fake identification card with Identity Theft Victim 1's name and identifiers, but his picture. ECF No. 14-6  He then used that card to open a bank account, from which he issued a fraudulent check to obtain a boat from yet another victim in Florida (in April 2019, just a few days after threatening Florida Victim 1). The defendant also created an email account comprising portions of Identity Theft Victim 1's name and personal identifiers, which he then used to facilitate numerous frauds, or to purchase firearms. ECF Nos. 14-3, 14-12, 14-13 and 14-24. He also created fake paystubs and documents purporting to show that he worked at a local hospital. The result was a perversely inverse relationship in which the more the defendant used identity theft victim 1's identity to aggrandize himself, the more he harmed that victim. Every line of credit opened by the defendant came at Identity Theft Victim 1's expense. Every interaction in which he lied, cheated, or stole came at the expense of Identity Theft Victim 1's reputation. To take just one example: in March 2019 the defendant pretended to be Identity Theft Victim 1 in a call with a local credit unit, concocting a story about needing a $25,000 line of credit as part of a recent move to Colorado. ECF No. 14 at 8 (referencing Exhibits 1(a) and 1(b)); ECF No. 15. He got the line of credit and over $1,000 before the credit union was able to see through the deception.

In April 2019 the defendant was arrested by the Broomfield Police Department when he showed up at Victim Car Dealership 1 for the execution of the fraud scheme described in detail

---

[1] The government will offer into evidence at the hearing the exhibits submitted in the government's motion for an order of pretrial detention, ECF Nos. 14-3 to 14-25. As set forth in that motion, those exhibits contain specific examples of the defendant's dishonesty, his use of false documents, and his distribution of drugs.

in paragraphs 19-21 of the plea agreement. Upon his arrest, he lied to the police and claimed that Identity Theft Victim 1 was a close friend. Despite a prior felony conviction, he showed up at the dealership with drug paraphernalia in the truck and magazines of ammunition in the back.

The defendant's arrest in April 2019 did not deter him. Indeed, by that time he had corrected the mistake he made with Identity Theft Victim 3: even though Identity Theft Victim 1 tried to put a fraud alert on his credit, the defendant had so successfully assumed his identity that he was able to circumvent that alert and continue using the identity. In May 2019 the defendant took his young daughter and girlfriend with him as props while he fraudulently posed as Identity Theft Victim 1 to obtain a lease from a landlord in Arvada. He was arrested again and, once again, he lied. He falsely claimed that medical bills from a cancer diagnosis had ruined his credit. The defendant did not have cancer. Just a month later, in June, he was writing fake prescriptions describing a diagnosis of stage 4 cancer of his urinary tract as part of an effort to fraudulently obtain oxycodone. ECF No. 14-17. This is but one example of the defendant's manipulative behavior, which often sough to play on the sympathy and decency of others.

The defendant was released after his May arrest. The May arrest deterred him no more than the April arrest. Having been caught using the identifiers of Identity Theft Victims 1 and 3, he shifted to Identity Theft Victim 2. And this time, he used his own grandmother as an instrumentality of his crimes: he used a driver's license with information for Identity Theft Victim 2, but a picture of his grandmother to carry out additional frauds against additional auto dealerships. ECF No. 14-11

During this same period of time, the defendant used his talent for creating fake documents to fraudulently obtain prescriptions for oxycodone, which he sometimes distributed to others. ECF Nos. 14-16 to 14-21. The defendant once again falsely claimed to have a cancer

diagnoses on fraudulent prescriptions. And, once again, he used his grandmother's identity to help him carry out crimes, using false prescriptions in her name to feed his drug habit.

The defendant is a scofflaw who ruined the credit histories of others without remorse, restraint or reservation. He stopped using their identities only when it was impossible to do so. Arrests did not deter him. When confronted by victims, his response was to terrorize them. When confronted by police, his response was to try to manipulate them. The nature of his crime is one of callous disregard for anyone but himself. His crimes are among the most serious of non-violent crimes committed under the least sympathetic circumstances. This factor strongly weighs in favor of the recommended sentence.

      C.      **The Defendant's History and Characteristics Demonstrate a Lifetime of Fraud and Manipulation Fully Supporting the Recommended Sentence**

The offenses that have finally landed the defendant in federal court are not an anomaly. The defendant's history is permeated with anti-social criminal behavior. The defendant downplayed his early criminal history by telling Probation that he was "rambunctious." "Sinister" is a better word. In April 1999 – the same month as the Columbine shooting — the then-fifteen-year old defendant acquired possession of an explosive device.

His record since that time shows a continuing lack of regard for anyone, including his intimate partners and family. His record contains convictions for driving drunk, for violating court orders and for assault against the mother of his daughter. As set forth above, he used his own grandmother as an instrumentality of his scheme. On each of the occasions in which the defendant pleaded guilty in a criminal court, the defendant had an opportunity to reconsider his life decisions and use his considerable intelligence to contribute to his community. Instead, he turned his talents towards evading accountability or responsibility for his choices. In July 2017 the police tried to pull him over to execute active arrest warrants. Instead of doing the right

thing, he used his infant daughter to shield him from pursuing police. He put his daughter at considerable risk by inserting her into the middle of a high-speed chase, fleeing from the police with her in the car. Court records show that he accelerated past the speed limit and drove near other cars in an unsafe manner. It worked: the police stopped the pursuit when they realized a child was at risk. Records show that just a few days prior he hit victims from behind at a red light, falsely told them he'd sort it out in a parking lot, and then drove away. In typical fashion, he lied about it when confronted by the police.

  The defendant has a history of deflecting responsibility through threats and manipulation. Emails recovered during the investigation show that he faked a cancer diagnosis as part of a deception to acquire powerful opiates. As set forth above, when confronted by a victim he lashed out with vulgar threats. He was no more kind to those he knew closely. In September 2019, while in the throes of mounting legal troubles relating to his crime spree, he texted a relative who had notified him that his grandmother was in the hospital: "if you're trying to lure me there . . .I'll get you." ECF No. 14.

  The fact that the defendant committed his crime over the course of multiple intervening arrests is a strong indication that he is a scofflaw. Statements to the Probation Office show that even his guilty plea in this matter has not changed his comfort with misinformation. The defendant told Probation that when he was actively using drugs he would not stay around his girlfriend or his daughter. The evidence is to the contrary. In May 2019 the defendant drove to a house in Arvada as part of a scam to falsely lease it under the name of Identity Theft Victim 1. He brought his girlfriend and then three-year-old daughter with him. He also brought substances that field-tested positive for meth and, as well as a loaded syringe[2]: when he was arrested at the

---

[2] The substance in the syringe was not field tested because, despite his close proximity to

7

scene the police found each of these items in the car he used to transport his family, as well as blue ligature bands in the cup holder.

There is nothing in the defendant's background or history that supports leniency in this case. He has spent most of his adult life making selfish decisions at the expense of others. This factor, just like the nature and seriousness of the offense, strongly weighs in favor of the Recommended Sentence.

### D. The Recommended Sentence is Necessary to Deter this Defendant from Further Preying on his Community

The defendant's history makes a strong case for concluding that he *is* the "Holmesian bad man" personified: the kind of person who "cares nothing for an ethical rule which is believed and practiced by his neighbors" but who "is likely to care a good deal to avoid being made to pay money, and will want to keep out of jail if he can." Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 458, 459 (1897). That is, he is precisely the kind of person who can be deterred only if he can accurately predict that courts will impose a lengthy prison sentence for his conduct. Between 1999 and 2017 the defendant pleaded guilty to 15 criminal violations. None of those arrests or guilty pleas deterred him from committing the extensive array of criminal acts that are the subject of this case. Indeed, the defendant committed the crimes here while on supervision for a 2018 felony charge. A timeline of his criminal conduct shows his inability to resist criminal temptation or accept the consequences of his decisions: the defendant was arrested in Broomfield in April 2019 and released. Despite being arrested for identity theft, he continued to commit identity theft and was arrested in Arvada in May 2019 while posing as Identity Theft

---

his girlfriend and daughter, the defendant told the arresting officers he had a dangerous bacterial infection — MRSA (Methicillin-resistant Staphylococcus aureus) —and the officers had safety concerns about field-testing the substance inside.

Victim 1.  Despite these arrests in April and May, he was arrested in a third jurisdiction — Denver — driving the $77,989.89 2019 GMC Sierra he had obtained through fraud against Victim Car Dealership 7 with a fraudulently obtained Ducati motorcycle (obtained by using the identity of Identity Theft Victim 2) sitting in the back.  During this arrest, the defendant pretended to be someone else (one of the friends he did drugs with), gave false identifying information, and claimed the truck he was driving had been purchased by his "roommate," Identity Theft Victim 1. ECF No. 14 at 12; ECF No. 15.  Finally, the defendant was arrested in yet another jurisdiction by the Boulder County Sheriff's Office in 2019.  This time he attempted to flee from his arrest on foot.

      This is a case where specific deterrence weighs heavily in favor of the Recommended Sentence.  The defendant is not swayed by appeals to his conscience or empty possibilities that he *might* receive a jail sentence.  The sentence in this case should be enough to do what 15 guilty pleas and multiple arrests could not:  alter the defendant's decision calculus so that the consequences, discounted by the likelihood of getting caught, outweigh the perceived benefits.  Research indicates that the Recommended Sentence is likely to have that effect.  United States Sentencing Commission, *Length of Incarceration and Recidivism* at 4 (April 2020), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200429_Recidivism-SentLength.pdf (last accessed September 3, 2021) (finding significant deterrent effect to sentences of more than 60 months).

      Anything less than the Recommended Sentence would also undermine general deterrence.  "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime can therefore be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).  This defendant calculated here that

9

using fake identities would shield him from accountability. Other would-be identity thieves weighing the possibly enormous gains and the inherent ability to avoid detection, should be able to look at the sentence in this case and rationally conclude that the crime is not worth it. In this particular case, a downward variance — or even a sentence at the low-end of the recommended range would discount the costs of the crime and undermine, rather than promote, the purpose of § 3553(a)(2)(A). *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (citing cases and Congressional findings supporting the deterrent effect of prison on white collar crime).

The Court should also consider the possibility that the defendant is simply not deterrable. In this case, the defendant's crimes stopped only when he was finally detained after the arrest in December 2019. If the defendant cannot be deterred, only the Recommended Sentence at the top of the recommended range will be sufficient, but not greater than necessary, to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)C). This is all the more true when the defendant at issue has extensive experience and knowledge regarding the crime of identity theft. He knows how to obtain personal identifiers, how to obtain and use false identification documents, how to create other fake documents, and how to use all of these means to defraud others. The only way to ensure he is not tempted to use this knowledge to immediately enrich himself is a lengthy sentence of imprisonment.

E. The Sentence Should Promote Respect for the Law

This factor also weighs heavily in favor of the Recommended Sentence. The defendant's repeated violations of court orders and numerous terms of probation show a profound lack of respect for the law. The sentence in this case should be sufficient to show that criminal choices result in real criminal punishment.

## II.     CONCLUSION

This is a case involving a defendant who has repeatedly found himself in criminal court but who has never received substantial punishment for almost a lifetime of selfish conduct that caused harm to others.  It has now culminated in a million-dollar fraud that will have lasting impacts on three identity theft victims.  The defendant flouted the law, law enforcement, and the state courts for years.  The highest sentence recommended by the guidelines is sufficient, but not greater than necessary to achieve the goals of criminal sentencing in this case.  For all of the reasons set forth above, the government asks the Court to impose the Recommended Sentence, three years of supervised release and the jointly-stipulated restitution of $54,614.09.

Respectfully submitted this 3rd day of September, 2021.

>                        MATTHEW T. KIRSCH
>                        Acting United States Attorney
>                        District of Colorado
>
> By:     s/ *Bryan David Fields*
>                        BRYAN DAVID FIELDS
>                        Assistant United States Attorney
>                        1801 California Street, Suite 1600
>                        Denver, CO 80202
>                        Telephone 303-454-0100
>                        Facsimile 303-454-0402
>                        Bryan.Fields3@usdoj.gov

**CERTIFICATE OF SERVICE**

    I certify that on this 3rd day of September 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case

                   s/ *Bryan David Fields*
                   BRYAN DAVID FIELDS
                   Assistant United States Attorney
                   1801 California Street, Suite 1600
                   Denver, CO 80202
                   Telephone 303-454-0100
                   Facsimile 303-454-0402
                   Bryan.Fields3@usdoj.gov